

**FILED**
CLERK, U.S. DISTRICT COURT

11/14/2018

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DD _____ DEPUTY

ALDEN F. ABBOTT
General Counsel

LAURA A. ZUCKERWISE
NY Bar No. 4731188; lzuckerwise@ftc.gov
BRIAN N. LASKY
NY Bar No. 3993417; blasky@ftc.gov
DARREN LUBETZKY
NY Bar No. 4932976; dlubetzky@ftc.gov
FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2804 (Zuckerwise)
(212) 607-2822 (fax)

**LODGED**
CLERK, U.S. DISTRICT COURT

11/13/2018

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DD _____ DEPUTY

FAYE CHEN BARNOUW (local counsel)
CA Bar No. 168631; fbarnouw@ftc.gov
FEDERAL TRADE COMMISSION
10990 Wilshire Blvd., Suite 400
Los Angeles, CA 90024
(310) 824-4300
(310) 824-4380 (fax)

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**, <br><br> Plaintiff, <br><br> v. <br><br> **APEX CAPITAL GROUP, LLC,** a Wyoming limited liability company, <br><br> **CAPSTONE CAPITAL SOLUTIONS** | **FILED UNDER SEAL** <br><br> Case No. CV 18-9573-JFW(JPRx) <br><br> **COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF** |

**LIMITED,** a United Kingdom limited company,

**CLIK TRIX LIMITED,** a United Kingdom limited company,

**EMPIRE PARTNERS LIMITED,** a United Kingdom limited company,

**INTERZOOM CAPITAL LIMITED,** a United Kingdom limited company,

**LEAD BLAST LIMITED,** a United Kingdom limited company,

**MOUNTAIN VENTURE SOLUTIONS LIMITED,** a United Kingdom limited company,

**NUTRA GLOBAL LIMITED,** a United Kingdom limited company,

**OMNI GROUP LIMITED,** a United Kingdom limited company,

**RENDEZVOUS IT LIMITED,** a United Kingdom limited company,

**SKY BLUE MEDIA LIMITED,** a United Kingdom limited company,

**TACTIC SOLUTIONS LIMITED,** a United Kingdom limited company,

**PHILLIP PEIKOS,** individually, and as an officer of APEX CAPITAL GROUP, LLC,

and

**DAVID BARNETT**, individually, and as
an officer of APEX CAPITAL GROUP,
LLC,

                                            Defendants.

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.      The FTC brings this action under Sections 13(b) and 19 of the Federal
Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, Section 5 of the
Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8404, and
Section 918(c) of the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C.
§ 1693o(c), to obtain temporary, preliminary, and permanent injunctive relief,
rescission or reformation of contracts, restitution, the refund of monies paid,
disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts
or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), Section
4 of ROSCA, 15 U.S.C. § 8403, Section 907(a) of EFTA, 15 U.S.C. § 1693e(a),
and Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b).

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C.
§§ 1331, 1337(a) and 1345, 15 U.S.C. §§ 45(a), 53(b), and 57b; and Section 5(a) of
ROSCA, 15 U.S.C. § 8404(a).

3.      Venue is proper in this district under 28 U.S.C. §§ 1391(b)(1), (b)(2),
(c)(1), and (c)(3), and 15 U.S.C. §§ 53(b) and 57b.

## SUMMARY OF THE CASE

4.      Since early 2014, Defendants have operated an online subscription
scam, marketing and selling over the Internet more than 50 different products,
mainly personal care products and dietary supplements that allegedly promote
weight loss, hair growth, clear skin, muscle development, sexual performance, and
cognitive abilities.  Defendants claim to offer "free" trials of these products for just
the cost of shipping and handling, typically $4.95.  In fact, Defendants charge

3

consumers' credit and debit cards the full price of the products – approximately $90 – approximately two weeks after consumers order the trials.  Defendants also enroll consumers, without their knowledge or consent, in continuity programs, shipping them additional supplies of the products and charging them about $90 on a monthly basis.  Defendants frequently also charge consumers for supposedly complementary products and enroll consumers in continuity programs related to these secondary products, without consumers' knowledge or consent.  Defendants have taken tens of millions of dollars from consumers through this deceptive conduct.

5.     To further this scheme, Defendants have used dozens of shell companies and straw owners (referred to as "nominees" or "signors") to obtain merchant accounts needed to accept consumers' credit and debit card payments. This practice of processing credit card transactions through other companies' merchant accounts is known as "credit card laundering," and it is an unlawful practice used by fraudulent merchants to circumvent credit card associations' monitoring programs and avoid detection by consumers and law enforcement.

## PLAINTIFF

6.     The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces ROSCA, 15 U.S.C. §§ 8401-8405, which prohibits merchants from selling goods or services on the Internet through negative option marketing without meeting certain requirements to protect consumers.  A negative option is an offer in which the seller treats a consumer's silence as consent to be charged for goods or services.  Additionally, the FTC enforces the EFTA, 15 U.S.C. § 1693 *et seq*., which regulates the rights, liabilities, and responsibilities of participants in electronic fund transfer systems.

7.     The FTC is authorized to initiate federal district court proceedings by its own attorneys, to enjoin violations of the FTC Act, ROSCA, and the EFTA, and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. §§ 53(b), 56(a)(2)(B), 57b, 8404, and 1693o(c).

## DEFENDANTS

8.     Defendant **Apex Capital Group, LLC** ("Apex Capital Group") is a Wyoming limited liability company which has had business addresses at 31280 Oak Crest Drive, Suite 5, Westlake Village, California 91361; 690 S Highway 89, Suite 200, Jackson, Wyoming 83001; 8306 Wilshire Boulevard No. 1669, Beverly Hills, CA 90211; and 21300 Victory Boulevard, Ste. 740, Woodland Hills, CA 91367.  At all times material to this Complaint, acting alone or in concert with others, Apex Capital Group has advertised, marketed, distributed, or sold products to consumers throughout the United States.  Apex Capital Group transacts or has transacted business in this district and throughout the United States.

9.     **Omni Group Limited** is a United Kingdom limited company.  In its corporate filings, it initially provided as an office address the address of a residential property located in Bedford, United Kingdom, and later changed its address to that of a virtual office in London, United Kingdom.  Dozens of other limited companies within the control of Apex Capital Group, Phillip Peikos, and David Barnett, including all of the companies listed in Paragraphs 10-19, provided one or both of the same addresses in their corporate filings.  When Omni Group Limited was incorporated on July 28, 2015, its proposed directors and shareholders were Phillip Peikos and David Barnett.  David Barnett transferred his shares to Phillip Peikos in late 2017, and Peikos is now the sole shareholder of Omni Group Limited.  Omni Group Limited is or has been the sole or controlling shareholder of at least twenty limited entities, including the companies listed in Paragraphs 10-

19. Many of these companies sold products to U.S. consumers and distributed the sales proceeds to Apex Capital Group, Phillip Peikos, and David Barnett. Omni Group Limited has also transferred millions of dollars from its own bank account to Apex Capital Group.

