1   ALDEN F. ABBOTT
    General Counsel
2

3   LAURA A. ZUCKERWISE
    NY Bar No. 4731188; lzuckerwise@ftc.gov
4   BRIAN N. LASKY
    NY Bar No. 3993417; blasky@ftc.gov
5   DARREN LUBETZKY
    NY Bar No. 4932976; dlubetzky@ftc.gov
6   FEDERAL TRADE COMMISSION
7   One Bowling Green, Suite 318
    New York, NY 10004
8   (212) 607-2804 (Zuckerwise)
9   (212) 607-2822 (fax)

10  FAYE CHEN BARNOUW (local counsel)
    CA Bar No. 168631; fbarnouw@ftc.gov
11  FEDERAL TRADE COMMISSION
    10990 Wilshire Blvd., Suite 400
12  Los Angeles, CA 90024
13  (310) 824-4300
    (310) 824-4380 (fax)
14

15  Attorneys for Plaintiff
    FEDERAL TRADE COMMISSION
16

17              UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
18

19  **FEDERAL TRADE COMMISSION**,          **FILED UNDER SEAL**

20                          Plaintiff,     Case No.   CV 18-9573-JFW(JPRx)

21              v.                         Memorandum of Points and Authorities in
                                           Support of Plaintiff's *Ex Parte*
22  **APEX CAPITAL GROUP, LLC**, et al.,   Application for Temporary Restraining
                                           Order with Asset Freeze, Appointment of
23                          Defendants.    a Receiver, Other Equitable Relief, and
                                           Order to Show Cause Why a Preliminary
24                                         Injunction Should Not Issue
25

26

27

28

                                    i

# <u>TABLE OF CONTENTS</u>

I.   Introduction ........................................................................................... 1

II.  Defendants ............................................................................................. 3

    A. Corporate Defendants.......................................................................... 3

        i.   Apex Capital Group, LLC.............................................................. 3

        ii.  Omni Group Limited .................................................................... 4

        iii. The U.K. Shell Company Defendants........................................... 5

    B. Individual Defendants ......................................................................... 6

III. Statement of Facts ................................................................................. 8

    A. Defendants' Online Marketing Is Deceptive And Unfair .................. 8

        i.   Defendants' Websites Mislead Consumers ................................... 8

        ii.  Disclosures On Defendants' Websites Are Insufficient,
            Incomplete, Or Nonexistent......................................................... 11

        iii. Defendants Pack Unauthorized Charges For Upsells On
            Consumers' Credit Cards ........................................................... 13

        iv. Defendants Do Not Adequately Disclose Their Onerous Return,
            Cancellation, And Refund Policies And Practices .................... 15

    B. Defendants Perpetuated Their Scam Through Illegal Credit Card
       Laundering Practices ......................................................................... 18

        i.   Credit Card Processing Industry Background.......................... 18

        ii.  Defendants' Credit Card Laundering Practices ...................... 20

IV.  Argument.............................................................................................. 26

    A. This Court Has The Power To Grant The Requested Relief .......... 26

    B. The FTC Meets The Standard For Issuance Of A Temporary
       Restraining Order ............................................................................. 27

        i.   Plaintiff Is Likely To Succeed On The Merits........................... 28

            (1) Defendants Are Violating The FTC Act ............................... 28

            (2) Defendants Are Violating ROSCA .................................... 33

            (3) Defendants are Violating The EFTA ................................. 35

        ii.  The Equities Weigh In The FTC's Favor.................................... 36

    C. Defendants Are Each Liable For The Law Violations.................... 36

        i.   The Corporate Defendants Operate As A Common Enterprise .......... 36

ii

ii.  The Individual Defendants Are Liable For Injunctive And Monetary Relief .................................................................. 37

V.  An *Ex Parte* TRO With Asset Freeze And Receiver Is Essential To Prevent Further Harm To Consumers, Prohibit Defendants From Dissipating Assets Or Destroying Documents, And Preserve The Court's Ability To Award Effective Final Relief .................................. 40

A. The Proposed TRO Should Be Entered *Ex Parte* ............................. 41

B. An Asset Freeze Is Critical To Preserve Effective Consumer Relief .......... 42

C. A Receiver Is Appropriate In This Case ............................................. 44

D. Expedited Discovery And Immediate Access To Defendants' Business Premises Are Essential ................................................... 45

VI.  Conclusion ................................................................................. 46

iii

# TABLE OF AUTHORITIES

**Cases**

*AT&T Broadband v. Tech Comm'n, Inc.*
381 F.3d 1309 (11th Cir. 2004) ...............................................................42

*FTC v. Affordable Media, LLC*
179 F.3d 1228 (9th Cir. 1999) ................................................. 27, 28, 38

*FTC v. Am. Fin. Benefits Ctr.*
324 F. Supp. 3d 1067 (N.D. Cal. 2018) ........................................ 38, 39

*FTC v. Am. Home Servicing Ctr., LLC*
No. SACV 18-00597-JLS-KESx, 2018 WL 3410146 (C.D. Cal. Apr. 27, 2018)...45

*FTC v. Am. Nat'l Cellular, Inc.*
810 F.2d 1511 (9th Cir. 1987) ...............................................................27

*FTC v. Amy Travel Serv., Inc.*
875 F.2d 564 (7th Cir. 1989) .................................................................38

*FTC v. Bunzai Media Grp., Inc.*
No. CV15-C4527-GW (PLAx), 2015 WL 5305243 (C.D. Cal. Sept. 9, 2015) ......27

*FTC v. Cardiff*
No. 18-cv-2104, 2018 WL 5622644 (C.D. Cal. Oct. 10, 2018) .............................27

*FTC v. Commerce Planet, Inc.*
No. SACV 09-01324-CJC(RNBx), 2011 WL 13225087
(C.D. Cal. Sept. 8, 2011)..................................................................33

*FTC v. Commerce Planet, Inc.*
642 F. App'x 680 (9th Cir. 2016) ...........................................................17

*FTC v. Commerce Planet, Inc.*
815 F.3d 593 (9th Cir. 2016) .................................................................17

*FTC v. Commerce Planet, Inc.*
878 F. Supp. 2d 1048 (C.D. Cal. 2012) ..................................................17

iv

*FTC v. Credit Bureau Ctr., LLC*
325 F. Supp. 3d 852 (N.D. Ill. 2018) ................................................ 34, 37

*FTC v. Cyberspace.com LLC*
453 F.3d 1196 (9th Cir. 2006) ........................................................ 29, 30

*FTC v. Figgie Intern., Inc.*
994 F.2d 595 (9th Cir. 1993) ..............................................................28

*FTC v. Five-Star Auto Club, Inc.*
97 F. Supp. 2d 502 (S.D.N.Y. 2000) .............................................. 29, 30

*FTC v. Freecom Commc'ns, Inc.*
401 F.3d 1192 (10th Cir. 2005) ..........................................................28

*FTC v. Global Mktg Grp., Inc.*
594 F. Supp. 2d 1281 (M.D. Fla. 2008).................................................33

*FTC v. H. N. Singer, Inc.*
668 F.2d 1107 (9th Cir. 1982) ................................................ 26, 27, 43

*FTC v. Health Formulas, LLC*
No. 2:14-cv-1649-JAD-GWF (D. Nev. Oct. 9, 2014)...............................27

*FTC v. Health Formulas, LLC*
2015 WL 2130504 (D. Nev. May 6, 2015)...................................... 31, 34

*FTC v. Ideal Fin. Solutions, Inc.*
No. 2:13-cv-00143-JAD-GWF, 2015 WL 4032103
(D. Nev. June 30, 2015) .....................................................................32

*FTC v. Int'l Computer Concepts, Inc.*
No. 5:94CV1678, 1994 WL 730144 (N.D. Ohio Oct. 24, 1994) ...........43

*FTC v. JK Publ'ns, Inc.*
99 F. Supp. 2d 1176 (C.D. Cal. 2000) ........................................... 32, 33

*FTC v. John Beck Amazing Profits, LLC*
865 F. Supp. 2d 1052 (C.D. Cal. 2012) ....................... 29, 30, 31, 37, 38

*FTC v. Johnson*
156 F. Supp. 3d 1202 (D. Nev. 2015) .......................................................37

*FTC v. Johnson*
96 F. Supp. 3d 1110 (D. Nev. 2015) .........................................................30

*FTC v. Johnson*
No. 2:10-cv-02203-RLH-GWF (D. Nev. Feb. 10, 2011) ........................19

*FTC v. Lights of Am., Inc.*
SACV10-01333 JVS(MLGx), 2013 WL 5230681 (C.D. Cal. Sept. 17, 2013).......29

*FTC v. Neovi, Inc.*
604 F.3d 1150 (9th Cir. 2010) .................................................... 31, 32, 33

*FTC v. Pantron I Corp.*
33 F.3d 1088 (9th Cir. 1994) ...................................................................29

*FTC v. Publ'g Clearing House, Inc.*
104 F.3d 1168 (9th Cir. 1997) .................................................................38

*FTC v. RevMountain, LLC*
No. 17-cv-02000-APG-GWF (D. Nev. July 25, 2017)............................27

*FTC v. Triangle Media Corp.*
No. 18cv1388-MMA (NLS) (S.D. Cal. June 29, 2018) ..........................27

*FTC v. Triangle Media Corp.*
No. 18cv1388-MMA (NLS), 2018 WL 4051701 (S.D. Cal. Aug. 24, 2018) .. 19, 43

*FTC v. U.S. Oil & Gas*
748 F.2d 1431 (11th Cir. 1984) ........................................................ 43, 44

*FTC v. Warner Commc'ns, Inc.*
742 F.2d 1156 (9th Cir. 1984) .................................................................36

*FTC v. Wealth Educators, Inc.*
No. 15-02357 SJO (JEMx), 2015 WL 11439063 (C.D. Cal. Apr. 6, 2015)............28

*FTC v. World Travel Vacation Brokers, Inc.*
861 F.2d 1020 (7th Cir. 1988) ................................................................44

*FTC v. World Wide Factors*
882 F.2d 344 (9th Cir. 1989) ................................................................36

*Int'l Controls Corp. v. Vesco*
490 F.2d 1334 (2d Cir. 1974)................................................................43

*Johnson v. Couturier*
572 F.3d 1067 (9th Cir. 2009) ........................................................ 42, 44

*Lancore Servs. Ltd. v. Barclays Bank Plc*
[2009] EWCA (Civ) 752, 2009 WL 2173222 ........................... 18, 19, 33

*Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*
467 F.3d 283 (2d Cir. 2006)............................................................ 17, 18

*S.E.C. v. Manor Nursing Ctrs., Inc.*
458 F.2d 1082 (2d Cir. 1972)................................................................43

*US v. Johnson*
732 F. App'x 638 (10th Cir. Apr. 19, 2018)........................................19

*Velo Holdings Inc. v. Paymentech, LLC*
475 B.R. 367 (Bankr. S.D.N.Y. 2012)................................................17

**Statutes, Rules, and Regulations**

12 C.F.R. § 205.10(b) ..........................................................................35

12 C.F.R. Part 205, Supp. I ..................................................................35

12 C.F.R. § 1005.10(b) .........................................................................26

15 U.S.C. § 1693e(a)...................................................................... 26, 35

15 U.S.C. § 205.10(b) ...........................................................................35

15 U.S.C. § 45(a) ........................................................................... 26, 28

vii

15 U.S.C. § 45(n) ................................................................................31

15 U.S.C. § 53(b) ...............................................................................26

15 U.S.C. § 57a ..................................................................................33

15 U.S.C. § 57b ..................................................................................27

15 U.S.C. § 8403 ........................................................................ 26, 34

15 U.S.C. § 8404 ................................................................................33

Fed. R. Civ. P. 1 ................................................................................45

Fed. R. Civ. P. 26(d) .........................................................................45

Fed. R. Civ. P. 34(b) .........................................................................45

Fed. R. Civ. P. 65(b) .................................................................. 41, 42

## I.     INTRODUCTION

Defendants operate a massive Internet marketing scam that has bilked consumer victims out of more than twenty-two million dollars.  Through an enterprise that has operated for more than four years, Defendants first obtain consumers' credit or debit card information through deceit; they then run up unauthorized charges on consumers' payment cards and launder those charges through unlawfully obtained merchant accounts.

