Edward Chang (SBN 268204)
echang@mcnamarallp.com
McNamara Smith LLP
655 West Broadway, Suite 1600
San Diego, California 92101
Telephone: 619-269-0400
Facsimile:  619-269-0401

*Attorneys for Temporary Receiver,*
*Thomas W. McNamara*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 2:18-cv-09573-JFW (JPRx) |
| Plaintiff, | **PRELIMINARY REPORT OF TEMPORARY RECEIVER** |
| v. | |
| APEX CAPITAL GROUP, LLC, et al., | JUDGE:   Hon. John F. Walter |
| Defendants. | CTRM:    7A |

# **TABLE OF CONTENTS**

I. IMPLEMENTATION OF TRO ........................................................................1
   A.    Receivership Entities.............................................................................1
   B.    Business Location .................................................................................2
   C.    Documents/Information/Electronic Data ..............................................3
   D.    Receiver's Website ...............................................................................3
   E.    Cooperation ..........................................................................................3
III. CAN OPERATIONS BE CONTINUED  LEGALLY AND
     PROFITABLY?.............................................................................................5
   A.    Defendants' Unlawful Operations .......................................................6
       1.    The Risk Free Trial Continuity "Sale" .....................................6
       2.    Sourcing .....................................................................................8
       3.    Shipping .....................................................................................8
       4.    Consumer Complaints, Refunds, and Chargebacks ..................8
       5.    Defendants' Proliferation and Manipulation of Nominee
           Merchant Accounts .....................................................................9
       6.    Proliferation of Websites .........................................................12
   B.    Additional Nominee Entities..............................................................12
   C.    Jaci.....................................................................................................13
   D.    NextG Payments .................................................................................13
   E.    Brandooza ...........................................................................................13
   F.    Apex Capital International S.a.r.l. ......................................................14
   G.    DMB Marketing LLC .........................................................................14
IV. FINANCIAL RESULTS ............................................................................14
   A.    Receiver's Forensic Accountant's Report .........................................14
V. ASSETS AND LIABILITIES ......................................................................15
   A.    Asset Freeze .......................................................................................15
   B.    Other Assets and Liabilities ...............................................................17

## PRELIMINARY REPORT OF TEMPORARY RECEIVER

On Friday, November 16, 2018, the Court entered the Temporary Restraining Order ("TRO") which appointed me Temporary Receiver ("Receiver") of the Receivership Entities. By this Preliminary Report, I report to the Court my initial actions, review of the Receivership Entities, and conclusions to date.

## I.

## IMPLEMENTATION OF TRO

### A.    Receivership Entities

Receivership Entities subject to the receivership are expressly defined to include the Corporate Defendants,[1] the Wyoming Related Companies,[2] and the U.K. Related Companies.[3]  TRO, Definition K, page 8.  In addition, Receivership Entities include "any other entity that has conducted any business related to Defendants' marketing or sale of products with a Negative Option Feature, including receipt of Assets derived from any activity that is the subject of the Complaint in this matter, and that the Receiver determines is controlled or owned by any Defendant."  TRO, Definition K, page 8.  To date, we have determined that multiple additional entities qualify as Receivership Entities under this definition:

- Five new nominee entities formed by Defendants for the purpose of opening new merchant accounts to conduct business inextricably related to Defendants' sale of products with a Negative Option

---

[1]  The Corporate Defendants include: Apex Capital Group, LLC ("Apex"); Capstone Capital Solutions Limited; Clik Trix Limited; Empire Partners Limited; Interzoom Capital Limited; Lead Blast Limited; Mountain Venture Solutions Limited; Nutra Global Limited; Omni Group Limited; Rendezvous IT Limited; Sky Blue Media Limited; and Tactic Solutions Limited; and each of their subsidiaries, affiliates, successors, and assigns.  TRO, Definition C, pages 6-7.

[2]  The Wyoming Related Companies include entities formed in Wyoming by Defendants, in the names of nominees, for the sole purpose of fronting merchant accounts.  They are identified in Exhibit A to the FTC Complaint.

