1 | Hernán D. Vera – State Bar No. 175149
     hvera@birdmarella.com
2 | Peter A. Goldschmidt – State Bar No. 307647
     pgoldschmidt@birdmarella.com
3 | BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
   | DROOKS, LINCENBERG & RHOW, P.C.
4 | 1875 Century Park East, 23rd Floor
   | Los Angeles, California 90067-2561
5 | Telephone: (310) 201-2100
   | Facsimile: (310) 201-2110
6 |
7 | Attorneys for Defendants SIA Transact
   | Pro and Mark Moskvins
8 |
9 | **UNITED STATES DISTRICT COURT**
10 | **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**
11 |
12 | FEDERAL TRADE COMMISSION,
13 |                    Plaintiff,
14 |        vs.
15 | APEX CAPITAL GROUP, LLC, et al.,
16 |                    Defendants.

CASE NO. 2:18-cv-09573-JFW-JPR

**SIA TRANSACT PRO'S NOTICE OF MOTION AND MOTION TO DISMISS**

*[Filed concurrently with Declaration of Mark Moskvins]*

Date:      September 9, 2019
Time:      1:30 P.M.
Crtrm.:    7A

Assigned to Hon. John F. Walter

3596203.2

**TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:**

   **PLEASE NOTICE THAT** on September 9, 2019, at 1:30 P.M., or as soon thereafter as counsel may be heard before the Honorable John F. Walter, Courtroom 7A of the above-entitled court, located at 350 W. 1st Street, Los Angeles, CA 90012, Defendant SIA Transact Pro ("Transact Pro") will, and hereby does, move to dismiss the complaint and all causes of action asserted against it pursuant to Rules 12(b)(1), 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure. Specifically, Transact Pro moves to dismiss:

   (1)   under Fed. R. Civ. P. 12(b)(6) because the alleged conduct is wholly extraterritorial and outside the reach of the FTC Act.

   (2)   under Fed. R. Civ. P. 12(b)(1), challenging the exercise of subject matter jurisdiction under principles of international comity.

   (3)   under Fed. R. Civ. P. 12(b)(2) because there is no personal jurisdiction over Transact Pro.

   Defendant Mark Moskvins joins the 12(b)(6) and 12(b)(1) portions of the brief, but does not assert a personal jurisdiction challenge.

   This motion is based on this Notice, the attached Memorandum of Points and Authorities, the concurrently-filed Declaration of Mark Moskvins, the entire record herein, and such further briefing and argument as the Court may hear.

   The parties fully met and conferred on these motions pursuant to Local Rule 7-3. *See* Amended Joint Meet and Confer Statement [Dkt. 101], filed August 1, 2019.

DATED: August 5, 2019       Bird, Marella, Boxer, Wolpert, Nessim,
                            Drooks, Lincenberg & Rhow, P.C.

                            By:   */s/ Hernán D. Vera*
                                  _____
                                  Hernán D. Vera
                                  Attorneys for Defendants SIATransact Pro
                                  and Mark Moskvins

3596203.2

# **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ..................................................................................... 1

II.     FACTUAL BACKGROUND AND ALLEGATIONS IN
        COMPLAINT .......................................................................................... 3

        A.      Transact Pro is a Payment Processor Operating Exclusively in
                Latvia and the EU. ..................................................................... 3

        B.      Transact Pro Does Not Operate in the United States. .............. 4

        C.      All of Transact Pro's Alleged Conduct Took Place in Latvia. ... 5

        D.      Peikos Was Referred to Transact Pro by a Third Party to Assist
                with European-Based Business. .................................................. 7

III.    ARGUMENT .......................................................................................... 9

        A.      The Claims Against the Transact Pro Defendants Should Be
                Dismissed Under 12(b)(6) Because the Alleged Conduct Is
                Wholly Extraterritorial and Is Outside the Reach of the FTC Act. ........ 9

        B.      Counts VI and VII of the FAC Against the Transact Pro
                Defendants Should Be Dismissed Under FRCP 12(b)(2) Based
                on Principles of International Comity. ...................................... 15

        C.      There Is No Personal Jurisdiction Over Transact Pro. .......... 20

IV.     CONCLUSION ..................................................................................... 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*E.E.O.C. v. Arabian Am. Oil Co.*,
   499 U.S. 244, 111 S. Ct. 1227, 113 L. Ed. 2d 274 (1991) ..............................9, 10

*In re Grand Jury Proceedings, Yanagihara Grand Jury, Impanelled,*
   *June 13, 1988*,
   709 F. Supp. 192 (C.D. Cal. 1989) ........................................................................15

*In re Simon*,
   153 F.3d 991 (9th Cir. 1998) .................................................................................15

*JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C. V.*,
   412 F.3d 418 (2d Cir. 2005) ..................................................................................16

*McCulloch v. Sociedad Nacional de Marineros de Honduras*,
   372 U.S. 10, 83 S. Ct. 671, 9 L. Ed. 2d 547 (1963) ...............................................9

*Morrison v. Nat'l Australia Bank Ltd.*,
   561 U.S. 247, 130 S. Ct. 2869, 177 L. Ed. 2d 535 (2010) ..............................9, 10

*Mujica v. AirScan Inc.*,
   771 F.3d 580 (9th Cir. 2014) .................................................................................15

*Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru*,
   109 F.3d 850 (2d Cir. 1997) ..................................................................................15

*Sale v. Haitian Centers Council, Inc.*,
   509 U.S. 155, 113 S. Ct. 2549, 125 L. Ed. 2d 128 (1993) ....................................10

*Schwarzenegger v. Fed Martin Motor Co.*,
   374 F.3d 797 (9th Cir. 2004) .................................................................................22

*Sher v. Johnson*,
   911 F.2d 1357 (9th Cir. 1990) ...............................................................................22

*Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for the*
   *S. Dist. of Iowa*,
   482 U.S. 522, 107 S. Ct. 2542, 96 L. Ed. 2d 461 (1987) ........................................2

*Town of Springfield, Vt. v. McCarren,*
   549 F. Supp. 1134 (D. Vt. 1982), *aff'd sub nom. Town of Springfield*
   *v. McCarren*, 722 F.2d 728 (2d Cir. 1983)............................................. 17

*United States v. Nippon Paper Indus. Co.,*
   109 F.3d 1 (1st Cir. 1997) ...................................................................... 15

**Statutes**

Federal Trade Commission Act ..................................................................... 9

**Other Authorities**

Fed. R. Civ. P. 12(b) ............................................................................ 15, 16

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Plaintiff Federal Trade Commission ("FTC") is a civil law enforcement agency with a long history of fighting against what it perceives to be unfair and deceptive business practices.  And it has already done so quite thoroughly in this action—enjoining the entirety of business practices of the purported responsible parties ("Apex Defendants"), freezing their accounts, and requesting a receiver to recover millions in funds it believes are due American consumers.