10. **Capstone Capital Solutions Limited** is a United Kingdom limited company. In its corporate filings, it initially provided as an office address the address of a residential property located in Bedford, United Kingdom, and later changed its address to that of a virtual office in London, United Kingdom. Its director, as listed in its corporate filings, is a U.S. resident. Its sole shareholder is Omni Group Limited, which is owned by Phillip Peikos, who resides in the United States. At times material to this Complaint, Apex Capital Group, Phillip Peikos, and David Barnett have used Capstone Capital Solutions Limited to sell products to U.S.-based consumers, to debit U.S. consumers' credit cards and financial accounts, to open merchant accounts through which these charges are processed, and to distribute the sales proceeds to Apex Capital Group, Phillip Peikos, and David Barnett. At least nine merchant accounts have been established at a Latvian bank in the name of Capstone Capital Solutions Limited to process payments for online sales of products to consumers in the United States.

11. **Clik Trix Limited** is a United Kingdom limited company. In its corporate filings, it initially provided as an office address the address of a residential property located in Bedford, United Kingdom, and later changed its address to that of a different residential property located in London, United Kingdom. Its controlling shareholder is Omni Group Limited, which is owned by Phillip Peikos, who resides in the United States. At times material to this Complaint, Apex Capital Group, Phillip Peikos, and David Barnett have used Clik Trix Limited to sell products to U.S.-based consumers, to debit U.S. consumers' credit cards and financial accounts, to open merchant accounts through which these charges are processed, and to distribute the sales proceeds to Apex Capital Group,

6

Phillip Peikos, and David Barnett.  At least one merchant account has been established at a Latvian bank in the name of Clik Trix Limited to process payments for online sales of products to consumers in the United States.

12.     **Empire Partners Limited** is a United Kingdom limited company.  In its corporate filings, it initially provided as an office address the address of a residential property located in Bedford, United Kingdom, and later changed its address to that of a different residential property located in London, United Kingdom.  Its director, as listed in its corporate filings, is a U.S. resident.  Its controlling shareholder is Omni Group Limited, which is owned by Phillip Peikos, who resides in the United States.  At times material to this Complaint, Apex Capital Group, Phillip Peikos, and David Barnett have used Empire Partners Limited to sell products to U.S.-based consumers, to debit U.S. consumers' credit cards and financial accounts, to open merchant accounts through which these charges are processed, and to distribute the sales proceeds to Apex Capital Group, Phillip Peikos, and David Barnett.  At least seven merchant accounts have been established at a Latvian bank in the name of Empire Partners Limited to process payments for online sales of products to consumers in the United States.

13.     **Interzoom Capital Limited** is a United Kingdom limited company.  In its corporate filings, it initially provided as an office address the address of a residential property located in Bedford, United Kingdom, and later changed its address to that of a different residential property located in London, United Kingdom.  Its director, as listed in its corporate filings, is a U.S. resident.  Its controlling shareholder is Omni Group Limited, which is owned by Phillip Peikos, who resides in the United States.  At times material to this Complaint, Apex Capital Group, Phillip Peikos, and David Barnett have used Interzoom Capital Solutions Limited to sell products to U.S.-based consumers, to debit U.S. consumers' credit cards and financial accounts, to open merchant accounts through which these charges are processed, and to distribute the sales proceeds to Apex

Capital Group, Phillip Peikos, and David Barnett.  At least six merchant accounts have been established at a Latvian bank in the name of Interzoom Capital Limited to process payments for online sales of products to consumers in the United States.

14.     **Lead Blast Limited** is a United Kingdom limited company.  In its corporate filings, it initially provided as an office address the address of a residential property located in Bedford, United Kingdom, and later changed its address to that of a virtual office in London, United Kingdom.  Its director, as listed in its corporate filings, is a U.S. resident.  Its sole shareholder is Omni Group Limited, which is owned by Phillip Peikos, who resides in the United States.  At times material to this Complaint, Apex Capital Group, Phillip Peikos, and David Barnett have used Lead Blast Limited to sell products to U.S.-based consumers, to debit U.S. consumers' credit cards and financial accounts, to open merchant accounts through which these charges are processed, and to distribute the sales proceeds to Apex Capital Group, Phillip Peikos, and David Barnett.  At least one merchant account has been established at a Latvian bank in the name of Lead Blast Limited to process payments for online sales of products to consumers in the United States.

15.     **Mountain Venture Solutions Limited** is a United Kingdom limited company.  In its corporate filings, it initially provided as an office address the address of a residential property located in Bedford, United Kingdom, and later changed its address to that of a virtual office in London, United Kingdom.  Its director, as listed in its corporate filings, is a U.S. resident.  Its sole shareholder is Omni Group Limited, which is owned by Phillip Peikos, who resides in the United States.  At times material to this Complaint, Apex Capital Group, Phillip Peikos, and David Barnett have used Mountain Venture Solutions Limited to sell products to U.S.-based consumers, to debit U.S. consumers' credit cards and financial accounts, to open merchant accounts through which these charges are processed, and to distribute the sales proceeds to Apex Capital Group, Phillip Peikos, and

David Barnett.  At least eight merchant accounts have been established at a Latvian bank in the name of Mountain Venture Solutions Limited to process payments for online sales of products to consumers in the United States.

16.  **Nutra Global Limited** is a United Kingdom limited company.  In its corporate filings, it initially provided as an office address the address of a residential property located in Bedford, United Kingdom, and later changed its address to that of a virtual office in London, United Kingdom.  Its director, as listed in its corporate filings, is a U.S. resident.  Its sole shareholder is Omni Group Limited, which is owned by Phillip Peikos, who resides in the United States.  At times material to this Complaint, Apex Capital Group, Phillip Peikos, and David Barnett have used Nutra Global Limited to sell products to U.S.-based consumers, to debit U.S. consumers' credit cards and financial accounts, to open merchant accounts through which these charges are processed, and to distribute the sales proceeds to Apex Capital Group, Phillip Peikos, and David Barnett.  At least one merchant account has been established at a Latvian bank in the name of Nutra Global Limited to process payments for online sales of products to consumers in the United States.