Defendants use flashy websites to deceptively market a variety of consumer products, from skin creams to sexual performance supplements.  They offer so-called "free trials" of these products designed to draw consumers into providing their payment information.  The terms of the trials, to the extent they are present at all, are obscured behind hyperlinks, or hidden in tiny, difficult-to-read print in the midst of busy webpages.  Many consumers report that they believed they would be charged only $4.95 for the product to pay for the cost of shipping and handling.  They did not know that they would in fact be charged $80 to $100 for the purportedly "free trial," and subjected to additional monthly shipments and charges until they were able to cancel.  Nor did they know that by clicking through the online ordering process, they might be signed up to receive – and be charged for – additional products.  When consumers inevitably attempted to cancel these unintended orders, they often learned for the first time of Defendants' onerous policies and practices that prevent consumers from cancelling the continuous shipments and getting refunds.

The ability to accept credit and debit card payments is essential to Internet marketing scams.  If Defendants were unable to process such payments, their "free trial" scam could not have succeeded.   To preserve that access, Defendants circumvented screening processes in the credit card payment processing industry designed to prevent crooked merchants from accepting consumer payments.  By creating shell companies, recruiting nominal owners for those companies, and

making misrepresentations throughout their merchant account applications, Defendants systematically deceived banks into opening and maintaining merchant accounts that permitted Defendants to accept consumer payments.  These illegal practices, known as "credit card laundering," allowed Defendants to maintain access to the credit card payment processing system, extending the scheme's duration and the scope of consumer injury.

Defendants' deceptive and unfair practices violate Section 5 of the Federal Trade Commission Act ("FTC Act"), as well as the Restore Online Shoppers' Confidence Act ("ROSCA"), and the Electronic Funds Transfer Act ("EFTA"), and have caused substantial consumer injury.  To prevent Defendants from continuing to injure unsuspecting consumers, Plaintiff seeks a non-noticed *ex parte* temporary restraining order ("TRO") to stop Defendants' unlawful activities immediately.  The proposed TRO would enjoin Defendants' unlawful practices, freeze their assets, appoint a temporary receiver over the Corporate Defendants, permit immediate access to Defendants' business premises to preserve and collect records, and provide for certain expedited discovery.  This relief is essential to prevent further harm to consumers, prohibit Defendants from dissipating assets or destroying documents, and preserve this Court's ability to provide effective final relief for Defendants' law violations.  This memorandum sets forth the substantial evidence that demonstrates that the FTC is likely to succeed on the merits and that the equities weigh in the FTC's favor.[1]

---

[1] Plaintiff has submitted 19 exhibits with attachments in support of this Application, which are Bates stamped FTC-000001 – FTC-001271, in Plaintiff's Appendix of Declarations in Support of Plaintiff's *Ex Parte* Motion for Temporary Restraining Order with Asset Freeze, Appointment of a Receiver, Other Equitable Relief, and Order to Show Cause Why a Preliminary Injunction Should Not Issue ("App.").  Each exhibit is a declaration.  Exhibits 1-13  are sworn declarations from consumers who provided their credit card information to pay shipping and handling charges for a "free trial" of one or more of Defendants' products.  Some

## II.   DEFENDANTS

### A. Corporate Defendants

#### i.   *Apex Capital Group, LLC*

Apex Capital Group, LLC ("Apex Capital Group") is a Wyoming corporation incorporated in August 2013.[2]  Its principal place of business is in Woodland Hills, California.[3]  Apex Capital Group is at the center of Defendants' operation (the "Apex Enterprise").  It marketed consumer products through shell companies, identified in Exhibits A and B to the Complaint, which took money from consumers and transferred the money to Apex Capital Group's bank account at Citibank, N.A. (the "Apex Citi Account").[4]  According to the domestic shell companies' bank account statements, virtually all of the Apex Enterprise's operating expenses were paid from the Apex Citi Account, including advertising expenses, manufacturing and fulfillment expenses, and payments to its employees.[5]

From its inception, Apex Capital Group was owned jointly by Defendant Phillip Peikos and Defendant David Barnett (together, the "Individual

---

of these declarations have been redacted to protect consumers' privacy.  Exhibits 14 and 15 are declarations of representatives of the Better Business Bureau, summarizing additional consumer complaints.  Exhibit 16 is a declaration of a Postal Inspector for the United States Postal Inspection Service.  Exhibit 17 is a declaration of an FTC Technologist.  Exhibit 18 is a declaration of an FTC Investigator.  Exhibit 19 is a declaration of an FTC Forensic Accountant.  An index that provides the exhibit number and Bates range for each declaration is attached to this Memorandum.

[2] App. 207.

[3] App. 148.

[4] App. 1210 (Decl. of Thomas P. Van Wazer ("Van Wazer Decl."), FTC Forensic Accountant, showing flow of funds).

[5] App. 599 (check from Apex Citi Account to Raul Camacho identifying him as an employee); App. 1190, 1196-1197 (Van Wazer Decl.).

Defendants"), both authorized signers for the Apex Citi Account.[6]  The Individual Defendants paid themselves approximately $7.5 million from the Apex Citi Account between September 2014 and August 2017.[7]

Apex Capital Group continues to operate.  Apex Capital Group received $571,591.80 in August 2018 from a Latvian payment processor called Transact Pro SIA and from Cascade Canyon LLC, one of the shell companies used by the Apex Enterprise to collect consumer money.[8]  The Apex Citi Account paid out $633,825.48 that same month, including payments to Peikos and to entities engaged in marketing activities.[9]

ii.  *Omni Group Limited*

Omni Group Limited ("Omni Group") is a U.K. limited company that serves as a holding company for many of the U.K. shell companies that are part of the Apex Enterprise.  Omni Group is or has been the sole or controlling shareholder of all of the U.K. shell companies named as Defendants.[10]  These companies sold products to U.S. consumers and transferred the sales proceeds to the Apex Citi

---

[6] App. 575 (signature card for Apex Citi Account); App. 576-577 (account opening document for the Apex Citi Account identifying Peikos and Barnett each as 50% owners).

[7] App. 1190, 1196-97 (Van Wazer Decl.).

[8] App. 612-13 (August 2018 bank account statement for Apex Citi Account).

[9] *Id.*  Also in 2018, the Apex Citi Account transferred money to bank accounts in the name of Apex Capital Group or Omni Group Limited located in Luxembourg, the U.K., and Puerto Rico.  App. 618, 619; *see also* App. 1220 (Van Wazer Decl., identifying payments from Apex Citi Account to "Apex Capital Group Intl SARL" account in Luxembourg).

[10] App. 160-169 (Declaration of Florence M. Hogan ("Hogan Decl."), FTC Investigator), 223-224, 229-233; 238-242, 247-251, 263-264, 276-277, 289-290, 615-316, 321-325, 330-334.

Account.[11]   Omni Group also transferred millions of dollars from its own bank account to the Apex Citi Account.[12]   Omni Group does not have an office; instead, it uses the address of a residential home and a mail drop as its business address in corporate filings.[13]   Dozens of other limited companies within the Apex Enterprise use the same residential address and mail drop in their corporate filings.[14]   When Omni Group was incorporated in July 2015, its sole directors and shareholders were Phillip Peikos and David Barnett.[15]   David Barnett transferred his shares to Phillip Peikos in late 2017, and since then, Peikos has been the sole shareholder of Omni Group.[16]

iii.   <em>The U.K. Shell Company Defendants</em>

Capstone Capital Solutions Limited, Clik Trix Limited, Empire Partners Limited, Interzoom Capital Limited, Lead Blast Limited, Mountain Venture Solutions Limited, Nutra Global Limited, Rendezvous IT Limited, Sky Blue Media Limited, and Tactic Solutions Limited (together, the "U.K. Shell Company Defendants," and, along with Omni Group and Apex Capital Group, the "Corporate Defendants") are U.K. limited companies.[17]   The U.K. Shell Company

---

[11] App. 185-187 (certain merchant accounts were used to sell products using Latvian-based payment processor to cardholders with U.S. banks), 189-190 (those merchant accounts are associated with the U.K. shell companies named as defendants in this matter through the centralsitemanager.com website, which is described at <em>infra</em> 20), 895-990 (same), 1195-96 (Van Wazer Decl.) (FTC Forensic Accountant analysis showing that all of the U.K. companies named as defendants, along with other U.K. companies, transferred money into the Apex Citi Account).

[12] App. 1195 (Van Wazer Decl., showing Omni Group transferred almost $3 million into Apex Citi account between July 2016 and May 2017).

[13] App. 166, 171-172 (Hogan Decl.).

[14] App. 160-168, 170-172 (Hogan Decl.).

[15] App. 295-297, 299.

[16] App. 302-303.

[17] App. 214-336.

5

Defendants all list on their corporate filings certain individuals as their purported principals who are merely nominal owners;[18] the U.K. Shell Company Defendants are in fact owned by Omni Group. *See Supra* Section II(A)(ii). Their corporate filings all provide the same residential address and/or mail drop as Omni Group.[19] They all have merchant accounts[20] with the same bank in Latvia, through which they all sell products to consumers in the United States.[21] Altogether, these companies have transferred at least $9 million into the Apex Citi Account.[22]

### B. Individual Defendants

Defendant Phillip Peikos is an owner and Chief Executive Officer of Apex Capital Group[23] and Omni Group.[24] Through his ownership of Omni Group, Peikos, in turn, also controls each of the U.K. Shell Company Defendants.[25] Peikos is an authorized signer for the Apex Citi Account, has signed checks from the Apex Citi Account, and has used a credit card in his own name to make payments on behalf of Apex Capital Group.[26] Peikos was a signatory for at least twenty-two bank accounts in the name of shell companies related to the Apex

---

[18] *See infra* 20-21; App. 214-336, 193-194. These same individuals also serve as nominees to secure merchant accounts for the domestic shell companies. *E.g.*, App. 176-179.

[19] App. 160-169, 215-336.

[20] For an explanation of merchant accounts, see *infra* at Section III(B)(i).

[21] *Supra* n. 11.

[22] App. 1195-1196 (Van Wazer Decl.).

[23] App. 576-577, 1122-1123.

[24] App. 302-303 (Peikos was the sole shareholder of Omni Group as of December 4, 2017).

[25] *See supra* Section II(A)(ii).

[26] App. 575 (authorized signer for Apex Citi Account); App. 585, 587-599 (signed checks); App. 1175 (used credit card in his own name to make payments on behalf of Apex Capital Group).