[3]  The U.K. Related Companies include entities formed in the U.K. by Defendants, in the names of nominees, to front merchant accounts.  They are identified in Exhibit B to the FTC Complaint.

Feature: Albright Solutions LLC ("Albright"); Asus Capital Solutions LLC ("Asus Capital"); Element Media Group LLC ("Element"); NextLevel Solutions LLC ("NextLevel"); and Vortex Media Group LLC ("Vortex"); and

- Seven other entities which have received assets from Defendants' negative option sales and are controlled by Defendants:  Brandooza LLC ("Brandooza"); Jaci, LLC ("Jaci"); Jaci Holding LLC ("Jaci Holding"); Jaci PR LLC ("Jaci PR", and together with Jaci and Jaci Holding, "Jaci Entities"); NextG Payments, LLC ("NextG"); Apex Capital International S.a.r.l. ("Apex International"); and DMB Marketing LLC ("DMB").

On November 21 and 28, 2018, we provided notice to all parties, as required by TRO Section XV(U), that we had determined that the above-identified entities are Receivership Entities.

### B.    Business Location

As directed by TRO Sections XV(H) and XXIII, at approximately 10:00 a.m. on Monday, November 19, 2018, we entered the Defendants' current business location at 21300 Victory Boulevard, Suite 740, Woodland Hills, California.  Upon our arrival, only the Chief Financial Officer ("CFO") of Apex, Raul Camacho ("Camacho"), was onsite.  A web developer, Derrick Lyons ("Lyons"), arrived at approximately 11:00 a.m.  Neither Defendant Phillip Peikos ("Peikos") nor Defendant David Barnett ("Barnett") were present.

The business location is a modest 1,700 square feet suite in a high rise building.  The office has three individual window offices, an area with central work stations, a conference room, and a small kitchen.  Apex moved into the location in late March 2018 and pays rent of roughly $4,000 per month.  While there were numerous computer monitors set up throughout the office, there was ///

only one laptop and one external hard drive backup present.[4]  *See* Appendix, Exhibit 1 for inventory of furniture and equipment onsite.

### C.    Documents/Information/Electronic Data

We secured the very limited quantity of hard copy documents onsite.  Those documents were mostly located in CFO Camacho's corner office.[5]  Computer forensics professionals from Plaintiff Federal Trade Commission ("FTC") imaged the hard drive of the laptop located in Camacho's office and Camacho's smartphone, which he used to conduct business.[6]  We also secured access to Defendants' server, which hosts their websites and emails.  Additionally, we served the TRO/Asset Freeze on the domain registrars for the operative websites.

### D.    Receiver's Website

We have activated a receivership website to ultimately serve as a vehicle to communicate with consumers.[7]

### E.    Cooperation

On the day of the immediate access, November 19, the Receiver contacted Defendant Peikos via telephone and spoke with him twice.  Peikos stated he would cooperate with our requests and agreed to provide administrative credentials to the Receivership Entities' email accounts.  These credentials were later provided.  On

///

///

---

[4]  This dirth of onsite computer equipment and personnel to use it is consistent with Defendants' practice of outsourcing nearly all aspects of their business (i.e., advertising, fulfillment, call center, etc.).  When asked why there were so many computer monitors, Camacho stated that Defendants were considering bringing some programming functions in-house, but that never occurred.

[5]  Neither Peikos nor Barnett had a dedicated office in the suite.

[6]  The Receiver's computer forensic expert coordinated with FTC professionals to ensure the steps taken to image the items were forensically sound.

[7]  https://regulatoryresolutions.com/case/federal-trade-commission-v-apex-capital-group-llc-et-al/.

November 21, 2018, we met with Peikos' counsel in our offices and gave him a verbal report on our initial observations.[8]

We attempted to speak with Defendant Barnett. We called his cell phone prior to Thanksgiving, but were unable to leave a message because his mailbox was full. We telephoned again on Monday, November 26, 2018 at noon, and this time were able to leave a message in his voicemail box. Barnett has not responded. We did locate a settlement agreement between Peikos and Barnett in the Apex offices which appeared to settle all matters between the two as of November 2017, leaving Peikos in control of the enterprise. Per the agreement, Peikos agreed to repay a purported $1 million loan from Barnett. In return, Peikos assumed sole ownership of Apex and other companies jointly owned by Barnett and Peikos. *See* Appendix, Exhibit 2.