But federal law is crystal clear that the FTC's powers do have limits.  Indeed, Counts VI and VII of the First Amended Complaint ("Complaint" or "FAC") against Transact Pro constitute a ***breathtaking*** overextension of the FTC Act.  To that end, Transact Pro moves to dismiss these counts on three independent grounds.[1]

***First***, the FTC's claims against Transact Pro fail to state a claim under Federal Rule of Civil Procedure 12(b)(6) because the allegedly unfair conduct occurred solely in the European Union ("EU").  The Supreme Court has repeatedly held that a statute cannot be applied purely outside the boundaries of the United States unless there is an "affirmative intention of the Congress clearly expressed" to rebut the "presumption against extraterritoriality."  *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010).  Here, distilled to its essence, the gravamen of the FTC's claims against Transact Pro is based on two alleged predicate acts that ***occurred entirely in Latvia***.[2]  Because the FTC Act does not contain this

---

[1]   Defendant Mark Moskvins joins the first and second arguments within Transact Pro's present motion.

[2]   The conduct alleged against Transact Pro is (1) helping to establish a series of UK-based companies and merchant accounts in the EU that enabled the Apex Defendants to operate a group of "free trial" websites that the FTC claims were deceptive (FAC ¶¶ 6, 88-102, 121-122); and (2) authorizing various "microtransactions" in connection with two Latvian banks that allegedly assisted the Apex Defendants to avoid the fraud-detection algorithms of the Visa and

unmistakable statement of congressional intent, it cannot apply to Transact Pro's wholly-foreign conduct.

**Second**, even assuming *arguendo* that the FTC Act somehow does apply, the Court should decline to exercise subject matter jurisdiction under well-established principles of international comity. "Comity refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states." *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for the S. Dist. of Iowa*, 482 U.S. 522, 543 n.27 (1987) (internal quotations omitted). What the FTC failed to inform the Court—when it belatedly sought leave to add Transact Pro as a defendant—is that these **same** practices have already been investigated (and made the subject of a lengthy administrative agreement) by the Latvian Financial and Capital Market Commission (the "Latvian FCMC"). (*See* Declaration of Mark Moskvins ("Moskvins Decl.") ¶¶ 19-28.) Transact Pro cooperated with that investigation for many years, changed many of its practices pursuant to that administrative agreement, terminated its relationships with merchants operating "free trial" websites, and paid civil penalties. (*Id.* at 25-27.) Undeterred, the FTC now seeks to push aside the existing Latvian regulatory scheme governing this conduct and micromanage the purely-in-Latvia actions of Transact Pro half a world away. That it cannot do.

**And third**, the FTC's claims against Transact Pro should be dismissed for lack of personal jurisdiction. Transact Pro is a Latvian company with no employees, offices, branches, affiliates, representatives, or partners in the United States. (Moskvins Decl. ¶¶ 7-17.) It does not service merchant accounts in the United States, does not advertise in the United States, and does not conduct business in the United States. Simply put, it does not have sufficient minimum contacts to satisfy

---

MasterCard networks in the EU, thereby purportedly enabling the Apex Defendants to continue their operations and sales to customers in the EU as well as the United States (*id.* ¶¶ 6, 88-102, 124-125).

2

the jurisdictional requirements of the Due Process Clause.  The FTC's sole argument for jurisdiction—that Transact Pro "did business" with Peikos, and knew that it was affecting U.S. consumers—is insufficient under well-established federal law.  *See Asahi Metal Indus. Co. v. Super Ct.*, 480 U.S. 102 (1987).  Peikos asked Transact Pro to *assist in doing business in the EU*.  That's it.  Whether or not Transact Pro should have foreseen that its Latvian conduct would have an effect on US consumers through the stream of commerce is not enough to support personal jurisdiction.

## II.   FACTUAL BACKGROUND AND ALLEGATIONS IN COMPLAINT

### A.   Transact Pro is a Payment Processor Operating Exclusively in Latvia and the EU.

Transact Pro is a licensed payment processor in Riga, Latvia that provides online payment acceptance and processing services for corporate merchants in the EU.  (FAC ¶¶ 24-26; Moskvins Decl. ¶ 2.)  As of 2018, Transact Pro had nearly 100 employees, all of whom work in Riga's office at Kr. Valdemara Street 62, Riga, LV-1013, Latvia.  (*Id.* ¶ 5.)  Transact Pro works with over 1000 online merchants throughout the EU and services over 7 million online transactions per month.  (*Id.* ¶ 6.)

Transact Pro is a highly respected member of the Latvian (and EU) business community.  Founded in 2004, Transact Pro was the first licensed "electronic money institution" in Latvia with the right to provide payment services and is now approved to conduct business throughout the EU with all EU member regulatory institutions.  (Moskvins Decl. ¶¶ 2-3.)  Transact Pro is also a founding member of the Association of Latvian Payment Services and Electronic Money Institutions, whose mission is to promote and strengthen the interests of payment service providers and electronic money institutions in Latvia, and Transact Pro donates to the Latvian Ministry of Culture each year in support of civic and charitable causes.  (*Id.* ¶¶ 3-4.)  On June 17, 2019, the State Revenue Service in Latvia named Transact

1   Pro to the "Gold Level" of its "White List"—an accolade reserved for highly

2   respected companies with minimal violations or tax reporting delays and strong risk

3   monitoring.  (*Id.* ¶ 4.)

4   **B.**     **Transact Pro Does Not Operate in the United States.**

5   The FTC admits that "[n]o American financial authority regulates SIA

6   Transact Pro and it has no U.S. branches."  (FAC ¶ 26.)  All of Transact Pro's

7   operations are subject to Latvian and EU law.  (*See id.* ¶ 24.)  Transact Pro is not

8   registered to do business in any individual State within the United States.

9   (Moskvins Decl. ¶ 17.)

10   By every definition, Transact Pro operates only in Latvia and the EU.

11   Transact Pro has no offices, employees, warehouses, or other operations in the

12   United States.  (Moskvins Decl. ¶ 7.)  It does not process payments through any

13   banks in the United States.  (*Id.* ¶ 10.)  It does not assist in the opening or

14   maintenance of merchant accounts in the United States.  (*Id.* ¶ 11.)  Transact Pro

15   provides payment services only within the EU and does not provide any other

16   services within the United States.  (*Id.* ¶¶ 13.)  It does not maintain any bank

17   accounts in the United States for any merchant.  (*Id.* ¶ 16.)  Even if it wanted to,

18   Transact Pro could not service US merchants due to regional restrictions by

19   MasterCard and Visa.  (*Id.* ¶ 13.)

20   To be exceedingly clear, Transact Pro has no affiliates, partners, branches, or

21   representatives in United States.  (*Id.* ¶ 8.)  Transact Pro has never provided U.S.

22   contact information on its website or advertised that it provides services within the

23   United States.  (*Id.* ¶ 15.)  It has no U.S. PO boxes or other methods by which to

24   accept physical mail, deliveries, or payments in the United States.  (*Id.* ¶ 9.)