17.  **Rendezvous IT Limited** is a United Kingdom limited company.  In its corporate filings, it initially provided as an office address the address of a residential property located in Bedford, United Kingdom, and later changed its address to that of a virtual office in London, United Kingdom.  Its sole shareholder is Omni Group Limited, which is owned by Phillip Peikos, who resides in the United States.  At times material to this Complaint, Apex Capital Group, Phillip Peikos, and David Barnett have used Rendezvous IT Limited to sell products to U.S.-based consumers, to debit U.S. consumers' credit cards and financial accounts, to open merchant accounts through which these charges are processed, and to distribute the sales proceeds to Apex Capital Group, Phillip Peikos, and David Barnett.  At least one merchant account has been established at a Latvian

bank in the name of Rendezvous IT Limited to process payments for online sales of products to consumers in the United States.

18.   **Sky Blue Media Limited** is a United Kingdom limited company.  In its corporate filings, it initially provided as an office address the address of a residential property located in Bedford, United Kingdom, and later changed its address to that of a different residential property located in London, United Kingdom.  Its controlling shareholder is Omni Group Limited, which is owned by Phillip Peikos who resides in the United States.  At times material to this Complaint, Apex Capital Group, Phillip Peikos, and David Barnett have used Sky Blue Media Limited to sell products to U.S.-based consumers, to debit U.S. consumers' credit cards and financial accounts, to open merchant accounts through which these charges are processed, and to distribute the sales proceeds to Apex Capital Group, Phillip Peikos, and David Barnett.  At least eight merchant accounts have been established at a Latvian bank in the name of Sky Blue Media Limited to process payments for online sales of products to consumers in the United States.

19.   **Tactic Solutions Limited** is a United Kingdom limited company.  In its corporate filings, it initially provided as an office address the address of a residential property located in Bedford, United Kingdom, and later changed its address to that of a different residential property located in London, United Kingdom.  Its director, as listed in its corporate filings, is a U.S. resident.  Its controlling shareholder is Omni Group Limited, which is owned by Phillip Peikos, who resides in the United States.  At times material to this Complaint, Apex Capital Group, Phillip Peikos, and David Barnett have used Tactic Solutions Limited to sell products to U.S.-based consumers, to debit U.S. consumers' credit cards and financial accounts, to open merchant accounts through which these charges are processed, and to distribute the sales proceeds to Apex Capital Group, Phillip Peikos, and David Barnett.  At least eight merchant accounts have been

established at a Latvian bank in the name of Tactic Solutions Limited to process payments for online sales of products to consumers in the United States.

20.     Capstone Capital Solutions Limited, Clik Trix Limited, Lead Blast Limited, Empire Partners Limited, Interzoom Capital Limited, Mountain Venture Solutions Limited, Nutra Global Limited, Rendezvous IT Limited, Sky Blue Media Limited, and Tactic Solutions Limited, are collectively referred to herein as the "UK Corporate Defendants."

21.     Defendant **Phillip Peikos** ("Peikos") resides in Westlake Village, California.   He is the Chief Executive Officer and co-owner of Apex Capital Group and the sole shareholder and director of Omni Group Limited, which is the sole or controlling shareholder of all of the UK Corporate Defendants.  At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Apex Capital Group, Omni Group Limited, and the UK Corporate Defendants, including the acts and practices set forth in this Complaint. Defendant Peikos resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

22.     Defendant **David Barnett** ("Barnett") is a California resident.  He was the Chief Operating Officer of Apex Capital Group.  He was a co-owner of Apex Capital Group until at least late 2017.  He was also an owner and director of Omni Group Limited until November 2017, when he transferred his shares to Peikos.  At times material to this Complaint, acting alone or in concert with others, he formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Apex Capital Group, Omni Group Limited, and the UK Corporate Defendants, including the acts and practices set forth in this Complaint. Defendant Barnett resides in California and, in connection with the matters alleged

herein, transacts or has transacted business in this district and throughout the United States.

23.     Peikos and Barnett are collectively referred to herein as the "Individual Defendants."

## COMMON ENTERPRISE

24.     Defendant Apex Capital Group, Omni Group Limited, and the UK Corporate Defendants have operated as a common enterprise while engaging in the deceptive and unfair acts and practices, and other violations of law, alleged below. They have conducted the business practices described below through an interrelated, international network of dozens of shell companies that have common ownership, officers, managers, business functions and practices, and office locations (together, the "Apex Operation").  The companies regularly transfer funds among their corporate bank accounts, ultimately funneling money into a single, centralized account at Citibank, N.A. (the "Apex Citi Account"), from which the Apex Operation's expenses are withdrawn and funds distributed to the Individual Defendants.

25.     Because Apex Capital Group, Omni Group Limited, and the UK Corporate Defendants operate with the other entities in the Apex Operation as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below.

26.     The Individual Defendants are or have been owners, officers, organizers, and/or beneficiaries of Apex Capital Group, Omni Group Limited, and the UK Corporate Defendants.

27.     The Individual Defendants have formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Apex Capital Group, Omni Group Limited, and the UK Corporate Defendants that constitute the common enterprise.

## ALTER EGO

28.     As stated in Paragraphs 8-19 and 21-22, there is such a unity of interest between Omni Group Limited and the UK Corporate Defendants, and Apex Capital Group, Peikos, and Barnett, that Omni Group Limited and the UK Corporate Defendants are alter egos of Apex Capital Group, Peikos, and Barnett. Omni Group Limited and the UK Corporate Defendants are or have been dominated and controlled by Peikos and Barnett, and were created to facilitate the Apex Capital Group enterprise.

29.     Failure to disregard Omni Group Limited and the UK Corporate Defendants' corporate forms would sanction a deception or injustice by shielding and safeguarding them from liability for their role in a scheme that has caused tens of millions of dollars in consumer injury.  Omni Group Limited and the UK Corporate Defendants would be unjustly enriched if permitted to keep money obtained from consumers through deception and through their participation in the Apex Capital Group enterprise.

30.     This Court has personal jurisdiction over Omni Group Limited and the UK Corporate Defendants because they are alter egos of Apex Capital Group, Peikos, and Barnett, individually and/or collectively.

## COMMERCE

31.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

### I.     *The Apex Operation's Subscription Scam*

#### A.     *The Corporate Network*

32.     Through the Apex Operation, Defendants have marketed and sold more than 50 different products, most of which allegedly promote weight loss, hair growth, clear skin, muscle development, sexual performance, and cognitive

abilities.  The Apex Operation began in early 2014, when the Individual Defendants used Apex Capital Group, the main operating company, and other entities to receive payments from consumers for these products.  Consumer funds are funneled through other entities' bank accounts into the Apex Citi Account, Apex Capital Group's main bank account.  The Individual Defendants have been co-signatories on the Apex Citi Account, from which they have received millions of dollars.