Enterprise.[27]  He received approximately $4.5 million in distributions and payments from the Apex Citi Account.[28]

Defendant David Barnett was an owner and Chief Operating Officer of Apex Capital Group from its inception in August 2013[29] until at least late 2017.[30]  He was also an owner of Omni Group until November 2017, and through Omni Group, he controlled, with Peikos, each of the U.K. Shell Company Defendants.[31]  Barnett was a signatory for nineteen bank accounts of the shell companies,[32] as well as the Apex Citi Account.[33]  Like Peikos, Barnett used a credit card in his own name to make purchases on behalf of Apex Capital Group and was directly involved in the business's operations.[34]  He received at least $3 million in distributions and payments from the Apex Citi Account.[35]

---

[27] App. 174-175 (Hogan Decl.).

[28] Those payments were transferred directly to Peikos and to NextG Payments, Peikos's wholly owned company.  App. 624-625 (Peikos is 100% owner of NextG Payments), 1197 (Van Wazer Decl., showing Peikos received $4.496 million through August 2017).

[29] App. 576-579, 1122-1123.

[30] The last payment Barnett received from the Apex Citi Account was in March 2018.  *Compare* App. 603 (March 2018 statement for Apex Citi Account showing $25,000 payment to Barnett), *with* App. 606-610 (Apr. 2018 statement for Apex Citi Account showing no payment to Barnett).

[31] App. 295-299, 303; *supra* Section II(A)(ii).

[32] App. 174-175 (Hogan Decl.).

[33] App. 173, 575.

[34] App. 1176, 1178, 1184-85 (Barnett signed contract on behalf of Apex Capital Group).

[35] App. 1197 (Van Wazer Decl., showing Barnett received $3 million through June 2017).

III.   **STATEMENT OF FACTS**

**A. Defendants' Online Marketing Is Deceptive And Unfair**

i.   *Defendants' Websites Mislead Consumers*

Defendants have marketed a large number of products[36] including, among others, anti-wrinkle creams[37] and supplements that allegedly promote hair growth,[38] sexual performance,[39] and cognitive abilities.[40]  Consumers encounter online advertisements for these products in a variety of ways.  Some consumers encounter pop-up advertisements inviting them to participate in online surveys, which at the end, offer a purportedly free gift of one of Defendants' products.[41]  Some receive unsolicited email advertisements,[42] and others encounter paid

---

[36] App. 992-1006 (listing products including Rejuvius, Juveliere, Follicure, Evermax, NeuroXR, Biogenic XR, VirilityX3, Follicure, DermaC, Flawless Eyes, Apres Workout, Sleep Simple, Muscle AVM, CD Muscles, WY Workout, and Elite Pro, among others).

[37] App. 40 (Decl. of Diahann Jensen, consumer who ordered trials of Dermanique face serum and Lumera eye cream); App. 100 (Decl. of Sharon Stiansen, consumer who ordered trials of eye cream to eliminate wrinkles); App. 60 (Decl. of Ann Kleiman, consumer who ordered trials of Rejuvius and Juveliere eye and skin creams); App. 135 (Decl. of Nakedia Washington, Director of Operations at Better Business Bureau Northwest-Pacific ("Washington BBB Decl.").

[38] App. 767-791.

[39] App. 1049-1062, 1138-1146.

[40] App. 2 (Decl. of Samuel Berg, consumer who ordered NeuroXR); App. 22 (Decl. of Dennis Brown ("Brown Decl."), consumer who ordered NeuroXR but received two products called Limitless Mind Formula and Focus ZX1); App. 1008-1018 (screenshots of websites).

[41] App. 135, 137-138 (Washington BBB Decl.).

[42] App. 22 (Brown Decl.) ("In November 2017, I received an email that looked like it was from my daughter, with information about a brain supplement.  The email contained pictures of Bill O'Reilly and Stephen Hawking, who seemed to be endorsing the supplement.").

8

advertisements that are displayed as search results on search engines like Google.[43] Many consumers come upon the ads on social media.[44]  Many of the advertisements offer a "trial" of Defendants' products purportedly for either the low cost of shipping and handling or for free.[45]

These advertisements contain links to websites where consumers can obtain the products.  After consumers click on the links, they are typically redirected to Defendants' websites,[46] where they are lured into ordering the so-called trials.[47] The order process is typically a two-step process, divided into two separate webpages.  The first webpage (the "landing page") consists of a long, splashy advertisement for the product, with windows to allow consumers to enter their contact information.[48]  For example, the top of a landing page for Biogenic XR is included here as Figure 1 (the full landing page, at App. 1148-1157, contains many pages of busy content).  In Figure 1, in large black, italicized, capital letters, is text stating, "***CLAIM YOUR FREE TRIAL***."

---

[43] App. 1008.

[44] App. 138 (consumer reported seeing advertisement on Facebook); App. 140-141 (Facebook); App. 2 (Twitter); App. 54 (Facebook); App. 97 (Facebook).

[45]  App. 40 (consumer saw Internet advertisement on accuweather.com that offered free 30-day supply of wrinkle-removing product); App. 79 (Internet advertisement, including purported testimonials from Bill Gates endorsing memory product, offered free 30-day supply for cost of shipping and handling); App. 66 (online contest offered purportedly free sample of testosterone supplement); App. 33 (Internet advertisement offered 30-day trial of weight loss and sexual enhancement product for $4.95 cost of shipping and handling); App. 1009-1011 (advertisement for "brain enhancer" offered "free one month supply").

[46] App. 22, 1009-1012 (advertisements linked to tryneuroxr.com); App. 204-205 (advertisement linked to biogenicxr.com); App. 1165 (domain registrar records showing biogenicxr.com domain associated with "apexcapital" username); App. 1172 (same re: tryneuroxr.com).

[47] App. 1012-1044, 1049-1081, 1125-1146, 1148-1157.

[48] *See, e.g.*, App. 1012-1018, 1049-1062, 1138-1146, 1148-1157.

**FIGURE 1**[49]



As is typical of Defendants' landing pages,[50] this landing page contains no visible disclosure informing consumers that the trial is, in fact, not free, or explaining the complicated terms and conditions of purchase.[51]  Instead, the terms and conditions are buried in a separate, multi-page terms and conditions webpage accessible only by an obscured hyperlink.[52]

After consumers enter their contact information on the landing page and click a "RUSH MY BOTTLE" or "RUSH MY ORDER" button,[53] they are redirected to a second page (the "order page").  The order pages typically state in large font that the 30-day supply of the product is a "FREE TRIAL," with "No

---

[49] App. 1148.

[50] *See supra* n. 48.

[51] App. 1148-1157.

[52] App. 1148-1157; *see also* 1012-1023, 1049-1062, 1138-1146.

[53] App. 1012, 1051, 1139 ("RUSH MY ORDER"); App. 1148 ("RUSH MY BOTTLE").

Commitments,"[54] or alternatively that a "1 Month Supply" is "$0.00,"[55] and that shipping and handling costs $4.95.  Some of Defendants' order pages state in large type: "YOUR TOTAL:  $4.95."[56]  The order pages invite consumers to enter their payment card information.

ii.  *Disclosures On Defendants' Websites Are Insufficient, Incomplete, Or Nonexistent*

Many consumers who went through this two-step process to order trials of Defendants' products came away with the impression that they would be charged no more than the $4.95 shipping and handling fee for the product.[57]  The websites

[54] App. 1063, 1125.

[55] App. 1024.

[56] *E.g.*, App. 1063.

[57] App. 22 (Brown Decl.) ("After I was charged the $4.95 for the sample of Neuro XR, I thought that was it.  I did not expect that they would charge me more later.  I did not see anything on the website about charging me for the full amount of the product after a trial period.  I also did not notice anything about future orders or future charges."); App. 33 (Decl. of Michael Darlington) ("I decided to try Celexas because of the 30-day trial offer.  I believed that the trial offer would allow me to test whether Celexas could really help me lose weight at an affordable price of under five dollars. . . . I have significant experience with computers and the internet and I am aware that some trial offers disclose additional terms hidden in fine print or through hyperlinks to another page.  I looked for any possible additional terms prior to placing my order.  I do not remember seeing, selecting, or agreeing to any additional terms indicating that I would be entering into a monthly subscription with recurrent payments for Celexas.").  *See also* App. 40, 43, 54, 60, 66 ("I have ordered trial items before, and I remember that when placing my orders on those prior occasions, the websites would specify that by ordering the trial terms, I was enrolling in an automatic subscription  and would be billed monthly.  When I ordered the Celexas and the testosterone supplement sample products, I looked for this information; however, it was not provided."), 79, 82, 97, 100, 126 (Declaration of Erin McCool, Operations Supervisor of the Better Business Bureau of Los Angeles & Silicon Valley); 135 (Washington BBB Decl.) ("Consumers typically reported that they paid a small fee online to order what they believed to be free trial samples of personal care products.").

create and reinforce this impression by calling the offers "FREE TRIALS" and/or showing the cost as "$0.00."[58]  The websites also create a sense of urgency through representations that the offer is available for only a limited time and in limited amounts,[59] which pushes consumers to click through the ordering process quickly. The websites also distract consumers from noticing any hyperlinks to hidden disclosures about the terms of the trial offers with pages full of bright, large text and graphics extolling the purported benefits of the product.[60]  Any mention of terms and conditions is either hidden in tiny, light-colored font that is overshadowed by adjacent large, brightly-colored, capital-letter text,[61] or buried in a separate webpage accessed only by clicking a small "Terms" hyperlink at the bottom of the website.  In some instances, the separate terms webpage fails entirely to identify the name of the product and its cost, leaving those portions blank.[62]

The representations that consumers will only have to pay $4.95 to obtain these products is false.  Instead, consumers are first charged $4.95 at the time of the order, and then they are charged a much greater amount – typically around $80 to $100 – usually fourteen days later.[63]  After that, consumers are automatically

---

[58] App. 1024, 1063, 1125.

[59] App. 1012 ("Due to very high demand from recent media coverage we can no longer guarantee supply."), 1138 ("HURRY!  LIMITED SUPPLIES AVAILABLE"), 1148 ("WARNING:  Due to extremely high media demand, there is a limited supply of Biogenic XR in stock as of May 2, 2017").

[60] *Supra* n. 48.

[61] *E.g.*, App. 1076-77.

[62] *E.g.*, App. 1067.

[63] *E.g.*, App. 1083 ($4.95 charge on Feb. 21, 2018; $89.78 charge on Mar. 7, 2018); App. 70, 75 ($4.95 charge on Nov. 3, 2016; $89.99 and $89.78 charges on Nov. 17, 2016).  *See also* App. 1240-1241 (Van Wazer Decl. listing the dollar amounts for almost 600 chargebacks, and finding most in the amount of $87.67 and $97.88, as well as in the amount of $4.95).

shipped a 30-day supply of the product on an ongoing basis each month, and charged the same $80 to $100 amount each month, until they are able to cancel.[64]

### iii. *Defendants Pack Unauthorized Charges For Upsells On Consumers' Credit Cards*

After consumers enter their payment information on the order page of one of Defendants' websites and click a "RUSH MY ORDER"[65] or "COMPLETE CHECKOUT"[66] button, they may be redirected to a third page (the "upsell page") where they are tricked into ordering a second product. Numerous upsell pages for Defendants' products were designed to look like they are merely the final step in ordering the original product, when in fact, clicking through an upsell page has the effect of ordering a second product. For example, the FTC's investigator conducted an undercover online order of one of Defendants' products, NeuroXR.[67] When the investigator finished entering payment information to order a trial of NeuroXR, for shipping and handling charges of $4.95, she was redirected to a webpage that appeared to contain a coupon for a second product, NeuroXR Sleep. The webpage also featured another prominent "COMPLETE CHECKOUT" box. A portion of this webpage is included below as Figure 2.