The two onsite employees, Camacho and Lyons, submitted to interviews. Camacho operates as the CFO, onsite manager and hub of operations (particularly financial matters), and *de facto* executive assistant to Peikos. His primary duties were to secure and manage the numerous merchant accounts necessary to process consumer payments and to orchestrate a myriad of fund transfers at Peikos' direction. He met with us for several hours and was generally cooperative and credible.

Lyons' duties were limited. He created and monitored "bank pages" or "clean pages" (internet websites which were submitted with merchant account applications); he also minimized consumer chargebacks by granting pre-emptive refunds on a daily basis. While Lyons did meet with us, he was not entirely cooperative or credible.

///

---

[8] After our meeting with counsel, we identified additional receivership assets (*i.e.*, two high end cameras) and requested that counsel work with the Defendants to immediately turn over the items.

1    The interviews of Camacho and Lyons, combined with our review of

2  documents and data, provide dramatic confirmation of the fraudulent premise of

3  this business.

### III.

### CAN OPERATIONS BE CONTINUED
### LEGALLY AND PROFITABLY?

7    The TRO includes two provisions which require the Receiver to make a

8  judgment as to whether operations can be continued legally and profitably:

- Section XV(T) authorizes the Receiver to suspend business operations of the Receivership Entities if, in the judgment of the Receiver, such operations cannot be continued legally and profitably.

- If the Receiver determines that operations cannot be continued legally and profitably, Section XV(V) directs that he take all steps necessary to ensure that (i) web pages or websites relating to the activities alleged in the Complaint cannot be accessed by the public or are modified for consumer education and/or informational purposes, and (ii) any phone numbers associated with Receivership Entities cannot be accessed by the public or are answered solely to provide consumer education or information regarding the status of operations.

20    We have determined the businesses of the Receivership Entities identified in

21 the Complaint and the five new nominee entities which are identified in Section

22 I.A, pages 1-2, above cannot operate lawfully and profitably under the terms of the

23 TRO.  The consumer product sales of these businesses were premised on, and

24 could not continue without, misrepresentations about "risk free" trials and the

25 Negative Option Feature and rampant credit card laundering.  Given this

26 determination, the Receiver has suspended all operations pending the outcome of

27 the show cause hearing.

28 ///

1   We have also delivered the TRO/Asset Freeze to merchant processors,

2   banks, a fulfillment center, a CRM provider, an accounting firm, a product

3   manufacturer, and a call center.  As a result, we believe that all consumer charges

4   have been halted.

5   The seven other additional Receivership Entities identified in Section I.A.,

6   page 2 above, do not presently appear to have active sales operations, but we are

7   continuing to investigate.

8   **A.   Defendants' Unlawful Operations**

9   Our determination on the lawful/profitable issue is based on our review thus

10   far of the various components of the businesses as detailed below.

11   1.   <u>The Risk Free Trial Continuity "Sale"</u>

12   The first step in this scheme was to lure consumers with the promise of a

13   risk free trial of a product (e.g., brain and focus supplements, male enhancement

14   and workout supplements, and skin care).  While Defendants managed and profited

15   greatly from the business, most operational aspects were outsourced to third

16   parties, including the acquisition of customers through Internet advertising. We

17   observed invoices from more than six different "affiliate" advertisers which

18   aggressively spread ads across the Internet.  In return, these affiliates were richly

19   rewarded – $36 for each consumer who agreed to the first risk free trial offer, and

20   another $36 for a successful "upsell," which occurs when the consumer in the

21   process of agreeing to the first product, is offered a second "risk free" trial for a

22   second product. [9]  *See* Appendix, Exhibit 3.  Affiliate advertising is expensive.  For

23   example, during October and November of this year, Defendants spent $70,000-

24   $80,000 per week on affiliates.[10]

25   _____

26   [9]  We did find some evidence that Defendants recently initiated their own
advertising, but we do not have much clarity on this yet.  It appears Peikos was

27   pursuing a crypto and casino scheme and, based on instant messaging chats we
reviewed, placing related internet ads directly.