25   Transact Pro's former CEO, Mark Moskvins, resigned from both the board

26   and as CEO in February 2019.  (*Id.* ¶ 5.)  He a citizen of the Republic of Latvia (not

27   the U.S.) and maintains a personal residence in Florida, where he spends about

28   several months each year.  (*Id.*)  Last year, Moskvins acquired Colorado National

1   Bank, but that bank does not currently provide services to Transact Pro.  (*Id.* ¶ 16-

2   18.)  Further, Colorado National Bank was not involved, in any way, in the conduct

3   alleged by the FTC in the Complaint and remains a separate legal entity, with its

4   own board of directors and employees.  (*Id.* ¶ 18.)

5         **C.**    **All of Transact Pro's Alleged Conduct Took Place in Latvia.**

6         Beginning in 2015, Transact Pro processed payments for a portion of online

7   sales by UK companies Capstone Capital Solutions Limited, Clik Trix Limited,

8   Empire Partners Limited, Interzoom Capital Limited, Lead Blast Limited, Mountain

9   Venture Solutions Limited, Nutra Global Limited, Omni Group Limited,

10  Rendezvous IT Limited, Sky Blue Media Limited, and Tactic Solutions Limited

11  (collectively, "UK Defendants").  (*See* FAC ¶¶ 11-20, 88.)  To get started, Transact

12  Pro referred the UK Defendants to two established Latvian banks to open merchant

13  accounts.[3]  (*Id.* ¶¶ 25, 88, 91.)  After that, Transact Pro debited consumer payments

14  into those merchant accounts—just like any other client.  (*See id.* ¶¶ 26, 44.)  Once

15  Transact Pro transferred a consumer's payment to the bank, it had no further

16  involvement with that money.  (*See id.* ¶ 26.)

17        The FTC claims that Transact Pro violated the FTC Act because it allegedly

18  "maintained numerous nominee ***offshore merchant accounts*** for" Defendants,

19  which "enabled" Defendants to launder money.  (*See id.* ¶ 6; *see also id.* ¶¶ 92-93.)

20  The FTC alleges that Transact Pro enabled Defendants to "continue" engaging in

21  illegal conduct by increasing their volume limits and processing a series of

22  "microtransactions" on these merchant accounts.  (*Id.* ¶ 102.)

23        The FTC admits that Transact Pro, a *Latvian* company, helped open merchant

24  accounts *exclusively in Latvia* for companies in the *United Kingdom*.  (*See* FAC

25

26       [3]  "In order to accept credit card payments from consumers, a merchant must

27  establish a merchant account with a merchant acquiring bank . . . .  A merchant

28  account is a type of account that allows businesses to process consumer purchases by credit or debit cards."  (FAC ¶ 66.)

¶¶ 6, 25, 88, 91.)

In fact, ***all of the alleged conduct by Transact Pro took place in Latvia***. (Moskvins Decl. ¶ 30.)  The opening and onboarding of these UK Defendants' merchant accounts was performed by Transact Pro's staff working in Riga, Latvia. (*Id.*)  And the KYC and AML-related due diligence performed by Transact Pro staff in connection with these accounts was done in Latvia.  (*Id.*)  Moreover, to process these microtransactions, Transact Pro staff had to send (through computer software maintained in Transact Pro facilities in Latvia) commands and instructions to the two acquiring banks that were servicing these merchant accounts—JSC Rietumu Bank and Baltikums Bank AS—both based in Latvia.  (*Id.* ¶ 31.)  Similarly, to increase the volume limits for these accounts, Transact Pro had to process various software commands on its computer system in Latvia.  (*Id.*)

The FTC alleges that Transact Pro occasionally "set up numerous merchant accounts to process payments in U.S. dollars, allowing those clients to sell their products to U.S. consumers."  (FAC ¶ 26.)  However, no special "set up" occurred—Transact Pro's software always allows customers to pay in a large variety of different currencies, regardless of the customer or merchant's physical location. (Moskvins Decl. ¶ 28.)

Finally, the FTC alleges that the Apex Defendants used websites with both "US and UK domains," but fails to allege whether, or how, this ties to Transact Pro's conduct as a payment processor for UK merchants with Latvian bank accounts.  (*See* FAC ¶ 46.)  Importantly, the FTC never alleges that Transact Pro had a direct contractual relationship with U.S. shoppers who used the websites in question or that Transact Pro ever sold, advertised, or marketed a product, plan, or service to U.S. shoppers in anyway.  It merely processed payments for the UK Defendants.  (*Id.* ¶ 88.)

### D.    Peikos Was Referred to Transact Pro by a Third Party to Assist with European-Based Business.

No one at Transact Pro, including Moskvins, had a close personal or business relationship with Defendant Peikos.  (Moskvins Decl. ¶ 32.)  Moskvins met Peikos in person only once in 2016.  (*Id.* ¶ 35.)  Moskvins did not directly solicit Peikos' business and recalls that a third party initially introduced them.  (*Id.* ¶ 33.)  In approximately 2015, Peikos communicated with Moskvins and asked for assistance in opening merchant accounts and processing payments in the European Union.  (*Id.* ¶ 34.)  Moskvins replied that Transact Pro could help and further introduced Peikos to Transact Pro account managers.  (*Id.*)  Peikos never stated that he wanted to do US business through EU-based merchant accounts; to the contrary, he represented that he already had established banking and payment processing partners in the United States.  (*Id.*)

### E.    The Latvian Financial and Capital Market Commission Already Conducted a Multi-Year Investigation of the Same Conduct Challenged by the FTC.

Transact Pro is regulated by the Latvian Financial and Capital Market Commission (the "Latvian FCMC").  (Moskvins Decl. ¶ 19.)  In October 2016, the Latvian FCMC began a planned investigation of a wide variety of Transact Pro's business practices.  (*Id.* ¶ 20.)  This investigation included a review of Transact Pro's policies and procedures for opening and onboarding merchant accounts, opening what it called "shell companies" in the European Union, performing Know Your Client ("KYC") due diligence, and performing Anti-Money-Laundering-related due diligence.  (*Id.*)  The investigation also analyzed what volume limits Transact Pro established for merchant accounts, how and when Transact Pro increased those limits, as well as Transact Pro's policies and procedures for the use of microtransactions.  (*Id.*)  Among many other areas, the investigation also included an analysis of Transact Pro's policies and procedures for the maintenance

1  and service of clients who utilized "negative option" or "free trial"-based

2  subscription services.  (*Id.*)

3      The investigation by the Latvian FCMC continued through end of 2017.  (*Id.*

4  ¶ 21.)  The Latvian regulators requested, received, and reviewed thousands of

5  documents, performed multiple on-site inspections, reviewed customer records,

6  interviewed Transact Pro staff, and met with Transact Pro management on numerous

7  occasions.  (*Id.*)

8      On April 23, 2018, the Latvian FCMC issued preliminary findings.  (*Id.* ¶ 22.)

9  Transact Pro responded to these findings, and communicated with the Latvian

10  FCMC for many months to clarify its position.  (*Id.*)  In response, the Latvian

11  FCMC and Transact Pro agreed upon an Administrative Agreement which was

12  signed on November 12, 2018.  (*Id.* ¶ 23.)  This Agreement required Transact Pro to

13  take a number of affirmative steps to change its business practices and enhance the

14  efficiency of Transact Pro's internal control system, and levied monetary penalties

15  for the relevant conduct.  (*Id.*)  This Agreement included certain conditions and

16  prohibitions on conduct related to what it called "shell companies," and detailed

17  instructions relating to the onboarding of merchant accounts.  (*Id.*¶¶ 24-25.)