33.     The Individual Defendants formed, or caused to be formed, at least 32 limited liability companies in Wyoming between August 2013 and March 2016 (the "Wyoming Companies") to obtain merchant accounts in the United States that would allow them to debit consumers' credit cards and financial accounts.  The Wyoming Companies do not conduct any business and have had no employees. They are listed in Exhibit A to this Complaint.

34.     In order to obtain merchant accounts in the name of the Wyoming Companies, the Individual Defendants caused merchant account applications to be submitted to payment processing entities that listed individual signors as the principal owners of the companies.  At least thirteen individuals who are California residents (some of whom were relatives or neighbors of an Apex Capital Group employee) were used by the Individual Defendants as signors on these merchant applications.  The signors received a monthly "commission" payment of approximately $1,000 from the Apex Citi Account.  Other than acting as signors on the merchant applications, these individuals did not engage in any business functions on behalf of the Wyoming Companies.

35.     From early 2014 through at least mid-2015, the Individual Defendants used merchant accounts in the names of certain of the Wyoming Companies to process consumers' payments for purported weight-loss and skin care products under brand names such as Authentic Yacon, Original Garcinia, Dermanique, Lumera, Juveliere, and Rejuvius.

14

36.     By the middle of 2015, the Individual Defendants had begun to use merchant accounts in the names of certain of the Wyoming Companies to process consumer payments for online sales of purported sexual performance, muscle-building, hair-growth, and cognitive enhancement products under brand names such as Evermax, Celexas, Virility X3, TestoXR, Follicure, and NeuroXR.

37.     The funds from sales processed through certain of the Wyoming Companies' merchant accounts were deposited into bank accounts in the names of those companies and then transferred, either directly or through intermediary accounts, to the Apex Citi Account.

38.     Beginning in July 2014, the Individual Defendants also formed, or caused to be formed, at least 37 limited companies in the United Kingdom, including the UK Corporate Defendants (altogether, the "UK Companies").  These companies were formed to obtain merchant accounts offshore in order to debit U.S. consumers' credit cards and financial accounts held in the U.S. and to process payments made by U.S. consumers for products marketed and sold by the Apex Operation.  The UK Companies are listed in Exhibit B to this Complaint.

39.     In many instances, the individuals named as directors of the UK Companies are the same California residents used as signors on merchant account applications submitted in the name of the Wyoming Companies.

40.     Apex Capital Group and the Individual Defendants used the UK Corporate Defendants to open at least thirty merchant accounts at a Latvian bank. These merchant accounts were used to process payments from U.S. consumers' credit cards and financial accounts related to their purchases of Defendants' products, including Biogenic XR, Evermax, and Virility X3.

41.     From May 2015 through 2017, offshore bank accounts associated with the UK Corporate Defendants and Omni Group Limited transferred approximately twelve million dollars to Apex Capital Group.

*B.*      *The Apex Operation's Deceptive Trial Offers*

42.      Defendants have registered more than one thousand websites, many of which they use or have used to market and sell their products.  The websites' addresses have both US and UK domains (*i.e.* .com and .co.uk), including for instance trybiogenic.com, eliteprosup.com, follicurehair.com, tryneuroxr.com, healthshop1.com, tryevermax.com, virilitydirect.com, bestcelex.co.uk, biogenicxricltd.co.uk, and interzoom.co.uk.

43.      Many of these websites purport to offer "free" or "risk free" trials of the products that include a negative option feature that is either not disclosed or is poorly disclosed in a manner that is neither clear nor conspicuous.  Consumers, without their informed consent, are then charged for products that are shipped to them each month until they take action to cancel and, sometimes, even after cancelling.  These websites include:  biogenicxr.com, celexas.com, tryevermax.com, and tryneuroxr.com.

44.      Defendants obtain consumers' credit or debit card information by enticing them to sign up for supposedly "free" or "risk-free" trials of the products with the only charge being a shipping and handling fee (typically $4.95).  At the initial time of purchase, the consumer is charged $4.95, and she is shipped a full month's supply of the product.  Approximately two weeks later, if the consumer has not affirmatively cancelled her order and returned the product, her credit or debit card is charged the full price of the product (typically about $90).  Each month thereafter, the consumer is shipped a month's supply of the product, and is charged about $90, until she calls to cancel.  Cancellation, as described below, is a difficult and time-consuming process.  Some consumers continue to be charged even after they cancel.

45.      Defendants market the products online through a variety of means, including advertisements hosted on third-party websites, purported Internet surveys and contests, social media advertisements, email, and search engine

advertisements, such as Google Ads.  In numerous instances, these advertisements claim to offer a "FREE BOTTLE" or a "RISK FREE" TRIAL and promise "SATISFACTION GUARANTEED 100%."

46.    For example, the following advertisement for Defendants' purported memory-boosting product, NeuroXR, promises consumers a "free one month supply of NeuroXR" if they click on the prominent link to "GET YOUR FREE BOTTLE."



47.    Numerous advertisements promoting trial offers of the products fail to explain the material terms and conditions of the purchase, including that consumers will be charged for the full cost of the products if they do not cancel their orders within a short period of time.  Similarly, numerous advertisements do not explain that consumers will be enrolled automatically in autoship programs, whereby the consumers will continue to receive, and be billed for, additional supplies of the products on a monthly basis.   On the contrary, advertisements for Defendants' products claim that they are "free" or "risk free."

C.    *The Apex Operations' Trial Offers Ordering Process*

48.    After consumers click on links in advertisements for Defendants' products, they are transferred to webpages on Defendants' websites called "landing pages."  Landing pages typically include windows for consumers to enter their

contact information.  Once consumers enter their contact information, they are transferred to other webpages called "order pages," where they are directed to enter their payment information.

49.   Numerous landing pages contain claims similar to those made in the advertisements.  For example, a landing page for a sexual performance product called Biogenic XR included misrepresentations that the trial would be "free" for consumers:



50.   These landing pages do not typically include clear or conspicuous disclosures explaining the terms of the trial offer.  For example, a landing page on Defendants' website for NeuroXR does not include any visible disclosures about the terms and conditions of the trial offer, such as (1) that consumers would be charged the full cost of the product if they did not cancel the trial offer within a short period of time; (2) that consumers would be enrolled automatically in autoship programs, pursuant to which Defendants would send them additional products each month and would charge them accordingly until they took steps to cancel the autoship program; or (3) that the trial offer included onerous cancellation and refund policies.  Instead, on this landing page, the consumer enters only his or her contact information and then, after making the determination that he or she would like to receive the trial offer, clicks a button that says, "RUSH

MY TRIAL."  Only if the consumer scrolls down several page lengths to the bottom of the landing page will she come across a "Terms & Conditions" link, appearing in very small font.  Only by clicking on that remote link may consumers view information regarding their enrollment in continuity programs with recurring charges.