---

[64] *E.g.*, App. 3, 22-23, 33-34, 60, 82-83, 135 (Washington BBB Decl.) ("Consumers reported that a few days after receiving the trial sample, they were charged . . . usually more than $80; they were later subjected to recurring charges and received recurring shipments of the products."), 1083-1085 (when FTC investigator ordered a product, FTC credit card was charged $89.78 on March 7, 2018, and $89.77 on April 11, 2018).

[65] App. 1076-77.

[66] App. 1033.

[67] App. 194-199 (Hogan Decl.) (describing undercover purchase process); App. 1008-1047 (screenshots and other documents from undercover purchase).

**FIGURE 2**[68]



Clicking "COMPLETE CHECKOUT" did not complete the order of NeuroXR, however; rather, it caused the FTC investigator to order NeuroXR Sleep as well. The only terms and costs on the coupon are "ADD AN ADDITIONAL TRIAL AT ONLY $4.97"; no other terms related to NeuroXR Sleep are disclosed anywhere on the website.[69]  Not only are consumers tricked into ordering a second product,

---

[68] App. 1034.

[69] App. 197-199, 1034-1035.  While there is a "terms" hyperlink at the bottom of the page, it contains terms for NeuroXR, not NeuroXR Sleep.  App. 1035-1041.

but Defendants' representations are also false because consumers' orders are already complete before they click the "COMPLETE CHECKOUT" button on the upsell page.

> iv. *Defendants Do Not Adequately Disclose Their Onerous Return, Cancellation, and Refund Policies and Practices*

Defendants' websites include numerous express representations that consumers' satisfaction is guaranteed[70] and that ordering the trial carries no commitments.[71]  These representations are false.  Defendants significantly restrict consumers' abilities to obtain refunds and even to cancel the ongoing shipments.  The undisclosed or poorly-disclosed restrictions on returns, cancellations, and refunds include:

- requiring consumers to return the unopened product at their own expense before the expiration of the trial period to avoid being charged, thus rendering the purported trial opportunity illusory;[72]

- making the trial period shorter than consumers would reasonably expect by starting the period from the date of the order rather than the date consumers receive the product;[73] and

---

[70] App. 1153 ("OUR PRODUCT BACKED WITH A 100% SATISACTION GUARANTEE!"); App. 1049, 1062, 1138, 1146 ("100% MONEY BACK"); App. 1065, 1126 ("30 DAY GUARANTEE").

[71] App. 1063, 1125.

[72] App. 135 (Washington BBB Decl.) ("representatives often told [consumers] Apex Capital would not reimburse them until they returned the products, unopened"), 141 ("I called to request a refund, and was told that I could not return the product if it was opened").

[73] App. 40 ("I spoke to a representative who told me I had not cancelled my shipment within fourteen days of ordering the products so I was billed for monthly supplies of Dermanique and Lumera"), 43, 197.

- demanding that consumers call a customer service number to cancel and/or obtain a refund, while making it difficult for consumers to get through to customer service representatives.[74]

Many consumers who satisfy these convoluted rules and return their products, unopened, to Defendants still are not given refunds.[75]  Some are told that they cannot have refunds because of technical difficulties.[76]  Other consumers are promised refunds that are never provided.[77]  Some consumers are charged restocking fees.[78]  Those consumers who are offered refunds are typically only offered partial refunds, instead of full refunds.[79]

Numerous consumers complained that they believed they had signed up for a free trial product and did not know they would be charged $80 or more for that product, let alone for additional products and upsells.[80]  The Better Business Bureau ("BBB") for the Northwest - Pacific Region has received hundreds of

---

[74] App. 60-61, 83, 113, 128 (customer service representative hung up on consumer complainant), 137, 139, 140-141.

[75]  Defendants seem to have provided some consumers with the return address of the post office itself, rather than the correct post office box.  App. 147 (Declaration of Postal Inspector stating that "senders attempting to send mail to Apex Capital Group addressed mail to the USPS's physical post office address in Pacoima, California, rather than to PO Box 4578").

[76] App. 135-136, 141-142, 143-144.

[77] App. 141, 203.

[78] App. 135-136.

[79] *E.g.*, App. 40, 100-101, 127, 142.  Indeed, when the FTC investigator called to cancel one of the products after placing her order, she asked for a full refund of two charges.  The investigator had to ask for full refunds six times before the customer service agent finally agreed to provide a full refund for one of the two charges.  The customer service representative told the investigator that she would be contacted within 48 hours about the second refund, but no one contacted her and she never received that refund.  App. 1090-1107.

[80] *See supra* n. 57.

complaints that they linked to Apex Capital Group.  They have given Apex Capital Group an "F" rating.[81]  In these complaints, many consumers said that when they ordered the products they did not see any disclosures about additional costs beyond the initial shipping and handling fee.[82]

Defendants' high credit card chargeback rates provide more evidence that consumers were unaware they were going to be charged for the products.[83]  "The average chargeback rate in the United States is 0.2% of the transaction rate" and a chargeback rate greater than 1% is considered excessive.  *FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1075 (C.D. Cal. 2012), *aff'd in relevant part by* 642 F. App'x 680 (9th Cir. 2016), *vacated and remanded on other grounds by* 815 F.3d 593 (9th Cir. 2016)).  By contrast, Defendants' chargeback rate ranged from 9.51% to 18.68% across fourteen merchant accounts for one of its payment processors.[84]

---

[81] App. 134, 144 (Washington BBB Decl.).

[82] App. 135 (Washington BBB Decl.) ("Consumers typically complained that when they ordered the products they did not see any disclosures in the websites concerning costs other than the initial small shipping and handling fee.  Furthermore, a few consumers commented that the relevant disclosures, when they were present, were barely visible.").

[83] A chargeback is essentially a reverse charge initiated by a consumer who disputes the charge.  *Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 286-87 (2d Cir. 2006).  Credit card companies consider chargeback rates or ratios in monitoring merchant risk.  A chargeback ratio is generally calculated by dividing the total dollar volume of the merchant's chargebacks in a given time period by the merchant's total sales dollar volume during the period.  *See In re Velo Holdings Inc. v. Paymentech, LLC*, 475 B.R. 367, 375 (Bankr. S.D.N.Y. 2012).

[84] App. 854-861, 863-868; *see also* App. 183-184 (Hogan Decl.) (calculating a chargeback ratio of 13.13% across $1,971,351 in sales, based on data from 15 merchant accounts produced by one payment processor).

### B. Defendants Perpetuated Their Scam Through Illegal Credit Card Laundering Practices

Defendants could not have maintained their flow of online sales without access to consumers' credit and debit cards. To ensure continuing access, Defendants laundered credit card charges and debit card withdrawals through accounts opened in the names of numerous shell entities, fronted by third parties (nominees or signers) recruited by Defendants to act as the principals on paper.

#### i. *Credit Card Processing Industry Background*

A company that sells products (a "merchant") supplies goods or services to a consumer (a "cardholder"). To accept credit and debit card payments from the cardholder, merchants enter into a contract (a "merchant services agreement" or "MSA") and open a merchant account with a bank (an "acquirer") that is a member of a credit card network such as Visa or MasterCard.[85] Credit card networks provide a system for exchanging payments by establishing rules for credit card transactions. Acquirers agree to follow the rules.

The credit card networks prohibit "credit card laundering," also called "transaction laundering," "factoring," and "aggregation," which:

> occurs when a merchant who has entered into an MSA processes card transactions for the supply of goods or services by a third party who has not entered into an MSA. . . . In such a case, goods and services are being supplied by an entity which has not been scrutinized by the merchant acquirer: and often this will be precisely because the supplier does not want to be subject to scrutiny. [Laundering] can be a cloak for transactions which are illegal and with which the merchant acquirer would not wish to be associated if it knew of them: it would not enter into an MSA with such a supplier.[86]

---

[85] *Paycom Billing Servs.*, 467 F.3d at 285-86 (providing background on credit card payment processing industry); *Lancore Servs. Ltd. v. Barclays Bank Plc*, [2009] EWCA (Civ) 752, 2009 WL 2173222.

[86] *Lancore Servs. Ltd.*, 2009 WL 2173222.

Laundering "is regarded as a risk to the integrity of the system as a whole."[87]  To

manage that risk, it is critical that "the transactions processed by th[e] merchant

should be settled by the merchant acquirer into a bank account in that merchant's

name."[88]

Unscrupulous Internet merchants frequently engage in credit card laundering

by using shell companies and/or nominees to obtain merchant accounts, and

numerous federal courts have entered judgments – civil and criminal – against

them.[89]  By laundering charges through shell companies, merchants and their real

principals are able to process more sales than otherwise allowed under sales

volume caps imposed by banks on individual merchant accounts.  Such merchants

are also able to ensure that if one merchant account is shut down due to excessive

chargebacks, others will continue to process consumers' payments.[90]  In addition,

---

[87] *Id.* (internal citations omitted).

[88] *Id.* (internal citations omitted).

[89] *See, e.g. US v. Johnson*, 732 F. App'x 638, 642-43 (10th Cir. Apr. 19, 2018)
(affirming conviction for making false statements, but reversing and remanding for
resentencing) (describing "strategy . . . to set up multiple merchant accounts in
names other than" the true principal's, to ensure continued access to merchant
accounts even when true merchant was unable to secure merchant accounts due to
history of excessive chargebacks); Prelim. Inj. Order, *FTC v. Johnson*, No. 2:10-
cv-02203-RLH-GWF (D. Nev. Feb. 10, 2011), ECF No. 130 (ordering prelim. inj.
against defendants who used shell companies to secure merchant accounts as part
of deceptive rebilling scheme); *see also FTC v. Triangle Media Corp.*, No.
18cv1388-MMA (NLS), 2018 WL 4051701, at *12 n.3 (S.D. Cal. Aug. 24, 2018)
(granting prelim. inj. for rebilling issues and quoting receiver's finding that
"Defendants have built a network of merchant accounts by forming shell
companies and convincing ordinary people, for a minimum of $500 per month, to
act as the 'front' (aka 'signer' or 'nominee') for the shell company and a merchant
account in its name.").

[90] *See US v. Johnson*, 732 F. App'x at 642-43 (describing credit card laundering as
"strategy" that enabled defendants to continue to access credit card networks after
true merchant was unable to acquire new merchant accounts).

individuals who may have been previously flagged by a bank or credit card association for engaging in unscrupulous practices may nonetheless be able to access the payment networks by using the nominees to conceal their identities.

*ii.     Defendants' Credit Card Laundering Practices*

The structure of the Apex Enterprise is revealed in a website registered to Apex Capital Group, with the Uniform Resource Locator ("URL") "centralsitemanager.com."[91]  This domain contains hundreds of internal websites, which all have the Apex Capital Group logo at the top of the page, followed by a company name, a product, the name of a bank or payment processor, an initial and recurring price, a billing descriptor, and the first and last name of someone identified as a "signer."[92]  Each of these websites appears to show the details of a unique merchant account in the name of a shell company and signer within the Apex Enterprise.  The website identifies dozens of company names, which are either limited liability companies or limited companies, and more than forty "signers."[93]

The list of company names includes many of the entities listed in Exhibits A and B to the Complaint.  The corporate entities referenced in these exhibits were shell companies.[94]  They shared officers and corporate addresses,[95] which were either just mail drops or residential homes.[96]  Moreover, all of the shell companies'

---

[91] App. 156-157, 188-190, 1173.