28   [10]  We observed a substantial increase in spending for affiliate advertising in
October and November.  Camacho attributed this to the five new domestic

Once a consumer completed the information requested on the affiliates' landing page, they were transferred to a "sales" page.  According to Camacho and Lyons, these sales pages were created by third parties, most recently by an Indian company, Codeclouds, which coordinated closely with Peikos.[11]  In our review of sample sales pages, we observed many of the deceptions alleged by the FTC:

- On one such sales page, after entering his or her name and address, the consumer is shown a disclaimer at the bottom of the page in hard-to-read, light grey text in a small font against a white background. This disclaimer deploys the Negative Option Feature and is purposely obtuse.  *See* Appendix, Exhibit 4.

- Another sample sales page includes the same disclaimer language in the same hard-to-read light grey text, but adds "offer terms" in dark grey text against the white background.  Those offer terms include "agreement" to the "Terms and Conditions."  *See* Appendix, Exhibit 5.  Even if customers were able to track these disclaimers and clicked the terms and conditions, they would likely be confused as these terms and conditions were opaque and misleading.  In particular, consumers were unlikely to understand they had 14 days to cancel.  The 14 day period started as soon as they agreed to the "risk free" trial.  *See* Appendix, Exhibit 6.

---

nominee merchant accounts recently activated (discussed further below at Section III(A)(5)).  The affiliate spend was artificially low in the previous months because Defendants lost their primary merchant accounts at Transact Pro, a Latvian processor.

[11]  In contrast, Lyons was responsible for the hundreds of "bank pages" or "clean pages."  Bank pages clearly lay out all material terms of a sale and are submitted to merchant processors as part of the application process.  Processors rely on the webpage submitted by merchant account applicants to accurately portray the offer and terms of sale.  Defendants lied to processors via the submission of false websites (and in numerous other ways).  When asked what the distinction was between bank pages and sales pages, Lyons could not explain the difference or why two pages were necessary.  His only comment was that sales pages were more "salesy."

- The sales pages prompt the consumer to accept the offer or risk being closed out of the free trial.  After a few seconds, a pop-up appears that says "Due to High Demand We Can Only Guarantee Availability Today . . . PAY ONLY FOR SHIPPING . . . ACCEPT OFFER."  *See* Appendix, Exhibit 7.
- Consumers who actually accepted the risk free trial offer were immediately linked to an upsale opportunity.  *See* Appendix, Exhibit 8.

  2. <u>Sourcing</u>

Contrary to the claims made in Defendants' ads, the actual products were not proprietary or special by any means.  Instead, they were run-of-the-mill generic products produced by third-party vendors and shipped with labels designed by Defendants.  The primary vendors at present are Ion Labs, Inc. in Florida (which provided products for U.S. sales at wholesale prices as low as $2.10 per bottle) and Global Naturals in the U.K. (which has provided product for U.K. sales with wholesale prices as low as €1.96 per bottle).  *See* Appendix, Exhibits 9 and 10.

  3. <u>Shipping</u>

Shipment of the products, and the processing of returns, was subcontracted to Rapid Fulfillment LLC ("Rapid Fulfillment") in California for U.S. consumers and Rapid Fulfillment Services Ltd. for U.K. consumers.  *See* Appendix, Exhibits 11 and 12.

  4. <u>Consumer Complaints, Refunds, and Chargebacks</u>

Inevitably, consumers complained they were charged the full price of the "risk free" trial products.  *See* Appendix, Exhibit 13.  Rather than handling these complaints in-house, Defendants outsourced customer service to call centers run by a third-party vendor, ePlanet Communications Inc.

Our review of a sampling of recorded calls and Defendants' scripts and policies confirms that every effort was made to keep the customer in the continuity

program.  Even when customers threatened to contact the Better Business Bureau, the FTC, state attorney general's office, or their bank, Defendants first tried to save the sale by offering a refund of 25%, then 50%, and ultimately 100%.  However, even when granted, the refunds were limited to the most recent shipment and a promise to cancel future shipments.  *See* Appendix, Exhibit 14.