18      The Latvian FCMC also suggested that Transact Pro review and terminate its

19  "negative option" accounts.  (*Id.*¶ 24.)  Transact Pro has, at all times, complied with

20  the Agreement, has terminated these "negative option" accounts as of

21  November 2018, and has paid the assessed civil penalties.  (*Id.* ¶¶ 24-25.)  The

22  Latvian FCMC has closely scrutinized Transact Pro's compliance with the

23  Agreement, and has been in constant communication with Transact Pro concerning

24  its progress in this regard.  (*Id.* ¶ 26.)

25      In connection with this investigation, the Latvian FCMC also required

26  Transact Pro to perform an independent audit of its business practices.  (*Id.* ¶ 27.)

27  Transact Pro hired the international auditing firm of BDO, and cooperated fully with

28  this audit.  (*Id.*)  BDO performed this audit over approximately four months, and

1   issued a public report giving recommendations for internal control system

2   improvements and strengthening.  (*Id.*)  Transact Pro provided the Latvian FCMC

3   with the report and agreed to implement the recommendations pursuant to the

4   Agreement.  (*Id.*)  The Latvian FCMC is aware of the audit findings and did not take

5   additional actions against Transact Pro or its business.  (*Id.*)

6           Despite the Latvian FCMC's extensive investigation, findings, Administrative

7   Agreement, and continued oversight, the FTC has attempted to duplicate the Latvian

8   FCMC's investigate efforts over Transact Pro.  To date, the FTC has subpoenaed

9   BDO as well as the Latvian banks, demanding that they produce "all documents and

10  communications" referring or relating to any audit, monitoring, or investigation of

11  SIA Transact Pro relating to its involvement with Apex and the UK Defendants.

12  (*See* Moskvins Decl. ¶ 38 & Exs. A-C.)

13  **III.   <u>ARGUMENT</u>**

14          **A.     The Claims Against the Transact Pro Defendants Should Be**

15                  **Dismissed Under 12(b)(6) Because the Alleged Conduct Is Wholly**

16                  **Extraterritorial and Is Outside the Reach of the FTC Act.**

17          "It is a longstanding principle of American law that legislation of Congress,

18  unless a contrary intent appears, is meant to apply only within the territorial

19  jurisdiction of the United States."  *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S.

20  247, 255 (2010) (internal quotations omitted).  This bedrock principle serves to

21  "protect against unintended clashes between our laws and those of other nations

22  which could result in international discord."  *E.E.O.C. v. Arabian Am. Oil Co.*

23  (*"Aramco"*), 499 U.S. 244, 248 (1991) (superseded by statute on other grounds); *see*

24  *also McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 20–

25  22 (1963) (discussing possibility of "international discord" if National Labor

26  Relations Act were applied to crews working on foreign-flag ships and declining to

27  exercise jurisdiction based on comity).

28          Thus, "unless there is the affirmative intention of the Congress clearly

9

1  expressed" to give a statute extraterritorial effect and therefore reach conduct

2  undertaken solely in foreign countries, courts must apply a "presumption against

3  extraterritoriality."  *Aramco*, *supra*, at 248; *see also Smith v. United States*, 507 U.S.

4  197, 204 (1993) ("we assume that Congress legislates against the backdrop of the

5  presumption against extraterritoriality") (internal quotations omitted).  This

6  "presumption of extraterritoriality" applies ***regardless*** of whether there is a risk of

7  conflict between the American statute and a foreign proceeding.  *See Sale v. Haitian*

8  *Centers Council, Inc.*, 509 U.S. 155, 173–174 (1993).  And "[w]hen a statute gives

9  no clear indication of an extraterritorial application, ***it has none***."  *Morrison*, 561

10  U.S. at 255 (emphasis added).[4]

11      The Supreme Court's most recent discussion and exposition of the principle

12  of extraterritoriality was in *Morrison*.  There, the Court was asked to determine

13  whether the Securities Exchange Act of 1934 (the "Exchange Act") had any

14  application to a class of Australian investors who were allegedly injured (essentially

15  by foreign commerce) in securities-related conduct that occurred in Florida.  *Id.*

16  Petitioners pointed out that § 10(b) of the Exchange Act defined "interstate

17  commerce" as "trade, commerce, transportation, or communication . . . ***between any***

18  ***foreign country and any state***."  *Id.* at 262 (emphasis added).  The Court analyzed

19  § 10(b) of the Exchange Act and ultimately held that there was "no clear indication"

20  by Congress to rebut the presumption against extraterritoriality.  *Id.* at 265.  On the

21  question of the "foreign commerce" language in the Act, it found that such

22  a statement was not enough:

23          But we have repeatedly held that even statutes that
           contain broad language in their definitions of 'commerce'
24          that expressly refer to 'foreign commerce' do not apply
           abroad.  The general reference to foreign commerce in the

25  _____

26  [4]   The Court in *Morrison* also clarified that a challenge to the extraterritoriality of
     a statute is technically a question of whether the allegations "state a claim" under the
27  statute.  *Morrison*, 561 U.S. at 254 (in addressing extraterritoriality question,
     "a remand would only require a new Rule 12(b)(6) label for the same Rule 12(b)(1)
28  conclusion.").

10

definition of "interstate commerce" does not defeat the presumption against extraterritoriality.

*Id.* at 262-263 (internal citations omitted).  Indeed, in contrast with the insufficient "foreign commerce" language of § 10(b), the Court cited to an example of another portion of the Exchange Act, which *did* express a sufficient intent to apply outside our national borders:  "Subsection 30(a) contains what § 10(b) lacks: a clear statement of extraterritorial effect."  *Id.* at 265.  The language of § 30(a) was sufficient because it clearly defined as unlawful an "instrumentality of interstate commerce for the purpose of effecting on an exchange *not within or subject to the jurisdiction of the United States* . . . ."  *Id.* at 264.