51.    Numerous order pages where consumers enter their payment information either (i) contain inadequate disclosures of the terms of the trial offer that are not clear or conspicuous; or (ii) lack disclosures of the terms of the trial offer entirely.  For example, after clicking the "RUSH MY TRIAL" button on the NeuroXR landing page, consumers are directed to an order page on the NeuroXR website where they are required to enter their billing information. On this order page, there are no visible disclosures regarding the terms of the trial offer.  Again, only by clicking on the "Terms" link could consumers learn about the short trial period, the fact that they will be charged the full cost of the product at the end of the trial period, and that if they order the trial they will be enrolled in an autoship program with recurring shipments and recurring charges.  The terms link is in small print toward the bottom of the webpage, away from the "COMPLETE CHECKOUT" button, and overshadowed by larger text and graphics on the page:



52.     Where order pages for Defendants' products do contain disclosures regarding the terms of the trial offer on the page itself, those disclosures typically are not clear or conspicuous.  For example, one order page for Biogenic XR contains a disclosure near the middle of the page regarding enrollment in the autoship program.  The disclosure appears in small type and in light-gray font against a white background.  This disclosure is overshadowed by the prominent, bold "FREE TRIAL" language that is higher up on the webpage.

**D.** *The Apex Operation's Offers for Upsell or Add-On Products*

53.     After consumers enter their credit or debit card information and submit their orders to purchase trials of Defendants' products, they are often directed to webpages that invite them to sign up for a second trial of other, allegedly related products, i.e. upsell or add-on products.

54.     For example, Plaintiff purchased online several of Defendants' products in the course of its investigation.  After submitting payment information

to purchase a trial of one such product called NeuroXR, and clicking the "COMPLETE CHECKOUT" button, a pop-up offer for a different product called NeuroXR Sleep appeared on the screen.  The pop-up contained what appeared to be an advertisement with a perforated border in the style of a cut-out coupon; inside the coupon the advertisement stated, "ADD AN ADDITIONAL TRIAL AT ONLY $4.97."  Underneath and outside of that box was a separate button stating "COMPLETE CHECKOUT."  Below the "COMPLETE CHECKOUT" button, in small, faint print, Defendants included a hyperlink that consumers could click to decline the second offer.



55.     The format of the website suggested that the "COMPLETE CHECKOUT" button was the final step in completing the purchase of the original NeuroXR trial.  In fact, Plaintiff's order was already complete after entering credit card information on the previous screen.  Plaintiff was enrolled in a second trial program in which Plaintiff was shipped a second product, NeuroXR Sleep, and was charged $4.95 twice.

56.    Numerous consumers who inadvertently purchase an upsell product are charged $4.95 for each purported trial, and then about two weeks later are charged the full price of both products.  Numerous consumers are enrolled in autoship programs for both products, continuing to receive shipments of both products each month until they take affirmative steps to cancel.

57.    After consumers place orders for Defendants' products, some receive no confirmation email whatsoever; others receive a confirmation email that lists only the $4.95 shipping and handling charge.  The confirmation email thus reinforces the false impression from the websites that, other than the obligation to pay shipping and handling, the trial product is free.

E.    *The Apex Operation's Onerous Cancellation and Refund Practices*

58.    In numerous instances, consumers who order trials of Defendants' products report that Defendants charge them without their knowledge or consent for the full price of these products and sign them up for continuity programs. Many consumers then attempt to cancel their enrollment in the continuity programs and to obtain refunds of Defendants' unauthorized charges, but they often have difficulty cancelling and obtaining refunds.

59.    Numerous consumers who call Defendants to cancel have a difficult time reaching customer service representatives, despite calling several times. Some consumers are placed on hold for more than an hour.  Other consumers report that they were given incorrect customer service numbers.  Even if they were able to reach a customer service representative to request cancellation, numerous consumers report that they continued to receive and to be charged for shipments of Defendants' products.

60.    Consumers also encounter a range of difficulties when they attempt to obtain refunds from Defendants for the unauthorized charges.  Some consumers who request refunds are told that they cannot get refunds because the requests were untimely; customer service representatives report that the products' terms and

conditions require refund requests to be made within 30 days of ordering.  Where the refund period has not lapsed, some consumers are told they can only get a refund if the trial product is returned unopened and at the consumer's expense. Some consumers who have attempted to return products are nonetheless told that they will not be refunded because the company allegedly never received the products.  In numerous instances, moreover, consumers are provided with a return address that is not the company's true address.

61.     Consumers often attempt to get their money back by initiating "chargebacks" with their credit card companies.  Many consumers ultimately cancel their credit or debit cards to ensure they will not be subjected to additional unauthorized charges.

## II.     The Apex Operation's Credit Card Laundering Activities

### A.     Background on Merchant Accounts and Credit Card Laundering

62.     In order to accept credit card payments from consumers, a merchant must establish a merchant account with a merchant acquiring bank or "acquirer." A merchant account is a type of account that allows businesses to process consumer purchases by credit or debit cards.

63.     Acquirers enter into contracts with entities known as payment processors that manage the bank's merchant processing program.  Payment processors in turn frequently enter contracts with multiple "independent sales organizations" ("ISOs") to sign up merchants for merchant accounts with the acquirer.

64.     The acquirer has access to the credit card associations ("card networks"), such as MasterCard and VISA.  The card networks require all participants in their networks, including the acquirers and their registered ISOs, to comply with detailed rules governing the use of the card networks.  These rules include screening processes and underwriting standards for merchants, to ensure that they are legitimate, bona fide businesses, and to screen out merchants engaged

in potentially fraudulent or illegal practices.  The rules also prohibit credit card laundering, which is the practice of processing credit card transactions through another company's merchant account.

65.     Merchants that pose a heightened risk of fraud to the card networks may be subject to closer scrutiny or may be denied merchant accounts.  For example, the ISO or acquirer may be concerned that the merchant is engaged in illegal activity or will generate excessive rates of transactions returned by consumers ("chargebacks").