[92] *See, e.g.*, App. 188-194, 895-990; 992-1006.

[93] App. 188-194.

[94] App. 1189-1190 (Van Wazer Decl.) (concluding that "the primary function of the [domestic shell company accounts] appears to be transferring funds in the Apex Citi Account" and noting that these accounts had no "payments for operating expenses"), App. 1210 (diagram showing flow of consumer payments).

[95] App. 170-172.

[96] App. 171-172.

bank accounts reviewed by Plaintiff's Forensic Accountant diverted funds to the Apex Citi Account, which paid the operating expenses of the Apex Enterprise.[97] The only authorized signers for their bank accounts were Peikos, Barnett, or an Apex Capital Group employee, Raul Camacho.[98]

The signers listed in the centralsitemanager.com website purport to be principals and/or owners of the shell companies,[99] but they are merely nominees. They are not authorized signers on the shell companies' bank accounts, and they do not receive any of the profits from the companies.  Instead, Defendants pay them a commission of approximately $1,000 per month from the Apex Citi Account.[100]

The shell companies obtained merchant accounts that allowed the Apex Enterprise to accept credit and debit card payments from consumers.  Numerous merchant account applications were submitted to multiple acquirers in the names of the shell companies.  The applications included false representations that the shell companies were the merchants and that the nominees were the merchants' principals.  These representations were false because the true seller of each of these products was Apex Capital Group, with Peikos and Barnett as its principals.  Apex Capital Group paid all of the expenses related to the sales of the products and

---

[97] App. 1187-1190, 1196-97 (Van Wazer Decl.).

[98] App. 174-175 (Hogan Decl.).

[99] For the U.S. shell companies, the signers purport to be principals and owners of the shell companies in merchant account applications.  *E.g.*, App. 176-179, 660, 673, 687, 713, 727, 741.  For the U.K. companies, the signers are typically listed in corporate filings as principals and, in some instances, as initial owners of the shell companies.  *E.g.*, App. 216-219, 238-242, 256-259.  Where the signers are listed as the initial owners, subsequent corporate filings make clear that they subsequently transferred their ownership to Omni Group.  *E.g.*, App. 223-224, 263-264, 276-277, 289-290, 315-316.

[100] App. 1197, 1226-1228.

ultimately realized the resulting profits.[101]  Apex Capital Group's principals exercised control over the shell companies through, among other things, their authority over the shell companies' bank accounts.[102]  The identification of the shell companies on the merchant accounts merely served to obscure the fact that Apex Capital Group, and its principals, were the beneficial sellers of the products.

The applications for merchant accounts submitted on behalf of the Defendants are replete with numerous other misrepresentations that allowed the Defendants to obtain and maintain access to the payment networks.  For example, a merchant account application submitted on behalf of Singletrack Solutions LLC ("Singletrack Solutions") for a pet vitamin product called Optimal Pet Direct lists Graciela Vasquez as the president and 100% owner of Singletrack Solutions.  Her email is provided as gracielavasquezapex@yahoo.com.[103]  Ms. Vasquez signed and dated the application July 15, 2015.  A different merchant account application submitted on behalf of Singletrack Solutions for a muscle-building product called Ultra lists a different signer, Juliane Pineda, as the president and 100% owner of Singletrack Solutions.  Ms. Pineda's email is provided as julianepinedaapex@yahoo.com.  This application asks if the "merchant or any of the Principals ever had a merchant relationship terminated" and the answer provided is "No."  Ms. Pineda signed and dated the application May 2, 2016.

These statements were false.  By May 2, 2016, two merchant accounts opened at another acquirer in the name of Singletrack Solutions had already been

---

[101] App. 1190-1199 (Van Wazer Decl.).

[102] App. 174-175 (Hogan Decl.)

[103] App. 741.  Indeed, the merchant applications included the signers' email addresses, and many of the email addresses conformed to the same model: [signer name]apex@yahoo.com.  *E.g.* App. 176-179, 673, 687, 727.

closed due to excessive chargebacks.[104]  Furthermore, neither Ms. Vasquez nor Ms. Pineda were the principals of Singletrack Solutions.  Singletrack Solutions' corporate filings list Raul Camacho, an employee of Apex Capital Group,[105] as the entity's CEO.[106]  Peikos and Camacho are the authorized signers on the bank account provided in both merchant account applications.  Peikos and Barnett were the individuals who ultimately profited from consumer sales made possible by these, and other, merchant accounts.[107]

Defendants made other false representations to the acquirers as well.[108] Defendants included in some of the merchant account applications images of falsified checks.[109]  For example, the merchant account application described above for Singletrack Solutions in the name of Ms. Vasquez includes an image of a check, included here as Figure 3(a).

---

[104] App. 870 (of fifteen merchant accounts that were closed, eleven were closed due to excessive chargebacks).

[105] App. 599.

[106] App. 352.

[107] App. 651-656 (Singletrack Solutions' bank account received deposits with the descriptions "Ultra" and "Optimal Pet Direct").  Moreover, the Van Wazer Declaration shows (1) Singletrack Solutions' bank account was part of the "Group 2 Wells Fargo Accounts," App. 1208; (2) the Group 2 Wells Fargo Accounts received millions of dollars from merchant account services, App. 1203-1204; (3) the Group 2 Wells Fargo Accounts transferred millions of dollars into the Apex Citi Account, App. 1204; and (4) Barnett and Peikos withdrew $7.5 million from the Apex Citi Account, App. 1196.  *See also* App. 1210 (diagram showing funds flowing to Peikos and Barnett).

[108] App. 179-183.

[109] *E.g.*, App. 676, 690, 716, 730, 744, 774.

1    **FIGURE 3(a)**[110]

2

3

4

5

6

7

8



9    The check is for a Wells Fargo bank account with the last four digits x1101, and it

10   is check number 1002.  It bears Ms. Vasquez's name.  The image of a check

11   included here as Figure 3(b) was provided as part of Singletrack Solutions'

12   merchant account application in Ms. Pineda's name.

13   **FIGURE 3(b)**[111]

14

15

16

17

18

19

20   This check image shows the same Wells Fargo bank account number and lists the

21   same check number, but this time bears Ms. Pineda's name.  Finally, the real check

22   number 1002 for the Wells Fargo bank account ending in x1101, included here as

23   Figure 3(c), has Phillip Peikos's name on it.

24

25

26   _____

27   [110] App. 744.

28   [111] App. 730.

24

**FIGURE 3(c)**[112]



In fact, Peikos and Camacho were the only authorized signatories for that account.[113]

Defendants not only deceived acquirers in their applications for merchant accounts; they also made false statements in letters responding to consumer chargebacks.  Defendants falsely represented (1) that customers had ordered products other than the ones customers actually ordered; (2) that customers ordered products through websites other than the ones consumers actually used; (3) that on those websites were clear and conspicuous disclosures of the terms and conditions; and (4) that consumers checked boxes to attest that they expressly agreed to the terms and conditions.[114]

Many of Defendants' merchant accounts were shut down, often due to their

---

[112] App. 650.

[113] App. 175 (Hogan Decl.).  Defendants' misrepresentations also included regularly opening merchant accounts to sell purported muscle-building or workout products, and then instead selling different products through those accounts, typically sexual performance products.  App. 179-183.

[114] App. 794-809, 811-831, 833-850 (chargeback files containing misrepresentations).

high chargeback rates,[115] but by churning shell companies, nominees, and merchant accounts, Defendants were able to avoid detection by the payment processing system and maintain access to consumer payment cards. Defendants' unlawful, continuing access to card payments has prolonged the scam and expanded the scope of consumer injury. Defendants took more than $22 million from consumers in a three year period alone.[116]

## IV.   ARGUMENT

Defendants' deceptive scheme violates Section 5 of the FTC Act, 15 U.S.C. § 45(a), Section 4 of ROSCA, 15 U.S.C. § 8403, Section 907(a) of EFTA, 15 U.S.C. § 1693e(a), and Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b). To prevent any further injury to consumers, the FTC asks that the Court issue the proposed TRO *ex parte*. The proposed TRO would enjoin Defendants' ongoing law violations and would provide other equitable relief designed to preserve the Court's ability to deliver monetary relief to victims at the conclusion of the case.

### A.   **This Court Has The Power To Grant The Requested Relief**

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), gives district courts authority to grant both a permanent injunction against violations of any provisions of law enforced by the FTC, and "any ancillary relief necessary to accomplish complete justice." *FTC v. H. N. Singer, Inc.*, 668 F.2d 1107, 1113 (9th Cir. 1982). Ancillary relief may include a non-noticed TRO, a preliminary injunction, an asset

---

[115] *Supra* n. 104.

[116] The FTC's Forensic Accountant analyzed that in the 2014-2017 period, domestic shell companies took in $9.6 million from consumers, net of chargebacks and returns, and U.K. limited companies took in $12.8 million from consumers. App. 1190 (Van Wazer Decl.).

freeze, and the appointment of a receiver.[117]  Section 19 of the FTC Act, 15 U.S.C.

§ 57b, also gives district courts jurisdiction to issue preliminary relief.  *H.N.*

*Singer*, 668 F.2d at 1110 ("It is clear that under this section [19] a district court has

jurisdiction to issue a preliminary injunction.").  Moreover, Section 19 provides "a

basis for the order freezing assets."  *Id.* at 1112.  Courts in the Ninth Circuit,

including in this district, have often granted *ex parte* TROs with asset freezes in

FTC cases brought against online rebilling schemes, like Defendants' operation.

*See, e.g.*, *FTC v. Cardiff*, No. 18-cv-2104, 2018 WL 5622644 (C.D. Cal. Oct. 10,

2018); *FTC v. Bunzai Media Grp., Inc.*, No. CV15-C4527-GW (PLAx), 2015 WL

5305243, at *1 (C.D. Cal. Sept. 9, 2015) (granting preliminary injunction and

referencing *ex parte* temporary restraining order with asset freeze and receiver

entered on June 17, 2015).[118]

## B.     The FTC Meets The Standard For Issuance Of A Temporary Restraining Order

A district court may grant the FTC temporary or preliminary injunctive

relief, where necessary to preserve the possibility of final relief, under a

---

[117] *H. N. Singer*, 668 F.2d at 1113 ("§ 13(b) provides a basis for an order freezing assets"); *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1233-34 (9th Cir. 1999) (affirming preliminary injunction including asset freeze); *FTC v. Am. Nat'l Cellular, Inc.*, 810 F.2d 1511 (9th Cir. 1987) (upholding appointment of receiver and asset freeze).

[118] *See also FTC v. RevMountain, LLC*, No. 17-cv-02000-APG-GWF (D. Nev. July 25, 2017) (granting *ex parte* TRO, including asset freeze, in online rebilling scheme); Order Granting *Ex Parte* Mot. For TRO and Appointing Receiver, *FTC v. Health Formulas, LLC*, No. 2:14-cv-1649-JAD-GWF (D. Nev. Oct. 9, 2014), ECF No. 12; *cf.* Order Granting in Part & Den. in Part Pl.'s *Ex Parte* Mot. for TRO with Asset Freeze, Appointment of a Receiver, other Equitable Relief, & Order To Show Cause why a Prelim. Inj. Should Not Issue, *FTC v. Triangle Media Corp.*, 18-cv-01388-MMA-NLS (S.D. Cal. June 29, 2018) (granting in part *ex parte* TRO in online rebilling scheme, including asset freeze, but denying expedited discovery).