Defendants also utilized several vendors (Verifi, Chargebacks911.com, and Ethoca), to identify orders likely to result in chargebacks because of some preliminary refund steps taken by the consumer.  Whenever such a potential chargeback was identified, it was employee Lyons' daily responsibility to immediately issue a full refund without calling or otherwise contacting the consumer.  Defendants granted these refunds in an attempt to avoid more merchant account cancellations due to excessive chargebacks.

> 5.   Defendants' Proliferation and Manipulation of Nominee Merchant Accounts
>
>      *a.   Opening Nominee Merchant Accounts*

The continued viability of any internet sales operation is dependent on the ability to utilize merchant accounts to process consumer payments by credit card.  CFO Camacho conceded that the "name of the game" is access to merchant accounts and that the Defendants' ability to grow is dependent on "what the banks give us."

Defendants' risk free trial continuity offers were so successful that they required the capacity to process a high volume of consumer charges.  This need was heightened by the practice of most processors to impose monthly dollar volume caps, particularly on new accounts, and to cancel accounts, in the high risk account universe in which Defendants operate, when chargebacks exceeded 3% of sales.

///

///

Defendants overcame the merchant account challenge by recruiting people who were not on the MATCH list (aka Terminated Merchant File)[12] to act as straw persons. Defendants built a stable of merchant accounts by enticing individuals to act as signors for entities applying for the accounts. Camacho was tasked with recruiting these individuals, who were paid $1,000 per month commissions (less a $250 cut taken by Camacho), to act as the owners of the entities. Defendants did all the work necessary: they formed the entity; opened a bank account in the name of the entity; submitted the merchant account application to the processor; and created clean bank pages for the processor to review.

When a spate of domestic accounts were cancelled due to chargebacks, Defendants shifted their credit card processing to a Latvian provider, Transact Pro, in early 2016.[13] Last spring, however, Transact Pro notified Defendants that they would no longer service their type of sales model and would need to close the merchant accounts. Recently, Transact Pro lined up a new foreign processing company for Defendants and was preparing to migrate Defendants' merchant accounts to Decta Limited ("Decta"). *See* Appendix, Exhibit 15. Camacho reported that Defendants were within a week or two of having merchant accounts with Decta.

With the loss of Transact Pro, Defendants scrambled over the summer to find new domestic acquiring banks where they could open merchant accounts. This was a challenge because many banks refuse to work with companies using the Negative Option Feature. Defendants established six new corporate entities,

---

[12] The MATCH list is a database of businesses and individuals whose credit card processing privileges have been terminated. Once a business or an individual is on the MATCH list, the business or the individual remains on the list for five years.

[13] Even though Transact Pro was initially attractive to Defendants because it was "more lenient" on chargebacks than domestic banks, Camacho explained that because it was a foreign processor, many charges were rejected by the consumer's credit card issuer, leading to fewer successful sales. As such, Defendants preferred domestic processors.

through the use of six nominee owners sourced by Camacho, and have succeeded in getting merchant accounts for five of the entities using two domestic processors, Vantiv and Harris Bank/Humboldt.  Each merchant account is typically allowed two MIDs and up to $50,000 per month, meaning, according to Camacho, that the five new corporations (and ten new MIDs) could potentially generate up to $500,000 per month for Defendants.

The availability of new domestic merchant accounts to process charges allowed Defendants to ramp up affiliate advertising in October and November. Camacho estimated that the Defendants processed between $100,000-$150,000 in the new accounts in October and were on track to process $500,000 in November.[14]  Given that they were also only a week or two away from accessing foreign merchant processing through Decta, the Defendants would have resumed full-throttle operations but for the FTC action.