Numerous other federal courts have applied the presumption against extraterritoriality to prohibit the application of U.S. laws to claims arising in foreign countries when "all the relevant conduct took place outside the United States."  *See, e.g.*, *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 124 & 116 (2013) (refusing to apply the Alien Tort Statute to foreign conduct and ruling that the "presumption against extraterritorial application helps ensure that the Judiciary does not erroneously adopt an interpretation of U.S. law that carries foreign policy consequences not clearly intended by the political branches"); *WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2137 (2018) (interpreting the Patent Act and noting that "if the relevant conduct occurred in another country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory" (internal quotation marks omitted)); *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2107 (2016) (interpreting RICO Act and ruling that "[a]lthough a risk of conflict between the American statute and a foreign law is not a prerequisite for applying the presumption against extraterritoriality, where such a risk is evident, the need to enforce the presumption is at its apex" (internal citation omitted)); *Liu Meng-Lin v. Siemens AG*, 763 F.3d 175, 179 (2d Cir. 2014) (refusing to apply whistleblower provision of Dodd-Frank

Act extraterritorially where "[t]he facts alleged in the complaint reveal essentially no contact with the United States regarding either the wrongdoing or the protected activity"); *Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29, 33 (2d Cir. 2010) ("The slim contacts with the United States alleged by Norex are insufficient to support extraterritorial application of the RICO statute."); *FTC v. Construct Data Publishers*, No. 13-CV-01999, 2014 WL 7004999, at *8 (N.D. Ill. Dec. 11, 2014) (applying presumption against extraterritoriality to set aside FTC's calculation of damages on foreign Defendants conduct abroad, holding that "[g]iven the statutory language and the presumption against extraterritoriality, Defendants have raised a meritorious defense as to the FTC's damage calculation").

In the present action, the conduct challenged by the FTC was all extraterritorial because it occurred ***solely*** in the EU.  To the extent that Transact Pro assisted in the creation of multiple UK-based merchant accounts—a common practice encouraged by Visa and Mastercard to help vendors distinguish product and enable customers to track purchases on their credit card receipts—the necessary steps to get this done were performed by Transact Pro personnel all working in Latvia and interacting with various agencies in the UK.  (Moskvins Decl., ¶¶ 28-31.[5])  All the electronic set-up transactions for reviewing, approving, and onboarding these merchant accounts were performed by Transact Pro employees in Riga, Latvia.  *Id.*  And all the "Know Your Customer" (KYC) and "Anti-Money Laundering" (AML) procedures that were followed in performing due diligence on these accounts were also done in the Transact Pro's offices in Latvia.  (*Id.* ¶ 30.)  In short, all the conduct that the FTC alleges was relevant to "credit card laundering" (a claim Transact Pro vigorously disputes, but which is beyond the scope of this motion), was undertaken in Latvia and in the UK.

---

[5]   In fact, the FTC admits that the opening of EU-based merchant account was a prerequisite to accepting consumer purchases by credit or debit cards.  (*See* FAC ¶ 66.)

Similarly, the conduct that is relevant to the FTC's unfounded claims that Transact Pro enabled the Apex Defendants to manipulate Visa/Mastercard chargeback ratios through "microtransactions" and "volume increases" all took place in Latvia. (*Id.* at ¶ 31.) To effectuate a microtransaction on these EU-based merchant accounts, computer commands had to be sent from Transact Pro's offices (in Latvia) to the acquiring banks maintaining and servicing the bank accounts linked with these merchant accounts. Only two banks serviced those accounts—JSC Rietmu Banks and Baltikums Bank AS—again, both based in Latvia. (*Id.*) Thus, the microtransactions and other increases that FTC alleges enabled or assisted in the unfair practices all were extraterritorial.[6]

Turning to the language and legislative history of 15 U.S.C. § 45—the sections of the FTC Act relied on by the FTC in Counts VI and VII against Transact Pro—there is no "clear indication" of a Congressional intent to allow the FTC to prosecute these cases for conduct solely occurring in foreign countries. The only federal appellate circuit to do an extensive analysis of the question held quite clearly that the FTC Act did not apply to extraterritorial conduct. *Nieman v. Dryclean U.S.A. Franchise Co., Inc.*, 178 F.3d 1126 (11th Cir. 1999). Specifically, the Eleventh Circuit held that:

> the language of the FTC Act does not clearly indicate that Congress intended the Act to apply extraterritorially. The provisions in the FTC Act that Nieman points to as supporting extraterritorial application of the Act are at best ambiguous and, more importantly, are virtually identical to those that the Supreme Court found not to support extraterritorial application of Title VII of the Civil Rights Act of 1964.

---

[6]   The FTC cannot avoid this conclusion by alleging that, in connection with conduct that purported spanned several years, a handful of isolated emails approving these transactions may have been sent by Transact Pro's then-CEO from his home in Florida. (FAC ¶¶ 27, 94, 99.) The alleged conduct giving rise to the claims themselves—load balancing and credit card laundering—occurred ***solely in Latvia*** since that is where those transactions were literally processed and implemented by Transact Pro staff. (Moskvins Decl. ¶¶ 28-31.)

1   *Nieman*, 178 F.3d at 1130.

2       In 2006, Congress passed the "U.S. SAFE WEB ACT," which primarily

3   authorized the FTC to share information and work collaboratively with foreign

4   regulatory agencies.  It also added some additional language authorizing the FTC

5   Act to cover "acts or practices involving foreign commerce" that cause or are likely

6   to cause foreseeable injury within the United States.  *See* 15 U.S.C. § 45(a)(4).

7       But parsing the language here is critical.  Congress did ***not*** say (as it could

8   have) that the FTC Act applies to wholly-foreign conduct "not within" the United

9   States.  *See RJR Nabisco*, 136 S. Ct. at 2102 (quoting *Morrison*, 561 U.S. at 265)

10  (Even "when a statute provides for some extraterritorial application, the

11  presumption against extraterritoriality operates to limit that provision to its terms.").

12  Instead, it simply referred to "foreign commerce."  As the Supreme Court held in

13  *Morrison* <u>four years later</u>, that is insufficient to rebut the presumption against

14  extraterritoriality.  *Morrison*, 561 U.S. at 262-262.  Indeed, the federal jury

15  instructions define "foreign commerce" as "commerce or travel between any part of

16  the United States and any place outside the United States."  United States

17  Department of Justice, Criminal Resources Manual, Jury Instruction 2180, available

18  at [https://www.justice.gov/jm/criminal-resource-manual-2180-jury-instruction-](https://www.justice.gov/jm/criminal-resource-manual-2180-jury-instruction-affecting-interstate-or-foreign-commerce)

19  [affecting-interstate-or-foreign-commerce](https://www.justice.gov/jm/criminal-resource-manual-2180-jury-instruction-affecting-interstate-or-foreign-commerce).  Here, the alleged violative conduct at

20  issue does not involve any "foreign commerce" between a part of the United States

21  and a foreign country—as discussed above, it simply involved the implementation

22  of financial transactions by staff in Latvia, on merchant accounts owned by UK

23  entities, processed through Latvian banks.

24      Finally, the legal conclusion that the FTC Act does not extend to Transact

25  Pro's wholly-in-Latvia conduct is buttressed by the FTC's ***own previous legal***

26  ***positions***.  In 2004, when arguing for the extraterritorial application of the FTC Act

27  in another proceeding, the FTC represented the following:  "More analogous to the

28  FTC Act is the Securities and Exchange Act of 1934, which defines 'commerce' as

1   'commerce among the several States, or between any foreign country and any State.'