66.     Consumers initiate "chargebacks" when they dispute credit card charges by contacting their "issuing bank," which is the bank that issued the credit card to the consumer.  When a consumer successfully disputes the charge, the consumer's issuing bank credits the consumer's credit card for the disputed amount, and then recovers the chargeback amount from the acquirer (the merchant's bank).  The acquirer, in turn, collects the chargeback amount from the merchant.

67.     In order to detect and prevent illegal, fraudulent, or unauthorized merchant activity, the card networks operate various chargeback monitoring and fraud monitoring programs.  For example, if a merchant generates excessive levels of chargebacks that exceed the thresholds set under VISA's chargeback monitoring program, the merchant is subject to additional monitoring requirements and, in some cases, penalties and termination.

68.     Credit card laundering is commonly used by fraudulent merchants who cannot meet a bank's underwriting criteria or who cannot obtain merchant accounts under their own names (whether because of excessive chargebacks, complaints, or other signs of illegal activity).

69.     Even when fraudulent merchants can qualify for a merchant account, they may engage in laundering as a way to conceal their true identity from consumers, the card networks, and law enforcement agencies.

70.     To conceal their identities, fraudulent merchants may create shell companies to act as fronts, and apply for merchant accounts under these shell companies.  Once the merchant accounts are approved, the fraudulent merchant then launders its own transactions through the shell company's merchant accounts.

71.     Fraudulent merchants may create multiple merchant accounts in order to maintain continued access to the card networks in the event any of the merchant's accounts are terminated.

B.      *Apex Capital Group and the Individual Defendants Caused the Laundering of Transactions Through Numerous Shell Companies' Merchant Accounts*

72.     Apex Capital Group and the Individual Defendants engaged in a scheme to apply for a large number of merchant accounts in the name of shell companies, including the UK Corporate Defendants, through which they could launder charges to consumers' credit or debit card accounts.

73.     As part of this scheme, Apex Capital Group and the Individual Defendants created or caused to be created numerous shell companies, including Omni Group Limited and the UK Corporate Defendants.  The purported directors of the UK Corporate Defendants are all straw owners who reside in the U.S.; the UK Corporate Defendants are in fact controlled by Peikos through Omni Group Limited.  Omni Group Limited and the UK Corporate Defendants participated in the scheme by allowing charges to be laundered through merchant accounts opened in the names of the UK Corporate Defendants.

74.     During the period of May 2014 through July 2017, Apex Capital Group and the Individual Defendants, directly or through agents acting on their behalf and for their benefit, submitted dozens of deceptive merchant applications in the name of at least thirteen domestic shell companies to multiple ISOs for their underwriting approval.

75.    The thirteen companies include:  Apres Vous Media LLC; Based Capital, LLC; Cascade Canyon, LLC; Confidential Holdings, LLC; Cornice Group, LLC; Horizon Media, LLC; Interzoom, LLC; Mountain Range Solutions, LLC; Old West Equity, LLC; Singletrack Solutions, LLC; Sky Media Group, LLC; Teton Pass, LLC; and Wyoming Freedom Group, LLC.  The applications listed at least ten nominees as the purported principal owners of these shell companies.

76.    When applying for a merchant account, merchants often submit with the applications copies of voided checks drawn on their business bank accounts, with the understanding that credit card sales revenues will be transferred into these accounts.

77.    At least ten merchant applications submitted in the name of domestic shell companies included checks that reflected the existence of business bank accounts in the name of the shell companies.  Each check had been altered to include the straw owner's name, even though none of the straw owners were signatories of any of the accounts.  Indeed, for multiple merchant account applications, Defendants attached or caused to be attached the same check number for the same bank account with different names on it.

78.    For example, the following check was submitted as part of an application to open a merchant account for a product called Optimal Pet:



While the name of straw owner Graciela Vasquez is listed on the check, a copy of a check with the same checking account and the same check number was submitted

as part of a different merchant account application, for a product called Ultra, with a different straw owner, Juliana Pineda, listed on the check:



79.     The two copies of checks attached to the merchant account applications were doctored.  Neither Ms. Vasquez nor Ms. Pineda were signatories on the Wells Fargo account ending x1101.  In fact, Defendant Peikos is a signatory on that account.

80.     Multiple ISOs approved the merchant account applications, set up merchant accounts for each of the thirteen shell companies, and began processing payments through acquiring banks.  When payments for Defendants' products were processed through the merchant accounts that Defendants secured in the names of the shell companies, the sales revenues were automatically transferred into the shell companies' Wells Fargo bank accounts.  From there, the shell companies transferred consumers' money, directly or through intermediary accounts, into the Apex Citi Account.

81.     Defendants secured more than forty merchant accounts based on these false merchant applications; nearly all of them were subsequently closed.  Numerous merchant accounts were closed due to excessive chargeback levels.

### VIOLATIONS OF THE FTC ACT

82.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

83.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

84.     Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.  15 U.S.C. § 45(n).

## COUNT I

### *Misrepresentations of the Price of the Trial Offers*

85.     In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of products, Defendants have represented, directly or indirectly, expressly or by implication, that Defendants will charge consumers at most only a shipping and handling fee for a one-time shipment of Defendants' product.

86.     In truth and in fact, in numerous instances in which Defendants have made the representation set forth in Paragraph 85 of this Complaint, Defendants have charged consumers more than a shipping and handling fee for one or more shipments of Defendants' product.

87.     Therefore, Defendants' representation described in Paragraph 85 of this Complaint is false and misleading, and constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II

### *Misrepresentation that Order is Not Complete*

88.     In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of personal care products to consumers who have already ordered a trial of one of Defendants' products, Defendants have represented, directly or indirectly, expressly or by implication, that consumers' initial orders are not complete and that clicking the "COMPLETE CHECKOUT" or similar button will merely complete their initial orders.

89.     In truth and in fact, in numerous instances in which Defendants have made the representation set forth in Paragraph 88 of this Complaint, consumers'

initial orders were complete, and clicking the "COMPLETE CHECKOUT" or similar button ordered an additional product and enrolled consumers in a continuity plan for that product.

90. Therefore, Defendants' representation described in Paragraph 88 of this Complaint is false and misleading, and constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT III

### *Failure to Disclose Adequately Material Terms of Trial Offer*

91. In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of personal care products, Defendants have represented, directly or indirectly, expressly or by implication, that consumers can obtain a trial of Defendants' product for the cost of shipping and handling, or for free.