"significantly more lenient standard" than that faced by private litigants. *FTC v. Wealth Educators, Inc.*, No. 15-02357 SJO (JEMx), 2015 WL 11439063, at **4-5 (C.D. Cal. Apr. 6, 2015).[119]  Preliminary injunctive relief is appropriate where the FTC demonstrates (1) a likelihood of success on the merits and (2) that the equities weigh in the FTC's favor.[120]

i.  *Plaintiff Is Likely To Succeed On The Merits*

Substantial evidence indicates that (1) Defendants engage in unfair and deceptive practices that violate Section 5(a) of the FTC Act; (2) Defendants make unauthorized charges on consumers' credit and debit cards in violation of ROSCA; and (3) Defendants make unauthorized deductions from consumers' bank accounts in violation of the EFTA and Regulation E.  The evidence also shows that the Individual Defendants are liable for these practices.

*(1) Defendants Are Violating The FTC Act*

By deceptively obtaining consumers' payment information, charging them without authorization, and laundering those charges through merchant accounts opened in the name of entities other than Apex Capital Group, Defendants have violated Section 5(a) of the FTC Act, which prohibits "unfair or deceptive acts or practices in or affecting commerce."  15 U.S.C. § 45(a).  Defendants' practices are both deceptive and unfair.

---

[119] *See also Affordable Media*, 179 F.3d at 1233 (quoting *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1160 (9th Cir. 1984)).

[120] The FTC need not prove irreparable harm or intent to deceive. *Wealth Educators*, 2015 WL 11439063, at *5; *FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1202 (10th Cir. 2005).  Moreover, it is "well established" that "proof of individual reliance by each purchasing customer is not needed. . . .  A presumption of actual reliance arises once the Commission has proved that the defendant made material misrepresentations, that they were widely disseminated, and that consumers purchased the defendant's product." *FTC v. Figgie Intern., Inc.*, 994 F.2d 595, 605-06 (9th Cir. 1993).

*a. Defendants' Practices Are Deceptive*

An act or practice is deceptive if (1) there is a representation, omission, or practice, that (2) is material, and (3) is likely to mislead consumers acting reasonably under the circumstances. *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994). A representation, omission, or practice is material if it "'involves information that is important to consumers and, hence, [is] likely to affect their choice of, or conduct regarding, a product.'" *FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006) (quoting *In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 165 (1984)). Materiality is presumed for "[e]xpress claims or deliberately made implied claims." *FTC v. Lights of Am., Inc.*, SACV10-01333 JVS(MLGx), 2013 WL 5230681, at *41 (C.D. Cal. Sept. 17, 2013) (citing *Pantron I*, 33 F.3d at 1095-96). A representation may be likely to mislead by virtue of the net impression it creates; the FTC may establish that it is likely to mislead by demonstrating that the representation was false. *FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1066-67 (C.D. Cal. 2012). In addition, a "failure to disclose pertinent information is deceptive if it has a tendency or capacity to deceive." *FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 532 (S.D.N.Y. 2000).

Here, Defendants have materially misled consumers about their supposedly "free" trials by misrepresenting the cost of the trial offer. Defendants represent on their websites that the consumer will only pay for shipping and handling, typically $4.95, to receive a trial of a product.[121] This is an express representation that is presumed to be material, *Pantron I*, 33 F.3d at 1095-96, and it is a false representation.[122] Defendants in fact charge consumers the full price for that

---

[121] *See supra* 9-11 & nn. 46-56.

[122] *Supra* 12-13 & nn. 63-64. The terms and conditions were not disclosed or were inadequately disclosed. *See supra* 11-12 & nn. 57-61. To the extent they were disclosed, such disclosures appeared in buried small print or in a separate

purportedly free trial, typically $80 to $100, and continue to charge them the same amount each month until the consumer is able to cancel the order.[123]  Because Defendants' representations that trials were "free" and that consumers would be charged only "$4.95," were false, the representations were likely to mislead reasonable consumers.  *See John Beck Amazing Profits*, 865 F. Supp. 2d at 1067.

Defendants also violate the FTC Act by failing to clearly and prominently disclose to consumers that, by ordering a trial product, the consumers are agreeing to be billed $80 or more within two weeks of their order, and on an ongoing basis every month thereafter.  *See Five-Star Auto Club*, 97 F. Supp. 2d at 532. Advertisements, like the content on Defendants' websites, that fail to disclose material information are deceptive.  *See John Beck Amazing Profits*, 865 F. Supp. 2d at 1067.  The terms of the trial offer are material to consumers and omitting them is likely to cause consumers to misunderstand the basic nature of their order, including how much and how often they will be charged, how to stop the charges, and whether refunds are available.  Courts have made clear that the failure to disclose clearly the terms of such a continuity program is both deceptive and material to consumers.  For instance, courts in this district have held that "information that purchasers would be automatically enrolled in continuity programs upon their purchase of the [products] is material, and Defendants' failure to disclose this information to consumers is likely to mislead the consumers acting

---

document accessible only through a hyperlink.  *See supra* 12 & nn. 60-61.  Small print disclosures, however, cannot overcome a deceptive net impression. *Cyberspace.com*, 453 F.3d at 1200 (collecting cases where courts held representations were deceptive despite presence of truthful disclosures); *see also FTC v. Johnson*, 96 F. Supp. 3d 1110, 1146 (D. Nev. 2015) ("The mere fact that the sites contained disclosures in smaller print . . . does not alter the deceptive net impression as to the cost and nature of the product because consumers would not be inclined to seek out this information.").

[123] *See supra* 12-13 & nn. 63-64.

reasonably under the circumstances." *Id.* at 1074.  Courts within this circuit have concluded that the FTC established a likelihood of success on the merits in substantially similar cases:

> [M]any of Defendants' websites do not adequately disclose that customers will be charged the full price of the product if they do not cancel within fourteen days despite the fact that the offer often states that it is for a month's supply of product, or that customers will be charged periodically for new shipments of product unless they affirmatively take action to cancel.

*Health Formulas, LLC*, 2015 WL 2130504, at *10 (D. Nev. May 6, 2015).

Finally, Defendants violate Section 5 by representing to consumers who have ordered a trial that the order is not complete until they click a "complete checkout" button, when in fact clicking the button obligates consumers to receive and pay for an additional product.[124]  These representations are false because consumers' orders are already complete before they click that button.

As a result of each of the misrepresentations and omissions detailed above, consumers are deceived in violation of Section 5 of the FTC Act.

### b. Defendants' Practices Are Unfair

An act or practice is unfair under Section 5 of the FTC Act if:  (1) it causes, or is likely to cause, substantial injury to consumers that (2) is not reasonably avoidable by consumers and (3) is not outweighed by countervailing benefits to consumers or competition.  15 U.S.C. § 45(n).  "Substantial injury" is demonstrated where defendants do a "small harm to a large number of people." *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1157-58 (9th Cir. 2010) (quotation marks and citation omitted).  Harm is not reasonably avoidable where consumers could not make a free or informed choice.  *Id.* at 1158.  An act or practice is not outweighed by countervailing benefits to consumers or competition where it is not

---

[124] *See supra* 13-15, nn. 65-69.

31

accompanied by an increase in services or benefits to consumers, or by benefits to competition. *FTC v. JK Publ'ns, Inc.*, 99 F. Supp. 2d 1176, 1201 (C.D. Cal. 2000).

Defendants unfairly charged consumers without their authorization. Defendants did not clearly and conspicuously inform consumers of the offers' material terms or conditions, including the amount their accounts would be charged. Hence, consumers could not properly authorize the charges. Defendants took at least $22 million from unsuspecting consumer victims, demonstrating substantial consumer injury.[125] These payments were not avoidable by consumers, since consumers only learned of the charges after their accounts had been charged or debited. *Neovi*, 604 F.3d at 1158; *Ideal Fin. Solutions*, 2015 WL 4032103, at *8. Nor could consumers mitigate their injuries, as Defendants set up roadblocks preventing them from receiving full refunds.[126] Scamming consumers out of their money has no countervailing benefits. It is well established that such conduct constitutes an unfair practice in violation of Section 5 of the FTC Act; indeed, "[c]ourts regularly find unauthorized billing to be unfair." *Ideal Fin. Solutions*,

---

[125] Consumer injury was substantial on an individual level as well; one consumer complained that he or she lost $200 to the Apex Enterprise, which was food money for the month for the consumer's children. That consumer explained, "[w]e will not be able to eat this month due to this [scam]." App. 136 (Washington BBB Decl.). Multiple consumers described themselves as "disabled" and/or on a "fixed income" for whom the unauthorized charges were "a terrible burden." App. 138, 139, 141-42. *See also FTC v. Ideal Fin. Solutions, Inc.*, No. 2:13-cv-00143-JAD-GWF, 2015 WL 4032103, at *30 (D. Nev. June 30, 2015) ("[T]aking consumers' funds without authorization causes substantial injury, even when the amount taken is relatively small.").

[126] *See supra* 15-16 & nn. 72-79; s*ee also Ideal Fin. Solutions*, 2015 WL 4032103, at *31 (finding that defendants violated the FTC Act based on unauthorized charges where "the consumers' ability to pursue potential avenues toward mitigating the injury was obstructed by [defendant's] customer service staff. . . .").

2015 WL 4032103, at *8 & nn.140-41 (collecting cases).[127]

Defendants also unfairly injured consumers by engaging in credit card laundering. Defendants ensured continuing access to the credit card networks by systematically and egregiously making false statements to acquirer banks. Indeed, in several merchant applications, they went so far as to submit doctored checks in an attempt to show that nominees were signatories on the shell companies' bank accounts, when they were not. Defendants used these unlawfully-obtained merchant accounts to process consumer payments, and then transferred the money from the consumer sales to the Apex Citi Account. This allowed them to evade the credit card networks' risk management rules, prolonging their ability to process consumer payments, and dramatically magnifying the scope of consumer injury. The practice has no countervailing benefit to consumers or to competition; on the contrary, credit card laundering undermines the entire payment processing system and efforts to ensure its stability; laundering is "a risk to the integrity of the system as a whole." *Lancore Servs.*, 2009 WL 2173222 (quoting lower court's findings). Nor could consumers avoid being victimized in this way. Since consumers did not authorize the charges in the first place, they certainly could not avoid having their payments processed through these merchant accounts.

### (2) *Defendants Are Violating ROSCA*

Defendants' billing practices also violate ROSCA,[128] which prohibits charging consumers for goods or services sold online through a negative option feature like Defendants', unless the seller meets certain conditions. A negative

---

[127] *See also FTC v. Global Mktg Grp., Inc.*, 594 F. Supp. 2d 1281, 1288-89 (M.D. Fla. 2008); *JK Publ'ns, Inc.*, 99 F. Supp. 2d at 1202-03; *Neovi*, 604 F.3d at 1157; *FTC v. Commerce Planet Inc.*, No. SACV 09-01324-CJC(RNBx), 2011 WL 13225087, at *2 (C.D. Cal. Sept. 8, 2011).

[128] A violation of ROSCA is a violation of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a. 15 U.S.C. § 8404.

option feature is "'a provision under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer.'" *FTC v. Credit Bureau Ctr., LLC*, 325 F. Supp. 3d 852, 862 (N.D. Ill. 2018) (quoting 16 C.F.R. § 310.2(w)). Specifically, Section 4 of ROSCA, 15 U.S.C. § 8403, requires the seller (1) to clearly and conspicuously disclose all material terms of the transaction, (2) to obtain the consumer's express informed consent before making the charge, and (3) to provide a simple mechanism to stop recurring charges.