### b.   Managing and Monitoring Nominee Accounts

After merchant accounts were opened, Camacho closely monitored the accounts and Lyons attempted to limit chargebacks.  The goal was to do everything possible to keep the accounts open.  In the event of closures, new nominees would have to be found to apply to new processors.  Camacho explained that after the recent closures at Transact Pro, and before the new domestic merchant accounts were acquired, the Defendants were living off the reserves from closed accounts – such reserves are typically released six months after the account is closed.[15]

During our interview, Camacho claimed Defendants were "getting out" of the risk free trial business and transitioning to a "straight" sales and continuity

---

[14]  In an instant messaging chat between Peikos and Camacho in August, 2018, as the new domestic merchant accounts were acquired, Camacho warned Peikos "that with all these new [merchant accounts. . . we need to run as clean as possible for 1st 3 months.  Once they drop from risk radar[,] then we do business as normal."  *See* Appendix, Exhibit 16.

[15]  We located Telegram chats between Peikos and Camacho discussing the fact they were surviving on these reserves.  *See* Appendix, Exhibit 17.

model focused on a new shampoo product (Jaci).  While we did see efforts to develop Jaci shampoo (*see* below at Section C), the recent frantic activity to establish new domestic and foreign merchant accounts casts doubt on Camacho's claim of going straight.  Moreover, he admitted that the Defendants' prior experiments with a straight sale model were not profitable.

### 6.   Proliferation of Websites

Apex controlled more than a thousand websites.  *See* Appendix, Exhibit 18. Since each merchant account was required to be associated with a specific website, there had to be a proliferation of websites to match the proliferation in merchant accounts.  As discussed above, Defendants created bank pages which could be submitted during the merchant account application process.  Indeed, Lyons was specifically tasked with creating these pages, which had to constantly change as products and processors changed.  These bank pages do not, however, drive consumer traffic – that is achieved by deceptive advertisements placed by affiliates and sales pages created by vendors.

The proliferation of websites and nominee merchant accounts also had the benefit of protecting the anonymity of Defendants.  When customers complained to the Better Business Bureau ("BBB") or authorities, it was about the merchant or the product, and not the Defendants.  When a merchant account was closed due to excessive chargebacks – as they all were, even with close monitoring – there was no prejudice to Defendants.

### B.   Additional Nominee Entities

Camacho reported that six new entities were recently established in order to obtain domestic merchant accounts.  Five of these entities, identified as additional Receivership Entities in Section I.A, pages 1-2 above, have secured merchant accounts through which Defendants' product sales are being processed.

///

///

### C.     Jaci

Camacho reported that Defendants were planning to transition to straight sales. Their plan was allegedly to abandon their highly-lucrative Negative Option sales of nutraceutical products and to start selling proprietary shampoo and other products created by Peikos direct to consumers via social media.  According to Camacho, Peikos was the "brains" behind Jaci, working with a laboratory to formulate the shampoo and other products and with factories in China to design the bottles.  Defendants started working on Jaci in May 2017 and spent more than $300,000 of Apex's money in order to fund the startup.  At present, Defendants apparently have completed the formula for the shampoo and have finished designing the bottles, but have no current inventory and no sales.

### D.     NextG Payments

NextG was a merchant processing company formed in 2012 with Peikos as the sole owner.[16]  While there do not appear to be any current operations at NextG, Peikos has long used the company to shift millions of dollars back and forth within the Apex universe of accounts.  It appears at present that NextG's primary use is to hold the lease on Peikos' convertible Bentley.

### E.     Brandooza

Brandooza LLC is a Puerto Rico entity formed by Peikos in or about April 2018.  Its principal place of business is San Juan, Puerto Rico, and it has applied for domestic tax incentives under Act 20 in Puerto Rico as an advertising and public relations firm.  We have seen little evidence that it has active operations.

///

///

///

---

[16] Peikos has been involved in other questionable and related businesses. He was the owner of Diginetwork, Inc. which was involved in mobile cramming and appears to have narrowly avoided FTC action in 2013-2014 based on documents we located at the Apex office.

### F.      Apex Capital International S.a.r.l.

Defendant Apex's funds were invested in Bright Guard Inc.  Bright Guard shares issued for the investment were titled in the name of Apex Capital International, which, at the time, was jointly owned by Peikos and Barnett.