2   15 U.S.C. § 78c(a)(17)."  *See* FTC Brief in *In the Matter of Telebrands Corp.,*

3   *A Corp., TV Sav., LLC, A Ltd. Liab. Co., & Ajit Khubani, Individually & As*

4   *President of Telebrands Corp. & Sole Member of TV Sav., LLC*., No. 9313, 2004

5   WL 817053, at *5 (MSNET Mar. 3, 2004).  The FTC was exactly right—the FTC

6   Act is most analogous to the Securities Exchange Act.  And six years later—in

7   *Morrison*—the United States Supreme Court found that the Exchange Act did not

8   have extraterritorial application.

9       **B.**    **Counts VI and VII of the FAC Against the Transact Pro**

10             **Defendants Should Be Dismissed Under FRCP 12(b)(2) Based on**

11             **Principles of International Comity.**

12      International comity "is the recognition which one nation allows within its

13  territory to the legislative, executive or judicial acts of another nation, having due

14  regard both to international duty and convenience, and to the rights of its own

15  citizens or of other persons who are under the protection of its laws."  *In re Simon*,

16  153 F.3d 991, 998 (9th Cir. 1998) (quoting *Hilton v. Guyot*, 159 U.S. 113, 164

17  (1895)).  Stated differently, international comity "is a doctrine of prudential

18  abstention, one that 'counsels voluntary forbearance when a sovereign which has

19  a legitimate claim to jurisdiction concludes that a second sovereign also has

20  a legitimate claim to jurisdiction under principles of international law.'"  *Mujica v.*

21  *AirScan Inc.*, 771 F.3d 580, 597–99 (9th Cir.  2014), quoting *United States v.*

22  *Nippon Paper Indus. Co.*, 109 F.3d 1, 8 (1st Cir. 1997).

23      When applying the principles of comity, federal courts "ordinarily refuse to

24  review acts of foreign governments and defer to proceedings taking place in foreign

25  countries."  *Pravin Banker Assocs., Ltd. v. Banco Popular del Peru*, 109 F.3d 850,

26  854 (2d Cir. 1997).  It is a "voluntary deference to the acts of other governments,

27  undertaken for the common good even though no transnational institution exists to

28  exert any compulsion."  *In re Grand Jury Proceedings, Yanagihara Grand Jury,*

1   *Impanelled, June 13, 1988*, 709 F. Supp. 192, 195 (C.D. Cal. 1989) (quoting 18

2   Wright, Miller & Cooper, Federal Practice and Procedure § 4473 (1981); *see also*

3   *JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 423

4   (2d Cir. 2005) (comity "is clearly concerned with maintaining amicable working

5   relationships between nations, a 'shorthand for good neighbourliness, common

6   courtesy and mutual respect between those who labour in adjoining judicial

7   vineyards'"); *Pravin Banker Assocs., Ltd.*, 109 F.3d at 854 (comity is a "rule of

8   practice, convenience, and expediency rather than of law" that courts have embraced

9   "to promote cooperation and reciprocity with foreign lands.").

10      Motions to dismiss based on international comity are considered challenges to

11  subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  *See*

12  *Daewoo Motor Am., Inc. v. Gen. Motors Corp.*, 459 F.3d 1249, 1259 (11th Cir.

13  2006) (affirming dismissal on the basis of international comity in response to

14  Rule 12(b)(1) motion).

15      There are two types of comity recognized by the courts:  "adjudicatory

16  comity" and "prescriptive comity."[7]  *Mujica*, 771 F.3d at 598.  Adjudicatory comity

17  is the "discretion of a national court to decline to exercise jurisdiction over a case

18  before it when that case is pending in a foreign court with proper jurisdiction."

19  *Smagin v. Yegiazaryan*, 733 F. Appx. 393, 397 (9th Cir. 2018) (quoting *Mujica*, 771

20  F.3d at 599).  This form of comity allows a court "to abstain from exercising

---

22  [7]   Prescriptive comity "guides domestic courts as they decide the extraterritorial
23  reach of federal *statutes*."  *Mujica*, 771 F.3d at 598 (emphasis added).  The multi-
    year investigation of the Latvian FCMC is more properly analyzed under the
24  framework of "adjudicatory comity" because the Latvian FCMC has the power to
    make administrative findings and issue orders that are appealable to a higher
25  regional court.  *See* Nasdaq Baltic, "On the decision of the Financial and Capital
26  Market Commission Board in regards to AS 'Grindeks' shareholders, *available at*
    https://www.globenewswire.com/news-release/2014/11/24/685570/0/en/On-the-
27  decision-of-the-Financial-and-Capital-Market-Commission-Board-in-regards-to-AS-
28  Grindeks-shareholders.html (last visited Aug. 5, 2019).

16

jurisdiction due to a past or ***potential*** judicial proceeding elsewhere." *Mujica*, 771 F.3d at 600-01 (emphasis added).

Moreover, a "judicial proceeding" is broadly defined in federal law as including legal proceedings of regulatory agencies—like the Latvian FCMC[8]—that are delegated the power to investigate and enforce their orders through formal proceedings. *See Town of Springfield, Vt. v. McCarren*, 549 F. Supp. 1134, 1151 (D. Vt. 1982), *aff'd sub nom. Town of Springfield v. McCarren*, 722 F.2d 728 (2d Cir. 1983) ("Where a state chooses to confer a part of its judicial business on an administrative agency and grants the agency the power to enforce its own orders, it makes that agency a part of the state's judicial apparatus.").

In determining whether to dismiss based on comity, courts evaluate the United States' interests, the strength of the foreign government's interests, and the adequacy of the foreign forum. *Mujica*, 771 F.3d at 603.  In evaluating US interests, courts should consider five nonexclusive factors:  (1) the location of the conduct in question, (2) the nationality of the parties, (3) the character of the conduct in question, (4) foreign policy interests, and (5) any public policy interests. *Id.* at 604, 607.  Of these, the first—the location of the conduct—is considered the most important. *Id.*

All five factors bearing on the question of US interests favor the Court exercising "prudential abstention" in favor of the Latvian FCMC's multi-year investigation and Administrative Agreement.  As discussed in Section II.C., *supra*,

---

[8]   According to its website, "The Financial and Capital Market Commission is an autonomous public institution, which carries out the supervision of Latvian banks, credit unions, insurance companies and insurance brokerage companies, participants of financial instruments market, as well as private pension funds, payment institutions and electronic money institutions."  Latvian FCMC, "About Us," *available at* https://www.fktk.lv/en/about-us/ (last visited Aug. 5, 2019).  The Orders of the FCMC are directly appealable, within one month, to the Administrative Regional Court. *See, supra*, n.7, Nasdaq Baltic.

the "location of the conduct" occurred solely in Latvia, where Transact Pro's employees processed the instructions for the microtransactions challenged by the FTC, where the Transact Pro employees performed all the KYC and AML-related due diligence, and where all the onboarding, maintenance, and service of the UK-based merchant accounts was conducted.  (Moskvins Decl. ¶¶ 28-31.)  Indeed, all of that solely-in-Latvia conduct was extensively investigated by the Latvian FCMC and addressed in the parties' Administrative Agreement.  (*Id.* ¶¶ 22-27.)