92. In numerous instances in which Defendants have made the representation set forth in Paragraph 91 of this Complaint, Defendants have failed to disclose, or disclose adequately to consumers, material terms and conditions of their offer, including:

(a)     The total cost of the product;

(b)     That Defendants will charge consumers the total cost of the product upon the expiration of the trial period, typically 14 days;

(c)     That Defendants will automatically enroll consumers in a continuity plan with additional charges;

(d)     The cost of the continuity plan, and the frequency and duration of the recurring charges; and

(e)     The terms of Defendants' refund policies.

93. Defendants' failure to disclose, or disclose adequately, the material information described in Paragraph 92, above, in light of the representation

described in Paragraph 91, above, constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT IV

### *Unfairly Charging Consumers Without Authorization*

94.     In numerous instances, Defendants have charged consumers without their express informed consent.

95.     Defendants' actions cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

96.     Therefore, Defendants' practices as described in Paragraph 94, above, constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a) and 45(n).

## COUNT V

### *Unfairly Injuring Consumers by Engaging in Credit Card Laundering*

97.     In numerous instances, in connection with submitting applications to open merchant accounts to further Defendants' online subscription scam, Defendants have engaged in credit card laundering by:

(a)     Falsely representing, directly or through agents acting on their behalf and for their benefit, that the shell companies listed as the applicants on the merchant applications were the true merchants who were applying for merchant accounts; and/or

(b)     Falsely representing, directly or through agents acting on their behalf and for their benefit, that the individual signors listed as the principal owners on the merchant applications were the bona fide principal owners applying for merchant accounts.

98.     The Defendants' actions caused or were likely to cause substantial injury to consumers that was not reasonably avoidably by consumers themselves and that is not outweighed by countervailing benefits to consumers or competition.

99.   Therefore, the Defendants' acts or practices, as described in Paragraph 97 above, constitute unfair acts or practices in violation of Section 5 of the FTC Act §§ 45(a) and (n).

### VIOLATIONS OF THE RESTORE ONLINE SHOPPERS' CONFIDENCE ACT

100.   In 2010, Congress passed the Restore Online Shoppers' Confidence Act, 15 U.S.C. §§ 8401-05, which became effective on December 29, 2010. Congress passed ROSCA because "[c]onsumer confidence is essential to the growth of online commerce. To continue its development as a marketplace, the Internet must provide consumers with clear, accurate information and give sellers an opportunity to fairly compete with one another for consumers' business." Section 2 of ROSCA, 15 U.S.C. § 8401.

101.   Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as that term is defined in the Commission's Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.2(w), unless the seller:  (a) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information; (b) obtains the consumer's express informed consent before making the charge; and (c) provides a simple mechanism to stop recurring charges.  *See* 15 U.S.C. § 8403.

102.   The TSR defines a negative option feature as:  "in an offer or agreement to sell or provide any goods or services, a provision under which the consumer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer."  16 C.F.R. § 310.2(w).

103.   As described above, Defendants advertise and sell Defendants' personal care products to consumers through a negative option feature as defined by the TSR.  *See* 16 C.F.R. § 310.2(w).

104.   Under Section 5 of ROSCA, 15 U.S.C. § 8404, a violation of ROSCA is a violation of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a, and therefore constitutes an unfair or deceptive act or practice in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT VI

### *Violation of ROSCA – Auto-Renewal Continuity Plan*

105.   In numerous instances, in connection with the selling of their products on the Internet through a negative option feature, Defendants have failed to:

    a.  clearly and conspicuously disclose all material terms of the negative option feature of the product transaction before obtaining the consumer's billing information;

    b.  obtain the consumer's express informed consent to the negative option feature before charging the consumer's credit card, debit card, bank account, or other financial account for the transaction; and/or

    c.  provide simple mechanisms for a consumer to stop recurring charges for products to the consumer's credit card, debit card, bank account, or other financial account.

106.   Defendants' practices as set forth in Paragraph 105 are a violation of Section 4 of ROSCA, 15 U.S.C. § 8403, and are therefore a violation of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a, 15 U.S.C. § 8404(a), and therefore constitute an unfair or deceptive act or practice in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### *VIOLATIONS OF THE ELECTRONIC FUND TRANSFER ACT AND REGULATION E*

107.   Section 907(a) of the EFTA, 15 U.S.C. § 1693e(a), provides that a "preauthorized" electronic fund transfer from a consumer's account may be "authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made."

108.   Section 903(10) of the EFTA, 15 U.S.C. § 1693a(10), provides that the term "preauthorized electronic fund transfer" means "an electronic fund transfer authorized in advance to recur at substantially regular intervals."  Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b) provides that "[p]reauthorized electronic fund transfers from a consumer's account may be authorized only by a writing signed or similarly authenticated by the consumer. The person that obtains the authorization shall provide a copy to the consumer."

109.   Section 1005.10 of the Consumer Financial Protection Bureau's Official Staff Commentary to Regulation E, 12 C.F.R. § 1005.10(b), cmt. 5, Supp. I, provides that "[t]he authorization process should evidence the consumer's identity and assent to the authorization." The Official Staff Commentary to Regulation E further provides that "[a]n authorization is valid if it is readily identifiable as such and the terms of the preauthorized transfer are clear and readily understandable." 12 C.F.R. § 1005.10(b), cmt. 6, Supp. I.

## COUNT VII

### *Unauthorized Debiting from Consumers' Accounts*

110.   In numerous instances, Defendants debit consumers' bank accounts on a recurring basis without obtaining a written authorization signed or similarly authenticated from consumers for preauthorized electronic fund transfers from their accounts, thereby violating Section 907(a) of the EFTA, 15 U.S.C. § 1693e(a), and Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b).

111.   Further, in numerous instances, Defendants debit consumers' bank accounts on a recurring basis without providing a copy of a written authorization signed or similarly authenticated by the consumer for preauthorized electronic fund transfers from the consumer's account, thereby violating Section 907(a) of the EFTA, 15 U.S.C. § 1693e(a), and Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b).

112.    Under Section 918(c) of the EFTA, 15 U.S.C. § 1693o(c), a violation of the EFTA and Regulation E constitutes a violation of the FTC Act.

113.    Accordingly, by engaging in violations of the EFTA and Regulation E as alleged in Paragraphs 110-111 of this Complaint, Defendants have engaged in violations of the FTC Act. 15 U.S.C. § 1693o(c).

**CONSUMER INJURY**

114.    Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, ROSCA, and the EFTA. In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

**THE COURT'S POWER TO GRANT RELIEF**

115.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

116.    Section 19 of the FTC Act, 15 U.S.C. § 57b, Section 5 of ROSCA, 15 U.S.C. § 8404, and Section 917(c) of the EFTA, 15 U.S.C. § 1693o(c), authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, ROSCA, and the EFTA, including the rescission or reformation of contracts and the refund of money.