Defendants have failed to satisfy all three of these requirements. First, Defendants violated ROSCA by failing to clearly and conspicuously disclose to consumers many material terms of the transaction, including: the amount that consumers will be charged for the purportedly free trial; the fact that consumers will be signed up for repeated shipments and charged for those shipments on a monthly basis; the amount of those charges; and the onerous return, cancellation, and refund policies. These terms were completely absent from the website in some instances;[129] on other occasions, they were provided either in small, hard to read type on the face of the website or hidden in hyperlinks at the bottom of the website.[130]  Such disclosures do not cure the ROSCA violations. *See Health Formulas*, 2015 WL 2130504, at *17  (disclosures of negative option were not clear or conspicuous, where "buried in fine print on the payment page of Defendants' websites or stated in separate Terms and Conditions documents").[131]

---

[129] *See supra* 12 & n. 62; 14 & n. 69.

[130] *See supra* 10 & nn. 51-52, 61.

[131] *See also Credit Bureau Center*, 2018 WL 3122179, at *7 (granting summary judgment to FTC on ROSCA count) ("[C]ourts have routinely noted that  . . . a disclosure in small type is unlikely to be clear or conspicuous when accompanied by type that is larger, bolded, or italicized.").

Second, defendants failed to obtain consumers' express, informed consent before charging their cards.  By failing to provide clear and conspicuous disclosures, Defendants ensured that consumers would remain uninformed.  *Id.* at *16.

Third, Defendants have not provided a simple mechanism to stop recurring charges.  Numerous consumers reported that the customer service phone numbers provided to them did not work, and some consumers continued to be charged even after speaking to customer service representatives and requesting cancellation.[132] Some consumers even resorted to closing their credit card accounts to ensure that they would not be subjected to additional charges.[133]  Thus, Defendants did not provide an effective or simple mechanism to stop recurring charges.

### (3) Defendants Are Violating The EFTA

The EFTA and its implementing regulation, Regulation E, regulate the circumstances under which a merchant may make regularly recurring debits from a consumer's bank account.  EFTA and Regulation E require that before a merchant may make such recurring debits, it must obtain a written authorization signed or similarly authenticated by the consumer.  15 U.S.C. § 1693e(a); 12 C.F.R. § 205.10(b).  For an authorization to be valid, the terms of the preauthorization transfer must be "clear and readily understandable," and the authorization "should evidence the consumer's identity and assent to the authorization."  *CFPB Official Staff Cmt. to Reg. E*, 12 C.F.R. Part 205, Supp. I, ¶ 10(b), cmts. (5) and (6).  Moreover, a copy of the authorization must be provided to the consumer.  15 U.S.C. § 205.10(b).  These protections ensure that consumers' consent to recurring debits will be knowing and informed.

---

[132] App. 34, 54-55, 113.

[133] App. 4, 54; *see also* 113.

Because Defendants repeatedly charge consumers' debits cards,[134] but do not adequately disclose that consumers will be charged on a monthly basis, consumers cannot knowingly authorize Defendants to make recurring debits from their bank accounts.  Moreover, consumers receive no copies of any purported authorization for debits to their bank accounts.  For these reasons, Defendants' business practices fail to comply with EFTA.

### ii. *The Equities Weigh In The FTC's Favor*

The FTC's interest in protecting the public interest outweighs Defendants' interests in continuing these deceptive practices.  "[P]ublic equities receive far greater weight" than private equities.  *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1165 (9th Cir. 1984).  Defendants have operated their deceptive scheme since at least 2013, and have received over $22 million in ill-gotten gains from consumers since then.  Because the conduct is ongoing,[135] it is near certain that future violations will occur absent injunctive relief.  The public's interest in immediately halting this conduct and preventing the victimization of additional consumers far outweighs any interest Defendants may have in continuing their unlawful practices.  On the contrary, there can be "'no oppressive hardships to defendants in requiring them to comply with the FTC Act, refrain from fraudulent representation or preserve their assets from dissipation or concealment.'"  *FTC v. World Wide Factors*, 882 F.2d 344, 347 (9th Cir. 1989) (quoting and affirming district court's balance of equities).

### C. Defendants Are Each Liable For The Law Violations

### i. *The Corporate Defendants Operate As A Common Enterprise*

The Individual Defendants ran the Apex Enterprise through a web of companies, including both the Corporate Defendants and the entities listed in

---

[134] *See e.g.*, App. 82-83, 127, 136, 140-141.

[135] *Supra* Section II(A)(i).

36

Exhibit A and Exhibit B to the Complaint, which operate as a common enterprise. Each entity in a common enterprise can be held jointly and severally liable for the actions of each of the other entities in the group.  *FTC v. Johnson*, 156 F. Supp. 3d 1202, 1207 (D. Nev. 2015).  Entities constitute a common enterprise when they exhibit "'strongly interdependent economic interests or the pooling of assets and revenues.'"  *Id.* (quoting *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1142-43 (9th Cir. 2010).  Courts consider a variety of factors in determining whether a common enterprise exists, including:  "(1) common control; (2) sharing office space and offices; (3) whether business is transacted through a maze of interrelated companies; and (4) commingling of funds."  *John Beck Amazing Profits*, 865 F. Supp. 2d at 1082.

As demonstrated in Section II, each of these factors is present here.  The Corporate Defendants have been under the common control of the Individual Defendants.[136]  They share office spaces and officers.[137]  They transact business through dozens of interrelated shell companies.[138]  They commingle assets extensively, pooling all revenue in a single corporate account from which payments are made for the enterprise's operating expenses and distributions to the Individual Defendants.[139]  No distinction exists among the Corporate Defendants; they operate for a single, common purpose – executing the scam at issue here. Each of the Corporate Defendants is therefore liable for the total injury.

ii.   *The Individual Defendants Are Liable For Injunctive And Monetary Relief*

---

[136] *See supra* 3-7 & nn. 6, 10, 15.

[137] *See supra* 5 & nn. 13-14; 6 & n. 19; nn. 95-96.

[138] *See supra* 20-21 & nn. 94-101.

[139] *See supra* 20-22 & nn. 97-101.

Individual defendants may be held liable for injunctive relief where the FTC demonstrates that (1) the corporation committed misrepresentations or omissions upon which a person might reasonably rely, resulting in consumer injury, and (2) the individual defendant participated directly in the unlawful acts or practices or had authority to control them.  *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170-71 (9th Cir. 1997); *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989).  The first element is established for the reasons described above,[140] and the second element is established because both of the Individual Defendants were officers of Apex Capital Group and authorized signatories for the Apex Citi Account, as well as many other bank accounts in the names of the shell companies. *Publ'g Clearing House*, 104 F.3d at 1170; *John Beck Amazing Profits,* 865 F. Supp. 2d at 1080 ("Status as a corporate officer is sufficient to establish individual liability.").

Individual defendants can also be held liable for monetary relief, including restitution, where they had some knowledge of the unlawful acts or practices.  *See Publ'g Clearing House*, 104 F.3d at 1171.  The FTC can satisfy this knowledge requirement by showing actual knowledge of the misrepresentations, reckless indifference to the truth or falsity of the misrepresentations, or an awareness of a high probability of fraud coupled with an intentional avoidance of the truth.[141]  *Id.* "The extent of an individual's involvement in a fraudulent scheme alone is sufficient to establish the requisite knowledge for personal restitutionary liability." *Affordable Media*, 179 F.3d at 1235 (finding individual monetarily liable on basis of control of corporate defendant); *FTC v. Am. Fin. Benefits Ctr.*, 324 F. Supp. 3d 1067, 1080 (N.D. Cal. 2018) ("Circumstantial evidence regarding the individual's

---

[140] *See supra* 8-17.

[141] Intent to defraud is not necessary to establish that the individuals are liable for the corporate conduct.  *Publ'g Clearing House*, 104 F.3d at 1171.

'degree of participation in business affairs is probative of knowledge.'") (quoting *Amy Travel Serv.*, 875 F.2d at 574).

Here, both Peikos and Barnett had the requisite knowledge to justify individual monetary liability for the Corporate Defendants' acts. They were the two primary principals of this long-running scam that used a large number of dummy entities and straw persons to illegally obtain merchant accounts. As discussed above, they were owners of Apex Capital Group and of Omni Group, and each received millions of dollars in "distributions" and transfers from the Apex Citi Account.[142] They were also directly involved in the business operations. They were signatories for the Apex Citi Account, beginning in August 2013, and for dozens of the shell companies' bank accounts. Peikos himself signed checks made out to shell entities to cover overdraft expenses, checks paying rent for Apex's office space, and at least one check made out to the nominal owner of one of the U.K. Shell Company Defendants,[143] who is also one of the "signers" listed on the centralsitemanager.com domain.[144] Both Peikos and Barnett used credit cards with their names on them to make purchases from domain registrars on behalf of Apex Capital Group.[145] Barnett was involved in discussions about shipping logistics;[146] he set up and approved payments for advertising and fulfillment services;[147] and he was involved in setting up customer database products and services.[148] Peikos and Barnett's involvement in these day-to-day transactions demonstrates that they had

---

[142] *See supra* 6-7 & nn. 23-24, 28-29, 31, 35.

[143] App. 585, 587-599.

[144] App. 193-194.

[145] App. 1175-1176.

[146] App. 1178-1180.

[147] App. 615 (Barnett approved wire transfers to "Admecha LLC" and "Direct Outbound Services LLC," among others).

[148] App. 1184-1185.

knowledge of, or at least were recklessly indifferent to, the falsity of the representations and omissions.  *See Am. Fin. Benefits Ctr.*, 324 F. Supp. 3d at 1080 (finding knowledge requirement satisfied for purposes of establishing individual monetary liability where defendant was a founder and owner of companies, served as officer, was the signatory on their bank accounts, and signed contracts; these facts "evidence[] his involvement in both their high-level and day-to-day management").

In addition, Peikos and Barnett likely had direct knowledge of consumers' confusion about the purported free trial offers.  Numerous consumer complaints, chargeback documentation, and letters from payment processors terminating merchant accounts were mailed or emailed to addresses associated with Apex Capital Group.[149]  Some of this correspondence was sent to a third party chargeback monitoring service paid for from the Apex Citi Account, for which Peikos and Barnett were the only signatories.[150]

## V. AN *EX PARTE* TRO WITH ASSET FREEZE AND A RECEIVER IS ESSENTIAL TO PREVENT FURTHER HARM TO CONSUMERS, PROHIBIT DEFENDANTS FROM DISSIPATING ASSETS OR DESTROYING DOCUMENTS, AND PRESERVE THE COURT'S ABILITY TO AWARD EFFECTIVE FINAL RELIEF

In its Complaint, Plaintiff seeks a permanent injunction that would prohibit Defendants from future violations and would provide restitution for their victims. Through the present application, the FTC seeks temporary and ancillary relief in order to avoid continuing consumer injury while this action is pending, and to

---

[149] App. 142-143, 169-170, 207, 872, 875, 878.

[150] App. 142-143 (consumer complaints sent to "a.horne@cb911.email.contrepro.com"), 575, 836 ("CB911" flagged order as chargeback), 1217 (payments from Apex Citi Account to "Chargeback Alert Capital Group").

preserve the possibility of consumer redress.  Achieving these dual aims requires the appointment of a temporary receiver, an immediate freeze of Defendants' assets, and expedited discovery.  Absent such relief, there is a substantial risk that Defendants will continue to operate their deceptive scheme, destroy documents, and dissipate or conceal their ill-gotten assets in an attempt to preclude satisfaction of any final order, including monetary relief.