### G.      DMB Marketing LLC

DMB was used by Barnett to receive millions of dollars in fund transfers from Receivership Entities.  For example, a 2014 DMB federal tax return reflects the receipt of roughly $30 million from Receivership Entities.

## IV.

## FINANCIAL RESULTS

### A.      Receiver's Forensic Accountant's Report

The Receiver's forensic accountant, Lisa Jones, has reviewed the available financial records of the Receivership Entities, principally QuickBooks data, and prepared a preliminary accounting report.  *See* Appendix, Exhibit 19.  As the report notes, the findings are preliminary, based on a review of available data to date, and limited in scope and accuracy to the data input by Defendants into the QuickBooks files.

For purposes of this Preliminary Report, the most material conclusions of the report are as follows:

- In the years 2015-2018, a total of 57 nominee entities controlled by Defendants (25 U.K. and 32 Wyoming) with 68 different bank accounts recorded net sales (*i.e.*, gross sales net of refunds and chargebacks) of approximately $50.4 million ($14.4 million by U.S. entities and $36 million[17] by U.K. entities).  After the sales proceeds

---

[17]  As detailed in the Accountant's Report, Exhibit 19 at page 2, some of the U.K. nominee sales were recorded in QuickBooks in U.S. dollars ($18,157,257) and some in British Pounds (£ 17,779,013). For purposes of this report, and clarity of presentation, we have assumed a conversion rate of 1 to 1 (which is lower than the current conversion rate of £1.00 to $1.27). In a future report, we will present a more precise calculation of the conversion to U.S. dollars.

were deposited by the respective processors to the various nominee bank accounts, funds were transferred to accounts belonging to Apex Capital and Omni Group, often labeled as management income.

- The QuickBooks records also record $9.9 million additional sales by Apex, extending back to 2013.  Most of those sales ($8.2 million, 82% of the total) are recorded for the earlier years, 2013-2014. For 2015-2018, Apex net sales were $1.7 million.  We do not yet have the full details on the products and methodology behind these Apex sales.

- For the years 2015-2018, the aggregate net sales recorded by the 57 nominee entities and Apex combined were $52.1 million  If the 2013-2014 Apex sales are included, the total net sales are $60.3 million.

- For the years 2015-2018, aggregate refunds and chargebacks recorded in QuickBooks for the nominee accounts in the aggregate are nearly $15 million, representing 20% of gross sales by the nominee entities. The U.K. nominee entities' share of those refunds and chargebacks was $ 12.5 million, 27% of the U.K. gross sales.

- We have not undertaken any calculation or audit of net income derived from these sales, but can note that any such calculation would require a complex reconstruction of a myriad of intra-company transfers (usually recorded as "management income" or "management fees"), as well as entries for shareholder loans, accounts payable, accounts receivable, undeposited funds held in merchant accounts, and other idiosyncratic entries.

## V.

## ASSETS AND LIABILITIES

### A.    Asset Freeze

Beginning on November 19, 2018, we served the TRO/Asset Freeze on banks and other financial institutions where the Receivership Entities were known

to have accounts or credit card merchant accounts.  The following accounts were frozen:

| Account Name | Financial Institution | Acct. No. | Balance Frozen |
|---|---|---|---|
| Absolutely, LLC | JPMC | 8812 | $6,194.48 |
| Alpha Group LLC | Wells Fargo | 2069 | $13,394.16 |
| Apres Vous Media, LLC | Paysafe | 8911 | $4,949.99 |
| Apres Vous Media, LLC | Wells Fargo | 4941 | $99.00 |
| Cascade Canyon LLC | Paysafe | 2713 | $3,513.77 |
| Cascade Canyon LLC | Wells Fargo | 2944 | $4,662.39 |
| Confidential Holdings LLC | Wells Fargo | 8505 | $108.41 |
| Confidential Holdings LLC | Wells Fargo | 7158 | $14.00 |
| Cornice Group LLC | Paysafe | 9612 | $21,300.00 |
| Cornice Group LLC | Wells Fargo | 4982 | $14.00 |
| Dataflow LLC | Wells Fargo | 0281 | $312.15 |
| DMB Marketing LLC | EVO Payments | 4429 | $20,697.02 |
| Horizon Media, LLC | Paysafe | 7055 | $1,370.00 |
| Horizon Media, LLC | Wells Fargo | 8305 | $12.18 |
| Interzoom, LLC | Wells Fargo | 3074 | $211.00 |
| Jaci Holding LLC | Citibank | 5540 | $160.00 |
| Jaci, LLC | Citibank | 557 | $5,995.01 |
| Mountain Range Ventures LLC | Wells Fargo | 2621 | $14.00 |
| NextG Payments, LLC | Citibank | 6446 | $3,654.82 |
| Old West Equity LLC | Global Electronic Technology | N/A | $50.00 |
| Omni Holding Company, LLC | JPMC | 6081 | $890,812.19 |
| Precision Labs LLC | EVO Payments | 4641 | $3,008.32 |
| Pure Indoor Cycling, Inc. | Wells Fargo | 5209 | $54,226.80 |
| Shadow Peak, LLC | Wells Fargo | 4966 | $14.00 |
| Singletrack Solutions LLC | Wells Fargo | 2434 | $73.37 |
| Singletrack Solutions LLC | Wells Fargo | 1101 | $57.60 |
| Sky Media Group, LLC | Wells Fargo | 2969 | $14.00 |
| Sure Science LLC | Wells Fargo | 0307 | $95.35 |

| Account Name | Financial Institution | Acct. No. | Balance Frozen |
|---|---|---|---|
| Teton Pass LLC | Wells Fargo | 8690 | $37.25 |
| Top Quality Goods LLC | National Merchant Services | 9888 | $27,552.99 |
| Top Quality Goods LLC | National Merchant Services | 0886 | $30,000.00 |
| Top Quality Goods LLC | National Merchant Services | 8880 | $25,903.07 |
| Top Quality Goods LLC | National Merchant Services | 1884 | $21,342.10 |
| Wyoming Coastal Partners, LLC | Wells Fargo | 2951 | $71.38 |
| Wyoming Freedom Group, LLC | Paysafe | 7089 | $825.00 |
| Wyoming Freedom Group, LLC | Wells Fargo | 2977 | $14.00 |
| **TOTAL** | | | $1,140,773.80 |

Individual accounts of Peikos and Barnett have also been frozen, but are not presented here.

**B.    Other Assets and Liabilities**

Peikos envisions himself as a private equity investor and has deployed funds from the Apex business to fund multiple investments, including: vending machines in Australia (Vend3d Pty. Ltd.); a touch-free sunscreen dispensing company (Bright Guard, Inc.); a video e-commerce marketplace technology company (Cinsay, Inc.), and others.

Apex, as lender, and Bright Guard, Inc., as borrower, entered a loan agreement dated May 14, 2015 in the amount of $300,000.  Bright Guard agreed to repay the $300,000 loan in full with no interest on or before May 14, 2020. *See* Appendix, Exhibit 20.  The loan may have been converted to shares of stock. *See* Appendix, Exhibit 21.

1        In January 2018, Peikos invested $900,000 in American Patriot Brands, Inc,

2  a cannabis company.  While Peikos put the investment in his own name, the source

3  of the funds was likely from Apex.

4        In February 2018, Apex purchased 370 Class A shares of Highpost Holdings

5  Limited, a Cyprus company for,1.5 million euros.  *See* Appendix, Exhibit 22.

6        We are investigating these investments made by Peikos with Apex funds,

7  potential claims against third parties who may hold assets of Receivership Entities,

8  and potential fraudulent conveyance claims against third parties who may have

9  received funds in connection with their participation in the scheme.

10       We do not yet have a calculation of liabilities.

11  Dated:  November 28, 2018                    By:___/s/ Thomas W. McNamara_____
                                                 Thomas W. McNamara
12                                               Receiver

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 28, 2018, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of the filing to all participants in the case who are registered CM/ECF users.

  /s/ Edward Chang

Edward Chang
*Attorney for Temporary Receiver,*
*Thomas W. McNamara*