The second factor similarly weighs heavily in favor of an exercise of comity. Defendant Moskvins is a citizen of Latvia (not the United States), and ***all*** of Transact Pro's employees live and work in Latvia.  Other than Moskvins, the FTC would have to travel across the globe to take the depositions of any of Transact Pro's employees.  And while the FTC will surely point to the American nationality of the consumers it purports to represent, it is important to note that this is ***not*** a class action where restitutionary awards will be going to individual persons.  Any moneys received will go to the US coffers.  Thus, the only relevant "parties" are of Latvian nationality.

The third factor—the character of the conduct—also supports the exercise of abstention because the nature of the conduct is primarily about the Latvian financial system.  The FTC is essentially challenging the integrity and adequacy of Latvia's national controls on its banking system.  What types (and how much) due diligence should payment processors like Transact Pro do before onboarding a merchant account?  What conditions or other checks should entities in Latvia demand before doing business with companies that exhibit "characteristics of shell companies?" What policies and procedures should Latvian payment processors implement before approving microtransactions?  Those are precisely the issues that the Latvian regulators spent years investigating and addressing.  A review of the FTC's subpoenas and document request to the Latvian merchant banks and BDO (Transact Pro's independent auditor) show that the FTC fully intends to overlap—and put into

18

question—the Latvian FCMC's multi-year investigation and Administrative Agreement with Transact Pro.  (*See* Moskvins Decl. ¶ 38 & Exs. A-C.)

The fourth and fifth factors also militate strongly in favor of declining jurisdiction on comity grounds.  Companies like Transact Pro that operate exclusively in the EU should not expect to be hauled into US federal court in California simply because they approved transactions in Europe that, allegedly, allowed a beneficial owner of a UK company to continue operating in the United States.  What's next?  Should Bank of America executives in Charlotte, North Carolina, expect to be dragged into Latvian court by the Latvian FCMC if they approve US bank transfers that allegedly help a website in Latvia deceive customers in Riga?  Absurd.  Simply put, every nation should respect the primacy of each country's regulators to investigate and remediate potential weaknesses in their financial and banking systems.  The interference of the FTC in the affairs of the Latvian FCMC implicates exactly the type of foreign policy concerns that the principle of comity was meant to address.

The strength of the Latvian interests in addressing the conduct is plainly much stronger.  The alleged conduct—establishing shell companies in the EU, and engaging in microtransactions ***to evade European regulators***—is obviously of importance to the Latvian regulators whose work it is to strengthen the AML controls in their national financial and banking system.  That's precisely their job, and is why the planned investigation in Latvia took many years to complete.

Finally, there is no indication that the Latvian FCMC is an inadequate forum to address the challenged conduct.  It is an "autonomous institution" whose mission it is to supervise banks and other electronic money institutions like Transact Pro.[9] Moreover, it is empowered to issue orders and sanctions, assess civil penalties,

---

[9]   *See, supra*, n.8.

1  suspend bank executives, force equity sell-offs, and other remedies.[10]  Indeed, the

2  sheer amount of time that the Latvian FCMC investigated the conduct shows that it

3  took the issues seriously.  There is nothing to suggest that it is an inadequate forum.

4        **C.**    **There Is No Personal Jurisdiction Over Transact Pro.**

5        "For a court to exercise personal jurisdiction over a nonresident defendant,

6  that defendant must have at least 'minimum contacts' with the relevant forum such

7  that the exercise of jurisdiction 'does not offend traditional notions of fair play and

8  substantial justice.'"  *Schwarzenegger v. Fred Martin Motor Co*., 374 F.3d 797, 801

9  (9th Cir. 2004) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

10  There are two types of personal jurisdiction:  general and specific.  *Id.*

11        In order to have general (personal) jurisdiction, a nonresident defendant must

12  engage in "continuous and systematic general business contacts" with the forum

13  state.  *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984)

14  (*citing Perkins v. Benguet Consol. Mining Co*., 342 U.S. 437 (1952)).  This is an

15  "exacting standard" because it needs to "approximate physical presence" in the

16  forum state.  *Schwarzenegger*, 374 F.3d at 801; *see also Brand v. Menlove Dodge*,

17  796 F.2d 1070 (9th Cir. 1986) (general jurisdiction "is intended to be a fairly high

18  standard.").  Indeed, "[t]he standard is met only by 'continuous corporate operations

19  within a state [that are] thought so substantial and of such a nature as to justify suit

20  against [the defendant] on causes of action arising from dealings entirely distinct

21  from those activities.'"  *King v. Am. Family Mut. Ins. Co*., 632 F.3d 570, 579 (9th

22  Cir. 2011) (quoting *International Shoe*, 326 U.S. at 318).

23        Nothing in the Complaint even begins to approximate this level of

24  "continuous and systemic business contacts."  The Complaint alleges that Transact

25  Pro attended a trade show five years ago (in 2014) to purportedly solicit clients, and

26  that it allegedly did business with essentially one or two American clients (Peikos

27  _____

10  *See, supra*, n.7.

28

and Barnett) who wanted to conduct business in the EU.  (FAC ¶¶ 25, 94.[11])  Even assuming these allegations to be true (and Transact Pro does not), they are woefully insufficient to support general jurisdictions.  *See CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1075 (9th Cir. 2011) ("AcademyOne's relationships with three hundred California registered users . . . fall[s] well short of the necessary substantial 'volume' and 'economic impact' [for general jurisdiction].");  *Cubbage v. Merchent*, 744 F.2d 665, 667–68 (9th Cir. 1984) (no jurisdiction over doctors despite significant numbers of patients in forum, use of forum's state medical insurance system and telephone directory listing that reached forum); *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 772 (1984) (no general jurisdiction even where defendant's magazine had circulation of 10,000–15,000 copies in forum per month); *Congoleum Corp. v. DLW Aktiengesellschaft*, 729 F.2d 1240, 1242–43 (9th Cir. 1984) (no general jurisdiction despite solicitation of orders, promotion of products to potential customers through the mail and through showroom displays, and attendance at trade shows and sales meetings); *Bancroft & Masters v. Augusta National Inc.*, 223 F.3d 1082 (9th Cir. 2000) ("[E]ngaging in commerce with residents of the forum state is not in and of itself the kind of activity that approximates physical presence within the state's borders.").

   Specific jurisdiction is analyzed under a three-prong test:

> (1) The nonresident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable.

---

[11]   The other jurisdictional allegation is that Transact Pro had a contract with Triangle Holdings to obtain business referrals in the United States.  (FAC ¶ 25.) This allegation is simply false—Transact Pro never had a contract for referrals with Triangle Holdings.  (Moskvins Decl. ¶ 12.)

*Schwarzenegger*, 374 F.3d at 802.  The plaintiff bears the burden of establishing the first two elements.  *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990).