**PRAYER FOR RELIEF**

117.    Wherefore, Plaintiff FTC, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. § 53(b) and 57b, Section 5 of ROSCA, 15 U.S.C. § 8404,

35

Section 917(c) of the EFTA, 15 U.S.C. § 1693o(c), and the Court's own equitable powers, requests that the Court:

A.      Award Plaintiff such temporary and preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to temporary and preliminary injunctions, an order freezing assets, immediate access, and appointment of a receiver;

B.      Enter a permanent injunction to prevent future violations of the FTC Act, ROSCA, and the EFTA by Defendants;

C.      Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, ROSCA, and the EFTA, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

D.      Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Respectfully submitted,

ALDEN F. ABBOTT
General Counsel

WILLIAM H. EFRON
Regional Director

Dated: **Nov. 13** , 2018

LAURA A. ZUCKERWISE
BRIAN N. LASKY
DARREN LUBETZKY
Federal Trade Commission
One Bowling Green, Suite 318
New York, NY 10004

36

(212) 607-2804 (Zuckerwise)
(212) 607-2822 (Fax)
lzuckerwise@ftc.gov

FAYE CHEN BARNOUW
FEDERAL TRADE COMMISSION
10990 Wilshire Blvd., Suite 400
Los Angeles, CA 90024
(310) 824-4300
(310) 824-4380 (fax)

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

**EXHIBIT A**

| COMPANY | DATE OF ORGANIZATION | DATE OF ARTICLES OF DISSOLUTION |
|---|---|---|
| Alpha Group LLC | 4/30/2014 | 5/9/2015 |
| Apres Vous Media, LLC | 9/9/2015 | |
| Based Capital LLC | 9/17/2013 | 5/9/2015 |
| Bold Media LLC | 3/7/2014 | 5/9/2015 |
| Capstone Capital, LLC | 8/13/2013 | 7/29/2015 |
| Cascade Canyon LLC | 8/6/2014 | |
| Confidential Holdings, LLC | 9/9/2015 | |
| Cornice Group LLC | 8/6/2014 | |
| Crest Capital, LLC | 8/13/2013 | 7/29/2015 |
| Fortune Ventures LLC | 9/17/2013 | 5/9/2015 |
| Future Holdings LLC | 9/17/2013 | 5/9/2015 |
| Grand Assets, LLC | 9/17/2013 | 5/9/2015 |
| Horizon Media, LLC | 8/14/2015 | |
| Interzoom, LLC | 8/14/2015 | |
| Lead Blast LLC | 9/17/2013 | 5/9/2015 |
| Lion Capital LLC | 4/28/2014 | 5/9/2015 |
| Macro Group LLC | 4/28/2014 | 5/9/2015 |
| Mountain Range Ventures LLC | 11/18/2014 | |
| Mountain Solutions, LLC | 8/13/2013 | 5/9/2015 |
| Nutra First LLC | 9/17/2013 | 5/9/2015 |
| Nutra Global LLC | 9/17/2013 | 5/9/2015 |
| Old West Equity LLC | 8/6/2014 | |
| Omega Assets LLC | 4/28/2014 | 5/9/2015 |
| Rendezvous IT, LLC | 12/30/2013 | 5/9/2015 |
| Shadow Peak,  LLC | 9/9/2015 | |
| Singletrack Solutions LLC | 11/18/2014 | |
| Sky Media Group, LLC | 8/14/2015 | |
| Teton Pass LLC | 11/18/2014 | |
| Virtual Media LLC | 3/7/2014 | 5/9/2015 |
| Wonder Leads LLC | 9/17/2013 | 5/9/2015 |
| Wyoming Freedom Group LLC | 11/18/2014 | |
| Zoom Media LLC | 4/28/2014 | 5/9/2015 |

**EXHIBIT B**

| *COMPANY* | *DATE OF ORGANIZATION* | *DATE OF DISSOLUTION* |
|---|---|---|
| Ace Media Group Ltd | 8/14/2015 | |
| Alpha Corporate Ventures Ltd | 7/29/2014 | 3/8/2016 |
| Apres Vous Media Ltd | 2/11/2016 | 7/18/2017 |
| Based Capital Ltd | 7/22/2014 | 1/19/2016 |
| Capstone Capital Solutions Ltd | 2/9/2015 | |
| Clik Trix Ltd | 8/14/2015 | |
| Crest Capital Ventures Ltd | 2/9/2015 | 7/26/2016 |
| Digital X Solutions Ltd | 8/14/2015 | 9/26/2017 |
| Empire Partners Ltd | 8/14/2015 | |
| Energy Tomorrow Ltd | 2/6/2015 | 7/19/2016 |
| Exclusive Media Group Ltd | 2/12/2016 | 7/18/2017 |
| Fortune Ventures Ltd | 7/22/2014 | 3/1/2016 |
| Future Hold Ventures Ltd | 11/24/2014 | 5/10/2016 |
| Future Precision Ltd | 2/2/2017 | |
| G Force Max Ltd | 2/3/2017 | |
| Grand Assets Ventures Ltd | 11/24/2014 | 5/10/2016 |
| Horizon Media Partners Ltd | 8/14/2015 | |
| Interzoom Capital Ltd | 8/14/2015 | |
| Lead Blast Ltd | 11/24/2014 | |
| Lion Capital Solutions Ltd | 2/13/2015 | 7/26/2016 |
| Maverick Pro Ltd | 3/31/2017 | |
| Mountain Venture Solutions Ltd | 2/9/2015 | |
| New Idea Group Ltd | 7/28/2017 | |
| Nutra First Ltd | 7/22/2014 | 1/2/2018 |
| Nutra Global Ltd | 7/22/2014 | |
| Omega Assets Ltd | 11/24/2014 | 5/10/2016 |
| Online Product Group Ltd | 4/3/2017 | |
| Precision Tactic Group Ltd | 2/3/2017 | |
| Rendezvous IT Ltd | 2/9/2015 | |
| Sky Blue Media Ltd | 8/14/2015 | |
| Snowdrift Solutions Ltd | 3/9/2017 | |
| Tactic Solutions Ltd | 8/14/2015 | |
| Top Quality Group Ltd | 7/27/2017 | |
| Virtual Media Solutions Ltd | 11/24/2014 | 5/10/2016 |
| Visitron Capital Ltd | 8/14/2015 | 9/26/2017 |
| Web Media Depot Ltd | 8/14/2015 | 9/26/2017 |
| Zoom Media Ltd | 7/24/2014 | |