Further, Defendants here are particularly likely to attempt to frustrate potential victim relief.  Defendants have designed the Apex Enterprise to conceal the identities of the Individual Defendants and mask the involvement of Apex Capital Group.  The Apex Enterprise operates through dozens of shell entities in the United States and abroad.  Defendants conceal their actual office address by listing mail drops, residential homes, P.O. Boxes, and the addresses of their service providers instead.[151]  They move funds among dozens of bank accounts using an elaborate system of inter-company transfers.[152]  They sometimes transfer money to corporate accounts offshore – indeed, Apex Capital Group alone has bank accounts in the continental United States, Puerto Rico, and Luxembourg, and Omni Group and the U.K. Corporate Defendants also maintain corporate accounts offshore.[153] Defendants' extensive international connections provide ample means for secreting assets offshore and concealing them there.

### A.    The Proposed TRO Should Be Entered *Ex Parte*

Federal Rule of Civil Procedure 65(b) permits this Court to enter TROs without notice upon a clear showing that "immediate and irreparable injury, loss,

---

[151] App. 147-148, 169-172.

[152] App. 1192, 1201.

[153] App. 618-619 (Apex Citi Account transferred money to an Apex Capital Group LLC bank account in Puerto Rico, an Omni Group LTD bank account in London, and an Apex Capital Group Intl SARL account in Luxembourg in April and May of 2018).

or damage will result" if notice is given to defendants.  Fed. R. Civ. P. 65(b).
Here, immediate and irreparable injury will likely result if notice is provided to
Defendants.  First, the FTC's experience has shown that, upon discovery of legal
action, many defendants withdraw funds, destroy vital documents, and flee.[154]
Second, these Defendants have every incentive to dissipate assets and destroy
inculpatory evidence if given advance notice of the FTC's application.
Defendants' use of shell entities, and the Individual Defendants' efforts to conceal
their association with those shell entities, demonstrate a history of sophisticated
attempts to evade detection.  And Defendants have infrastructure in place to
transfer money out of the country.[155]  Indeed, their submission to banks of doctored
checks is indicative of their willingness to take measures necessary to deceive and
evade.  Providing notice of this action would likely impair the FTC's ability to
secure relief for consumers because it is likely that Defendants would dissipate
assets and destroy documents – a result that would cause immediate, irreparable
harm.  In light of these facts, this Court should grant the requested relief *ex
parte*.[156]

**B.     An Asset Freeze Is Critical To Preserve Effective Consumer
         Relief**

In the Ninth Circuit, an asset freeze is appropriate where, without the freeze,
there is a likelihood of dissipation of assets.  *Johnson v. Couturier*, 572 F.3d 1067,

---

[154] *See* Certification and Decl. of Pl.'s Counsel Brian Lasky in Supp. of Pl.'s:  (A)
*Ex Parte* Mot. for TRO; (B) *Ex Parte* Seal Order Application; and (C) *Ex Parte*
Appl. for Waiver of Notice Requirement.

[155] App. 618-619.

[156] *See AT&T Broadband v. Tech Comm'n, Inc.*, 381 F.3d 1309, 1319 (11th Cir.
2004) (holding *ex parte* relief appropriate where defendant, or persons involved in
similar conduct, concealed evidence or disregarded court orders).  Courts have
frequently entered *ex parte* TROs in FTC cases involving deceptive rebilling
scams.  *See supra* 27 & n.118.

1085 (9th Cir. 2009). Courts have found a likelihood of dissipation of assets in cases where, as here, business operations are permeated by fraud.[157] Moreover, asset freezes are appropriate where, as here, it is "extremely unlikely that the frozen assets will be adequate to redress consumer injuries."[158]

These Defendants are especially likely to dissipate assets because, as discussed *supra* Section V(A), they have both the infrastructure and the means to do so. They have caused consumer injury of at least $22 million. They have created shell corporations in multiple countries to shield themselves from detection and have used offshore bank accounts to move large amounts of cash.[159] This activity enables the dissipation of money obtained from Defendants' fraudulent business operations. Plaintiff respectfully requests that the funds be frozen, and any offshore funds be repatriated to preserve the ability to provide restitution for injured customers. In addition, Defendants may have large amounts of money held by acquirer banks or payment processors in merchant accounts on Defendants' behalf; Plaintiff asks that the Court ensure that this money is also frozen.

---

[157] *See, e.g., Int'l Controls Corp. v. Vesco*, 490 F.2d 1334, 1347 (2d Cir. 1974), *cert. denied*, 417 U.S. 932 (1974); *S.E.C. v. Manor Nursing Ctrs., Inc.,* 458 F.2d 1082, 1106 (2d Cir. 1972); *FTC v. Int'l Computer Concepts, Inc.*, No. 5:94CV1678, 1994 WL 730144, at *16 -17 (N.D. Ohio Oct. 24, 1994); *see also e.g., FTC v. U.S. Oil & Gas,* 748 F.2d 1431, 1434 (11th Cir. 1984); *H.N. Singer,* 668 F.2d at 1113.

[158] *Triangle Media*, 2018 WL 4051701, at *7. In the September 2014 through August 2017 period, about half of the amount withdrawn from the Apex Citi Account went to entities that provided services for the Apex Enterprise, including affiliate networks, call centers, and shipping and manufacturing services. App. 1196. It is unlikely that amount could be recovered.

[159] *See Triangle Media*, 2018 WL 4051701, at *7 (asset freeze is appropriate where "Defendants have the infrastructure and means to move millions of dollars within the United States and offshore"). Here, the U.K. Shell Company Defendants and Omni Group, along with other limited entities, have moved approximately $12.8 million into the U.S. App. 1190 (Van Wazer Decl.).

Freezing the assets of the Individual Defendants, as well as the Corporate Defendants, is appropriate here because these individuals owned the business that perpetrated the unfair and deceptive acts, and/or participated directly in those practices. *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1031 (7th Cir. 1988) (finding asset freeze for individuals appropriate where there was "a good deal of shifting of assets" from the Corporate Defendants "to the individual defendants"). In upholding an asset freeze, the Ninth Circuit has observed that an individual who has "impermissibly awarded himself" funds that are not rightfully his, "is presumably more than capable of placing assets in his personal possession beyond the reach of a judgment." *Johnson v. Couturier*, 572 F.3d at 1085. Indeed, Peikos and Barnett, who move money back and forth among their various corporate entities and ultimately to their own personal accounts, awarded themselves at least $7.5 million improperly obtained from consumers. Thus, an asset freeze is needed to preserve the status quo while the case is pending.

### C.    A Receiver Is Appropriate In This Case

The FTC seeks appointment of a temporary receiver over the twelve Corporate Defendants. This Court has inherent power to appoint a receiver. *See U.S. Oil & Gas*, 748 F.2d at 1432.[160] A receiver would prevent further harm to consumers and would locate and secure assets and records. A receiver can monitor the use of Defendants' assets, marshal and preserve records, identify assets, determine the size and extent of the enterprise, and identify additional consumers who were injured. As the facts above demonstrate, diversion and waste of funds is likely without the appointment of a receiver.

---

[160] *See also supra* 27 & n. 118.

44

**D.    Expedited Discovery And Immediate Access To Defendants'**
**Business Premises Are Essential**

The proposed TRO directs Defendants to provide both the temporary receiver and the FTC with immediate access to Corporate Defendants' business premises to allow the receiver and the FTC to quickly and efficiently locate assets Defendants have wrongfully taken from consumers, identify possible additional defendants, and locate and secure documents pertaining to Defendants' business. The business premises to which the receiver and the FTC would have immediate access includes offices located at 21300 Victory Boulevard, Suite 740, Woodland Hills, California 91367,[161] and additional business locations if they are discovered during the immediate access.

In addition, the FTC seeks permission to conduct limited expedited discovery on financial matters to locate and identify documents and assets, including requiring financial institutions served with the TRO to disclose whether they are holding any of Defendants' assets.  District courts may depart from normal discovery procedures and fashion discovery by order to meet discovery needs in particular cases.  Fed. R. Civ. P. 1, 26(d), 34(b).[162]  Here, the prompt and full disclosure of the scope and financial status of Defendants' business operations is necessary to locate and preserve Defendants' assets and business records.

---

[161] App. 148.

[162] *See also FTC v. Am. Home Servicing Center, LLC*, No. SACV 18-00597-JLS-KESx, 2018 WL 3410146, *2 (C.D. Cal. Apr. 27, 2018) (granting preliminary injunction and finding good cause to permit FTC to take limited expedited discovery as to existence and location of assets and documents).

## VI.   CONCLUSION

The FTC respectfully requests that the Court grant its motion for an *ex parte* TRO with an asset freeze, appointment of a temporary receiver, and other equitable relief.

Respectfully submitted,


Dated:  November 13, 2018

LAURA A. ZUCKERWISE
BRIAN N. LASKY
DARREN LUBETZKY
Federal Trade Commission
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2804 (Zuckerwise)
(212) 607-2822 (Fax)
lzuckerwise@ftc.gov

FAYE CHEN BARNOUW
FEDERAL TRADE COMMISSION
10990 Wilshire Blvd., Suite 400
Los Angeles, CA 90024
(310) 824-4300
(310) 824-4380 (fax)

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

46

## APPENDIX EXHIBIT INDEX

| Exhibit | Exhibit Description | Page Range |
|---------|---------------------|------------|
| 1 | Declaration of Samuel Berg, Consumer | FTC-000001-FTC-000020 |
| 2 | Declaration of Dennis Brown, Consumer | FTC-000021-FTC-000031 |
| 3 | Declaration of Michael Darlington, Consumer | FTC-000032-FTC-000038 |
| 4 | Declaration of Diahann Jensen, Consumer | FTC-000039-FTC-000041 |
| 5 | Declaration of Karen Johnson, Consumer | FTC-000042-FTC-000052 |
| 6 | Declaration of Joseph Gonzales, Consumer | FTC-000053-FTC-000058 |
| 7 | Declaration of Ann Kleiman, Consumer | FTC-000059-FTC-000064 |
| 8 | Declaration of Richard Michael Philson, Consumer | FTC-000065-FTC-000077 |
| 9 | Declaration of Scott Schuette, Consumer | FTC-000078-FTC-000080 |
| 10 | Declaration of Eric Simon, Consumer | FTC-000081-FTC-000095 |
| 11 | Declaration of Terri Smith, Consumer | FTC-000096-FTC-000098 |
| 12 | Declaration of Sharon Stiansen, Consumer | FTC-000099-FTC-000110 |
| 13 | Declaration of Casey Crystal Thompson, Consumer | FTC-000111-FTC-000122 |
| 14 | Declaration of Erin McCool, Operations Supervisor of the Better Business Bureau of Los Angeles & Silicon Valley | FTC-000123-FTC-000131 |
| 15 | Declaration of Nakedia Washington, Director of Operations at the Better Business Bureau Northwest- Pacific | FTC-000132-FTC-000145 |
| 16 | Declaration of Lisa D. Mayberry, Postal Inspector for the United States Postal Inspection Service | FTC-000146-FTC-000154 |
| 17 | Declaration of Christina Yeung, FTC Technologist for the Office of Technology Research and Investigation | FTC-000155-FTC-000157 |
| 18 | Declaration of Florence M. Hogan, FTC Investigator | FTC-000158-FTC-001185 |
| 19 | Declaration of Thomas P. Van Wazer, FTC Forensic Accountant | FTC-001186-FTC-001271 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28