None of the three prongs is met here.  Transact Pro has not "purposely directed" its activities to the United States.  Transact Pro does not have any employees, branches, affiliates, representatives, or partners in the United States. (Moskvins Decl. ¶ 7-8.)  It does not open merchant accounts, conduct any payment processing, or provide any other services in the United States.  (*Id.*)  It does not advertise in the United States.  (*Id.* at ¶¶ 9-17.)  It does not even have an operating bank account or a mailing address in the United States.  Indeed, because of Visa and Mastercard regional prohibitions, it couldn't conduct payment processing business in the United States even if it wanted to do so.  (*Id.*)  In short, Transact Pro does not conduct business in the United States and certainly has not "purposely avail[ed]" itself of the privileges of conducting business in a U.S. forum.

The FTC will undoubtedly argue that Transact Pro's "business" with Defendant Peikos is sufficient to establish jurisdiction.  Not so.  Transact Pro did not approach or solicit Peikos—he was referred by a third party.  (Moskvins Decl. ¶33.)  Peikos told Transact Pro's then-CEO that he **wanted to do business in Europe**, and that he needed Transact Pro's assistance to open the required merchant accounts and perform the payment processing in the EU.  (*Id.* at ¶ 34.)  He specifically told Transact Pro that he already had payment processors in the United States (a true statement).  (*Id.*)  And that is what Transact Pro agreed to do—establish accounts in Europe and process payments in the EU.  Period.  Transact Pro did not "avail" itself of the US market by assisting one US businessman to conduct business in Europe.[12]

---

[12]   Nor did Transact Pro "avail" itself of the US market by allowing these EU-based merchant accounts to accept transactions in dollars.  It is common knowledge that countless international investors and travelers prefer to conduct business in dollars. Indeed, according to the International Monetary Fund, in 2017 the US dollar was the currency used in 39.9% of global payments. https://www.bloomberg.com/news/articles/2018-10-03/the-tyranny-of-the-u-s-dollar

1    The second prong of the specific jurisdiction test also remains unsatisfied.

2  Here, the FTC's claims of load balancing and credit card laundering do not "arise[]

3  out of or relate[] to the defendant's forum-related activities." *See Schwarzenegger*,

4  374 F.3d at 802.  As discussed above, the alleged violative conduct occurred solely

5  in Latvia, where Transact Pro's employees and staff implemented the computer

6  instructions to approve and process the transactions in question.  None of that was

7  directly related to any US activity.  The FTC's claim requires several steps—*i.e.*,

8  because Transact Pro opened those EU-based accounts and approved a handful of

9  microtransactions, and because (allegedly) those transactions lowered the

10 chargeback ratios for certain merchant accounts, and because (allegedly) those

11 lower chargeback ratios allowed the UK entities to evade Visa and Mastercard fraud

12 algorithms, then the Apex websites in the US were (allegedly) assisted in continuing

13 their operation, and so US consumers were (allegedly) deceived when buying

14 products from those websites.  This Rube Goldberg-theory of liability is insufficient

15 to establish plausibly that the FTC's claims are somehow related to "forum related

16 activities" by Transact Pro.

17   Finally, analyzing the third prong, it is evident that the exercise of jurisdiction

18 does not comport with notions of "fair play and substantial justice."  For all the

19 reasons discussed in the comity section above, the exercise of jurisdiction is not

20 reasonable.  The FTC is now seeking to replace its judgment for a multi-year

21 Latvian regulatory process that has already involved the review of thousands of

22 documents, multiple site inspections, staff interviews, etc.—all for much of the same

23 conduct that the FTC is challenging.  And for what?  The Latvian FCMC

24 recommended to Transact Pro that it terminate merchant accounts associated with

25 "free trial" websites, ***and it did so***, so there's no need for any further injunctive

26 relief.  (Moskvins Decl. ¶¶ 24-25.)  And any restitution order would be unfair given

27 the already assessed (and paid) civil penalties by the Latvian FCMC.  It is also

28 unfair to Transact Pro to be added to this action—on the very eve of trial—where

nearly a year of intensive investigation of the Apex defendants (and the production

of over 300,000 documents) has already taken place.

Moreover, the United States Supreme Court has consistently rejected the

argument—relied on primarily by the FTC here—that jurisdiction can be found

simply where a defendant knew or should have known that its products or services

would enter or affect the US through the stream of commerce. *Asahi Metal Indus.*

*Co. v. Super Ct.*, 480 U.S. 102 (1987).  In *Asahi*, a Japanese manufacturer of tire

valve assemblies (Asahi Metal Industry) was sued in California Superior Court in

a product liability suit related to a motorcycle accident.  Even though the Japanese

valve manufacturer did not conduct business in California, and had no offices or

employees in California, the California Supreme Court held that jurisdiction existed

because it "knew that some of the valve assemblies . . . would be incorporated into

tire tubes sold in California, and that Asahi benefitted indirectly from the sale in

California of products incorporating its components." *Id.* at 108.  The California

Supreme Court also found that Asahi's "intentional act of placing its components

into the stream of commerce" together with its "awareness that some of the

components would eventually find their way into California" was sufficient to meet

the jurisdictional requirements of the Due Process Clause.  *Id.*  The United States

Supreme Court reversed, holding that it was insufficient that the defendant could

have foreseen that placing the product in the stream of commerce would affect US

consumers:

> The "substantial connection" [citations omitted] between
> the defendant and the forum State necessary for a finding
> of minimum contacts must come about by *an action of the*
> *defendant purposefully directed toward the forum State.*
> *Burger King, supra*, 471 U.S., at 476, 105 S. Ct., at 2184;
> *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774, 104
> S. Ct. 1473, 1478, 79 L. Ed. 2d 790 (1984).  The
> placement of a product into the stream of commerce,
> without more, is not an act of the defendant purposefully
> directed toward the forum State.  Additional conduct of
> the defendant may indicate an intent or purpose to serve

> the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State. But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.

*Asahi*, 480 U.S. at 112.

Applying that principle here, Transact Pro's alleged knowledge that these UK merchant accounts would be used to sell to US consumers is not enough to support jurisdiction. Stated differently, purportedly knowing that its actions would have a downstream effect on the stream of commerce in the US is too thin a reed to support personal jurisdiction. This is so because Transact Pro did not direct any of its activities to these US consumers. It did not take ***any*** actions "purposefully directed" to the United States. Indeed, it did nothing vis-à-vis the American market. All that the FTC can point to is Transact Pro's (fully lawful) services in the EU, provided to (fully lawful) UK entities, for which Peikos was the ultimate beneficial owner. It would be the height of irony indeed if that conduct—***all directed to assisting with business in the European Union***—somehow justified jurisdiction.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Transact Pro respectfully requests that the Court dismiss Counts VI and VII of the First Amended Complaint.

DATED:  August 5, 2019

Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, P.C.

By:   */s/ Hernán D. Vera*
⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
Hernán D. Vera
Attorneys for Defendants SIA Transact Pro and Mark Moskvins