# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**, | Case No. 2:18-cv-09573-JFW (JPRx) |
| Plaintiff, | **STIPULATED ORDER FOR PERMANENT INJUNCTION AND MONETARY JUDGMENT** |
| v. | |
| **APEX CAPITAL GROUP, LLC, et al.**, | |
| Defendants. | |

On November 13, 2018, Plaintiff, the Federal Trade Commission ("Commission" or "FTC"), filed its Complaint for Permanent Injunction and Other Equitable Relief in this matter, subsequently amended as First Amended Complaint for Permanent Injunction and Other Equitable Relief (as amended, "Complaint"), pursuant to Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8404, and Section 918(c) of the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693o(c). The Commission and Defendants Mark Moskvins and SIA Transact Pro stipulate to the entry of this Stipulated Order for

Permanent Injunction and Monetary Judgment to resolve all matters in dispute in this action between them.

THEREFORE, IT IS ORDERED as follows:

## FINDINGS

1. This Court has jurisdiction over this matter.

2. The Complaint charges that Settling Defendants participated in unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), through processing charges to consumers' credit and debit cards on behalf of an Internet marketing operation known as the Apex Enterprise.

3. Settling Defendants neither admit nor deny any of the allegations in the Complaint, except as specifically stated in this Order. Only for purposes of this action, Settling Defendants admit the facts necessary to establish jurisdiction.

4. Settling Defendants waive any claim that they may have under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action through the date of this Order, and agree to bear their own costs and attorney fees.

5. Settling Defendants and the Commission waive all rights to appeal or otherwise challenge or contest the validity of this Order.

## DEFINITIONS

For the purpose of this Order, the following definitions apply:

A. "**ACH Debit**" means any completed or attempted debit to a Person's account at a financial institution that is processed electronically through the Automated Clearing House Network.

B. "**Acquirer**" means a business organization, financial institution, or an agent of a business organization or financial institution that has authority from an organization that operates or licenses a credit card system (*e.g.* Visa, MasterCard, American Express, and Discover) to authorize Merchants to accept, transmit, or

process payment by credit card through the credit card system for money, goods or services, or anything else of value.

C. **"Add-On"** means any additional good or service that is offered to the consumer for purchase immediately preceding, at the time of, or closely proximate in time after the consumer's purchase of a different good or service, where the different good or service is or was advertised, marketed, promoted, or offered for sale by the Merchant or Seller, whether directly or through an intermediary, including by consulting, planning, participating, facilitating, or advising.

D. **"Apex Enterprise"** means Apex Capital Group, LLC, Capstone Capital Solutions Limited, Clik Trix Limited, Empire Partners Limited, Interzoom Capital Limited, Lead Blast Limited, Mountain Venture Solutions Limited, Nutra Global Limited, Omni Group Limited, Rendezvous IT Limited, Sky Blue Media Limited, Tactic Solutions Limited, the UK Related Apex Companies, and the Wyoming Related Apex Companies, and each of their subsidiaries, affiliates, successors, and assigns.

E. **"Affiliate"** means any Person who participates in an Affiliate Program.

F. **"Affiliate Network"** means any Person who provides another Person with Affiliates for an Affiliate Program or with whom any Person contracts as an Affiliate to market, advertise, or offer for sale any product, service, or program.

G. **"Affiliate Program"** means any arrangement under which any Client pays, or offers to pay, or provides, or offers to provide, any form of consideration to any third party, either directly or through an Affiliate Network (i) to provide any Client with, or refer to any Client, potential or actual customers; or (ii) otherwise to market, advertise, or offer for sale any product, service, or program on behalf of any Client.

H.     **"Card-Not-Present Transaction"** means a debit or credit card transaction whereby the Person's debit or credit card is not physically swiped, scanned, or imprinted.

I.     **"Chargeback"** means a procedure whereby an issuing bank or other financial institution charges all or part of an amount of a Person's credit or debit card transaction back to the Acquirer or other financial institution.

J.     **"Chargeback Rate"** means the proportion (expressed as a percentage) of Chargebacks out of the total number of attempted credit or debit card sales transactions.

K.     **"Client"** means any Person (a) who obtains, directly or indirectly, from any Settling Defendant a Merchant Account, or (b) to whom any Settling Defendant provides any Payment Processing services.

L.     **"Commission"** or **"FTC"** means the Federal Trade Commission.

M.     **"Corporate Defendant"** means SIA Transact Pro, and each of its subsidiaries, affiliates, successors, and assigns.

N.     **"Cosmetic"** means:

1.     articles to be rubbed, poured, sprinkled, or sprayed on, introduced into, or otherwise applied to the human body or any part thereof intended for cleansing, beautifying, promoting attractiveness, or altering the appearance; and

2.     articles intended for use as a component of any such article, except that such term shall not include soap.

O.     **"Covered Client"** means any Client who offers to sell, sells, promotes, or markets, the following goods or services: discount buying clubs; foreclosure protection or guarantees; lottery sales or sweepstakes; medical discount benefits packages including discount medical cards; multi-level marketing distribution; nutraceuticals; debt collection, debt counseling, debt settlement, or debt consolidation; payday lending; penny auctions; real estate seminars and

4

training programs; computer technical support services; goods or services with Negative Option Features not prohibited under Section I of this Order; and any Client whose businesses or products are marketed through Outbound Telemarketing.

P.     "**Credit Card Laundering**" means:

      1.     Presenting or depositing into, or causing or allowing another to present or deposit into, the credit card system for payment, a Credit Card Sales Draft generated by a transaction that is not the result of a credit card transaction between the cardholder and the Merchant;

      2.     Employing, soliciting, or otherwise causing or allowing a Merchant, or an employee, representative, or agent of a Merchant, to present to or deposit into the credit card system for payment, a Credit Card Sales Draft generated by a transaction that is not the result of a credit card transaction between the cardholder and the Merchant; or

      3.     Obtaining access to the credit card system through the use of a business relationship or an affiliation with a Merchant, when such access is not authorized by the Merchant Account agreement or the applicable credit card system.

Q.     "**Credit Card Sales Draft**" means any record or evidence of a credit card transaction.

R.     "**Dietary Supplement**" means:

      1.     any product labeled as a dietary supplement or otherwise represented as a dietary supplement; or

      2.     any pill, tablet, capsule, powder, softgel, gelcap, liquid, or other similar form containing one or more ingredients that are a vitamin, mineral, herb or other botanical, amino acid, probiotic, or other dietary substance for use by humans to supplement the diet by increasing the total dietary intake, or a concentrate, metabolite, constituent, extract, or combination of any ingredient described above,

that is intended to be ingested, and is not represented to be used as a conventional Food or as a sole item of a meal or the diet.

S.    "**Drug**" means:

1.    articles recognized in the official United States Pharmacopoeia, official Homeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them;

2.    articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in humans or other animals;

3.    articles (other than Food) intended to affect the structure or any function of the body of humans or other animals; and

4.    articles intended for use as a component of any article specified in Subsection (1), (2), or (3); but does not include devices or their components, parts, or accessories.

T.    "**Food**" means:

1.    any article used for food or drink for humans or other animals;

2.    chewing gum; and

3.    any article used for components of any such article.

U.    "**High Risk Client**" means any Client that (a) on an annual basis, whether measured by a single Merchant Account or by the aggregate of all Merchant Accounts held by the Client, processes more than fifteen percent (15%) Card-Not-Present Transactions and more than five hundred thousand dollars ($500,000) in total Card-Not-Present Transactions; or (b) is a Covered Client.

V.    "**Including**" means including but not limited to.

W.    "**Independent Sales Organization**" **or** "**ISO**" means any Person that (a) enters into an agreement or contract with a Payment Processor, Acquirer or financial institution to sell or market Payment Processing services to a Merchant or Seller; (b) matches, arranges for, or refers Merchants or Sellers to a Payment Processor or Acquirer for Payment Processing services, or that matches, arranges

for, or refers a Payment Processor or Acquirer to Merchants or Sellers for Payment Processing services; or (c) is registered as an ISO or merchant service provider ("MSP") with VISA, Mastercard, or any credit card association.

X.    **"Individual Defendant"** means individual defendant Mark Moskvins.

Y.    **"Merchant"** means a person who is authorized under a written contract with a Payment Processor to honor or accept credit cards, or to transmit or process for payment credit card payments, for the purchase of goods or services or a charitable contribution.

Z.    **"Merchant Account"** means any account with an Acquirer or other financial institution, service provider, Payment Processor, ISO, Payment Facilitator, or other entity that enables an individual, a business, or other organization to accept payments of any kind.

AA.    **"Microtransactions**," also referred to as Value Added Propositions or VAP, means a sales transaction where no goods or services are exchanged.

BB.    **"Money Making Opportunity"** means anything, tangible or intangible, that is offered, offered for sale, sold, or traded based wholly or in part on representations, either express or implied, about past, present, or future income, profit, or appreciation.

CC.    **"Negative Option Feature"** means, in an offer or agreement to sell or provide any good or service, a provision under which the consumer's silence or failure to take affirmative action to reject a good or service, or to cancel the agreement, is interpreted by the Seller or provider as acceptance or continuing acceptance of the offer.

DD.    **"Outbound Telemarketing"** means any plan, program, or campaign that is conducted to induce the purchase of goods or services by use of one or more telephones, and which involves a telephone call initiated by a Person other than the consumer, whether or not covered by the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310.

EE.   **"Payment Facilitator"** means an entity that is registered with a credit card system by an Acquirer to facilitate transactions on behalf of Sponsored Merchants, and receives settlement of transaction proceeds from the Acquirer on behalf of the Sponsored Merchants.

FF.   **"Payment Gateway"** means the transmission of consumer payment data between a payment portal (such as a website, mobile phone, card reading terminal, kiosk, or interactive voice response service) and a Payment Processor for the purpose of authorizing the transaction.

GG.   **"Payment Processing"** means transmitting sales transaction data on behalf of a Merchant or providing a Person, directly or indirectly, with the means used to charge or debit accounts through the use of any payment method or mechanism, including, but not limited to, credit cards, debit cards, prepaid cards, stored value cards, ACH Debits, and Remotely Created Payment Orders.  Whether accomplished through the use of software or otherwise, Payment Processing includes, among other things:  (a) reviewing and approving Merchant applications for payment processing services; (b) transmitting sales transaction data or providing the means to transmit sales transaction data from Merchants to Acquirers, Payment Processors, ISOs, or other financial institutions; (c) clearing, settling, or distributing proceeds of sales transactions from Acquirers or financial institutions to Merchants; (d) processing Chargebacks or returned Remotely Created Payment Orders or ACH Debits; or (e) signing a merchant acceptance agreement on behalf of an Acquirer, or receiving settlement of transaction proceeds from an Acquirer, on behalf of a sponsored Merchant.  Provided, however, that a Person does not provide Payment Processing services to a Client where such Person provides to that Client only Payment Gateway services.

HH.   **"Payment Processor"** means any Person providing Payment Processing services in connection with another Person's sale of goods or services, or in connection with any charitable donation.

II.     "**Person**" means any natural person, organization, or legal entity, including a corporation, limited liability company, partnership, proprietorship, association, cooperative, government or governmental subdivision or agency, or any other group or combination acting as an entity.

JJ.     "**Remotely Created Payment Order**" or "**RCPO**" means a payment instruction or order, whether created in electronic or paper format, drawn on a payor's financial account that is initiated or created by the payee, and which is deposited into or cleared through the check clearing system.  For purposes of this definition, an account includes any financial account or credit or other arrangement that allows checks, payment instructions, or orders to be drawn against it that are payable by, through, or at a bank.

KK.     "**Sales Agent**" means a Person that matches, arranges, or refers prospective Clients or Clients to a Payment Processor or ISO for Payment Processing, but does not hold any contractual liability in the event of losses related to the Payment Processing activities conducted by or on behalf of Clients.  As such, a Sales Agent may be involved in recommending a particular Payment Processor or ISO to a prospective Client, forwarding to the Payment Processor or ISO a prospective Client's or Client's merchant application, or negotiating rates and fees charged by a Payment Processor or ISO, but a Sales Agent may not be involved in any Payment Processing and may not act as an ISO.

LL.     "**Seller**" means any Person who provides, offers to provide, or arranges for others to provide goods or services to a customer in exchange for consideration.

MM.     "**Settling Defendants**" means the Individual Defendant and the Corporate Defendant, individually or collectively.

NN.     "**Shell Company**" means a limited liability company or other business entity with no significant assets or ongoing business activities.

OO.   **"Sponsored Merchant"** means any Person or entity to whom a Payment Facilitator agrees to provide Payment Processing services.

PP.   **"Total Return Rate"** means the proportion (expressed as a percentage) of all attempted ACH Debit or RCPO transactions that are returned through the banking system for any reason, whether before or after payment, out of the total number of such attempted transactions, calculated separately for each transaction type.

QQ.   **"UK Related Apex Companies"** means the companies identified in **Exhibit 2** to this Order and each of their subsidiaries, affiliates, successors, and assigns.

RR.   **"Wyoming Related Apex Companies"** means the companies identified in **Exhibit 1** to this Order and each of their subsidiaries, affiliates, successors, and assigns.

## I.

## BAN ON PROCESSING FOR CERTAIN MERCHANT CATEGORIES

**IT IS ORDERED** that Settling Defendants, Settling Defendants' officers, agents, and employees, and all other Persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are each permanently restrained and enjoined from Payment Processing, and from assisting others engaged in Payment Processing, whether directly or through an intermediary, for any Person:

A.   Offering to sell, selling, promoting or marketing a good or service with a Negative Option Feature in the following circumstances:

1.   Where the good or service is or relates to a Cosmetic, Food, Dietary Supplement, or Drug;

2.   Where the good or service is or relates to an Add-On good or service; or

3.     Where the good or service is advertised, marketed, or offered for sale both (i) through an Affiliate Program; and (ii) as either "free," "risk free," a "trial," a "sample," a "bonus," or a "gift," or using the phrase "no obligation" or any other words, depictions, or illustrations that denote or imply the absence of an obligation on the part of the recipient of the offer to affirmatively act in order to avoid charges.  Provided, however, that this Section I.A.3 does not apply to (1) Persons providing entertainment streaming services with annual net revenues over $10 million; or (2) internet service providers (ISPs) or telephone service providers with annual net revenues over $10 million.

B.     Offering to sell, selling, promoting or marketing the following goods or services:

      1.     Money Making Opportunities;

      2.     Credit repair;

      3.     Credit card protection;

      4.     Identity theft protection;

      5.     Mortgage or loan modification;

      6.     Government grants; or

      7.     Timeshare resale.

C.     Listed on the Mastercard Member Alert to Control High-Risk Merchants (MATCH) list for any of the following reasons: excessive Chargebacks or fraud, fraud conviction, laundering, identification as a Questionable Merchant per the Mastercard Questionable Merchant Audit Program, merchant collusion, illegal transactions, or identity theft.

## II.

## PROHIBITION ON CREDIT CARD LAUNDERING

**IT IS FURTHER ORDERED** that Settling Defendants, Settling Defendants' officers, agents, and employees, and all other Persons in active concert

or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are each permanently restrained and enjoined from Credit Card Laundering, and from assisting others engaged in Credit Card Laundering, whether directly or through an intermediary.

## III.

## PROHIBITIONS RELATED TO MERCHANT ACCOUNTS

**IT IS FURTHER ORDERED** that Settling Defendants, Settling Defendants' officers, agents, and employees, and all other Persons in active concert or participation with any of them who receive actual notice of this Order, whether acting directly or indirectly, are each permanently restrained and enjoined from:

A. Making, or assisting others in making, directly or by implication, any false or misleading statement in order to obtain Payment Processing services, including but not limited to false or misleading statements about the geographic location, name, identity, or corporate form of the Merchant or Seller;

B. Failing to disclose to an Acquirer or other financial institution, service provider, Payment Processor, ISO, or other entity that enables a Person to accept payments of any kind any material information related to a Merchant Account including, but not limited to, (a) the identity of any owner, manager, director, or officer of the applicant for or holder of a Merchant Account, and (b) any connection that such Person knows or should know exists between an owner, manager, director, or officer of the applicant for or holder of a Merchant Account and any Person who, for a reason related to excessive Chargebacks or fraud, identification as a Questionable Merchant per the Mastercard Questionable Merchant Audit Program, merchant collusion, illegal transaction, or identity theft, had a Merchant Account terminated by a Payment Processor or a financial institution, or has been fined or otherwise disciplined in connection with a Merchant Account by a Payment Processor or a financial institution; and

C.     Engaging in any tactics to avoid fraud and risk monitoring programs established by any financial institution, Acquirer, or the operators of any payment system, including, but not limited to:

1.     Using or allowing shell companies or nominees (including nominee owners, officers, or managers) to obtain Merchant Accounts to avoid fraud and/or risk monitoring programs established by any financial institution, Acquirer, or the operators of any payment system;

2.     Balancing or distributing sales transaction volume or sales transaction activity among multiple Merchant Accounts or merchant billing descriptors to avoid fraud and/or risk monitoring programs established by any financial institution, Acquirer, or the operators of any payment system; or

3.     Splitting a single sales transaction into multiple smaller transactions to avoid fraud and/or risk monitoring programs established by any financial institution, Acquirer, or the operators of any payment system;

D.     Causing or allowing a sham sales transaction, including Microtransactions or sales transactions by a Merchant or Seller to itself.

## IV.

## PROHIBITION AGAINST ASSISTING AND FACILITATING

**IT IS FURTHER ORDERED** that Settling Defendants, Settling Defendants' officers, agents, and employees,  and all other Persons in active concert or participation with any of them who receive actual notice of this Order, whether acting directly or indirectly, are permanently restrained and enjoined from providing substantial assistance or support to any Person that they know, or should know, is engaging in:

A.     Misrepresenting, directly or by implication, any material aspect of the performance, efficacy, nature, or central characteristics of any goods or services;

B.     Misrepresenting, directly or by implication, any material aspect of the nature or terms of any refund, cancellation, exchange, or repurchase policies;

C.    The unauthorized debiting or charging of consumer bank or credit card accounts; or

D.    Any deceptive, unfair, or abusive act or practice prohibited by Section 5 of the FTC Act.

## V.

## SCREENING OF PROSPECTIVE HIGH RISK CLIENTS

**IT IS FURTHER ORDERED** that Settling Defendants, Settling Defendants' officers, agents, and employees, and all other Persons in active concert or participation with any of them who receive actual notice of this Order, whether acting directly or indirectly, are permanently restrained and enjoined from Payment Processing or acting as an ISO or Sales Agent for any prospective High Risk Client without first engaging in a reasonable screening of the prospective High Risk Client to determine whether the prospective High Risk Client's business practices are, or are likely to be, deceptive or unfair within the meaning of Section 5 of the FTC Act. Such reasonable screening shall include, but not be limited to:

A.    Obtaining from each prospective High Risk Client, including the principal(s) and controlling Person(s) of the entity, any Person(s) with a majority ownership interest in the entity, and any corporate name, trade name, fictitious name or aliases under which such Person(s) conduct or have conducted business:

1.    A description of the nature of the prospective High Risk Client's business, including describing the nature of the goods and services sold and methods of sale, for which the prospective High Risk Client seeks Payment Processing services;

2.    The name of the principal(s) and controlling Person(s) of the entity, and Person(s) with a majority ownership interest in the entity;

3.    A list of all business and trade names, fictitious names, DBAs, and Internet websites under or through which the prospective High Risk Client has

marketed or intends to market the goods and services for which the prospective High Risk Client seeks Payment Processing services;

4. Each physical address at which the prospective High Risk Client has conducted business or will conduct the business(es) identified pursuant to Subsection (1) of this Section V.A;

5. The name and address of every Acquirer, originating depository financial institution (if Settling Defendant proposes to provide Payment Processing services for ACH Debit or RCPO transactions to such prospective High Risk Client), and Payment Processor used by the prospective High Risk Client during the preceding two years, and all merchant identification numbers used by any such banks or Payment Processors in connection with the prospective High Risk Client;

6. The prospective High Risk Client's past Chargeback Rate and Total Return Rate (if Settling Defendant proposes to provide Payment Processing services for ACH Debit or RCPO transactions) for the preceding three (3) months, and estimates of future Chargeback Rates and Total Return Rates (if Settling Defendant proposes to provide Payment Processing services for ACH Debit or RCPO transactions);

7. The names of trade and bank references; and

8. Whether the prospective High Risk Client, including the principal(s) and controlling Person(s) of the entity, any Person(s) with a majority ownership interest in the entity, and any corporate name, trade name, fictitious name or aliases under which such Person(s) conduct or have conducted business, has ever been:

(a) placed in a payment card association's Chargeback monitoring program during the preceding two years; or

(b) the subject of a complaint filed by the Commission or any other state or federal law enforcement agency;

B.     Taking reasonable steps to assess the accuracy of the information provided pursuant to Section V.A of this Order, including but not limited to: reviewing the Internet websites used by the prospective High Risk Client to market its goods or services; obtaining and reviewing copies of monthly Payment Processing statements issued by any bank, ISO, Sales Agent, Acquirer, or Payment Processor used by the High Risk Client during the preceding three (3) months; obtaining and reviewing a representative sample of current marketing materials for each good or service related to the offer for which Settling Defendants would provide the prospective High Risk Client with Payment Processing, ISO, or Sales Agent services.  The purpose of such steps is to determine whether the prospective High Risk Client is engaged in any of the following acts or practices, in which case Settling Defendants shall not provide Payment Processing or act as an ISO or Sales Agent for the prospective High Risk Client:

1.     Failing to clearly and conspicuously disclose all products and services that are sold in conjunction with the offered product or service, and the total cost to purchase, receive, or use, any products or services that are the subject of the sales offer;

2.     Misrepresenting any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of the sales offer;

3.     Failing to clearly and conspicuously disclose all material terms and conditions of an offer;

4.     Misrepresenting, expressly or by implication, any material aspect of the prospective High Risk Client's refund, cancellation, exchange, or repurchase policies; and

5.     Causing billing information to be submitted for payment without the customer's express authorization.

**VI.**

# MONITORING OF HIGH RISK CLIENTS

**IT IS FURTHER ORDERED** that Settling Defendants, Settling Defendants' officers, agents, and employees, and all other Persons in active concert or participation with any of them who receive actual notice of this Order, whether acting directly or indirectly, in connection with Payment Processing or acting as an ISO or Sales Agent, are permanently restrained and enjoined from:

A.      Failing to monitor the sales activity of all current Clients to identify Clients that should be designated as High Risk Clients requiring additional screening pursuant to Section V of this Order, and for newly-designated High Risk Clients, failing to complete the reasonable screening process described in Section V of the Order within a one month period;

B.      Failing to monitor each High Risk Client's transactions to determine whether the High Risk Client is engaged in practices that are deceptive or unfair in violation of Section 5 of the FTC Act.  Such monitoring shall include, but not be limited to, regularly reviewing High Risk Clients' Internet websites from an IP address that is not associated with Settling Defendants, regularly reviewing each High Risk Client's Chargeback Rates, Total Return Rates (if Settling Defendant proposes to provide Payment Processing services for ACH Debit or RCPO transactions), and reasons provided for these rates, as well as examining any unusual or suspect transaction patterns, values, and volume;

C.      Failing to calculate and update at least on a monthly basis for each High Risk Client the Chargeback Rate and Total Return Rate (if Settling Defendant proposes to provide Payment Processing services for ACH Debit or RCPO transactions).  For any Client with multiple processing accounts, the calculation of the Chargeback Rate and Total Return Rate shall be made for each of the High Risk Client's individual processing accounts, and in the aggregate for each High Risk Client;

D.    Failing to immediately stop processing sales transactions and, as soon as practical but in no more than 5 days, close all processing accounts for:

1.    Any Covered Client whose Total Return Rate exceeds two and one-half percent (2.5%) and whose total number of ACH Debit or RCPO returned transactions with the Payment Processor in any month exceeds fifty (50) transactions;

2.    Any Covered Client whose monthly Chargeback Rate exceeds one percent (1%) and whose total number of Chargebacks with the Payment Processor exceeds fifty (50) in two of the past six months; and

3.    Any Covered Client that Settling Defendants know or should know is engaged in tactics to avoid fraud and risk monitoring programs established by any financial institution, Acquirer, or the operators of any payment system, including, but not limited to, using shell companies or nominees (including nominee owners, officers, or managers) to obtain Merchant Accounts, balancing or distributing sales transaction volume or sales transaction activity among multiple Merchant Accounts or merchant billing descriptors, splitting a single sales transaction into multiple smaller transactions, or causing sham sales transactions, including Microtransactions, or sales transactions by a Merchant or Seller to itself;

E.    Failing to immediately conduct a reasonable investigation of the cause of Total Return Rate (if Settling Defendant proposes to provide Payment Processing services for ACH Debit or RCPO transactions) or Chargeback Rates (a reasonable investigation includes, but is not limited to:  taking reasonable steps to verify and update the truth and accuracy of information gathered in compliance with Section V of this Order and any other advertising of the High Risk Client; confirming that the High Risk Client has obtained required consumer authorizations for the transactions; contacting  Better Business Bureaus to gather detailed information, including complaints and other relevant information, regarding the High Risk Client; reviewing from an IP address that is not associated

with Settling Defendants the Internet websites used by the High Risk Client to market its goods and services; searching publicly available sources for legal actions taken by the Commission or other state or federal law enforcement agencies against the High Risk Client; and conducting "test" shopping to determine the High Risk Client's sales practices, where possible) for:

1. Any High Risk Client, excluding Covered Clients, whose Total Return Rate exceeds two and one-half percent (2.5%) and whose total number of ACH Debit or RCPO returned transactions with the Payment Processor in any month exceeds fifty (50); and

2. Any High Risk Client, excluding Covered Clients, whose monthly Chargeback Rate with the Payment Processor exceeds one percent (1%) and whose total number of Chargebacks exceeds fifty (50) in two of the past six months;

F. Failing to stop processing sales transactions and close all processing accounts for any High Risk Client investigated pursuant to Subsection 0, above, within 60 days of commencing the investigation, unless Settling Defendants draft a written report establishing facts that demonstrate, by clear and convincing evidence, that the High Risk Client's business practices related to the offer(s) for which Settling Defendants provide Payment Processing are not deceptive or unfair in violation of Section 5 of the FTC Act;

G. Failing to immediately stop processing sales transactions and close all processing accounts for any High Risk Client that Settling Defendants know or should know is engaged in tactics to avoid fraud and risk monitoring programs established by any financial institution, Acquirer, or the operators of any payment system, including, but not limited to, using shell companies or nominees (including nominee owners, officers, or managers) to obtain Merchant Accounts, balancing or distributing sales transaction volume or sales transaction activity among multiple Merchant Accounts or merchant billing descriptors; splitting a single sales

19

transaction into multiple smaller transactions, or causing sham sales transactions, including Microtransactions, or sales transactions by a Merchant or Seller to itself.

## VII.

## MONETARY JUDGMENT

**IT IS FURTHER ORDERED** that:

A.      Judgment in the amount of three million five hundred thousand dollars ($3,500,000) is entered in favor of the Commission against Settling Defendants, jointly and severally, as equitable monetary relief.

B.      Settling Defendants are ordered to pay to the Commission three million five hundred thousand dollars ($3,500,000).  Such payment must be made within ten (10) days of entry of this Order, or by December 31, 2019, whichever is later, by electronic fund transfer in accordance with instructions previously provided by a representative of the Commission.

C.      Settling Defendants relinquish dominion and all legal and equitable right, title, and interest in all assets transferred pursuant to this Order and may not seek the return of any assets.

D.      The facts alleged in the Complaint will be taken as true, without further proof, in any subsequent civil litigation by or on behalf of the Commission to enforce its rights to any payment or monetary judgment pursuant to this Order, such as a nondischargeability complaint in any bankruptcy case.

E.      The facts alleged in the Complaint establish all elements necessary to sustain an action by the Commission pursuant to Section 523(a)(2)(A) of the Bankruptcy Code, 11 U.S.C. § 523(a)(2)(A), and this Order will have collateral estoppel effect for such purposes.

F.      Settling Defendants acknowledge that their Taxpayer Identification Numbers (Social Security Numbers or Employer Identification Numbers), which Settling Defendants must submit to the Commission, may be used for collecting

and reporting on any delinquent amount arising out of this Order, in accordance with 31 U.S.C. § 7701.

G.     All money paid to the Commission pursuant to this Order may be deposited into a fund administered by the Commission or its designee to be used for equitable relief, including consumer redress and any attendant expenses for the administration of any redress fund.  If a representative of the Commission decides that direct redress to consumers is wholly or partially impracticable or money remains after redress is completed, the Commission may apply any remaining money for such other equitable relief (including consumer information remedies) as it determines to be reasonably related to Settling Defendants' practices alleged in the Complaint.  Any money not used for such equitable relief is to be deposited to the U.S. Treasury as disgorgement.  Settling Defendants have no right to challenge any actions the Commission or its representatives may take pursuant to this Subsection.

## VIII.

## PROHIBITION ON USE OF CUSTOMER INFORMATION

**IT IS FURTHER ORDERED** that Settling Defendants and Settling Defendants' officers, agents, and employees, and all other persons in active concert or participation with any of them  who receive actual notice of this Order, whether acting directly or indirectly, are hereby permanently restrained and enjoined from directly or indirectly:

A.     Failing to provide sufficient customer information to enable the Commission to efficiently administer consumer redress.  If a representative of the Commission requests in writing any information related to redress, Defendants must provide it, in the form prescribed by the Commission, within 14 days; and

B.     Disclosing, using, or benefitting from customer information, including the name, address, telephone number, email address, social security number, other identifying information, or any data that enables access to a customer's account

(including a credit card, bank account, or other financial account), that any Settling Defendant obtained prior to entry of this Order in connection with providing Payment Processing services for the Apex Enterprise.

*Provided, however*, that customer information may be disclosed to the extent requested by a government agency or required by law, regulation, or court order.

## IX.

## COOPERATION

**IT IS FURTHER ORDERED** that Settling Defendants must fully cooperate with representatives of the Commission in this case and in any investigation related to or associated with the transactions or the occurrences that are the subject of the Complaint. Such Settling Defendants must provide truthful and complete information, evidence, and testimony. Individual Defendant Mark Moskvins must appear and the Corporate Defendant must cause its officers, employees, representatives, or agents to appear for interviews, discovery, hearings, trials, and any other proceedings that a Commission representative may reasonably request upon 14 days written notice, or other reasonable notice, at such places and times as a Commission representative may designate, without the service of a subpoena.

## X.

## ORDER ACKNOWLEDGMENTS

**IT IS FURTHER ORDERED** that Settling Defendants obtain acknowledgments of receipt of this Order:

A. Each Settling Defendant, within 7 days of entry of this Order, must submit to the Commission an acknowledgment of receipt of this Order sworn under penalty of perjury.

B. For 5 years after entry of this Order, Individual Defendant Mark Moskvins for any business that he, individually or collectively with any other Settling Defendant, is the majority owner or controls directly or indirectly, and the

Corporate Defendant, must deliver a copy of this Order to: (1) all principals, officers, directors, and LLC managers and members; (2) all employees, agents, and representatives having managerial responsibilities for conduct related to the subject matter of the Order; and (3) any business entity resulting from any change in structure as set forth in the Section titled Compliance Reporting. Delivery must occur within 7 days of entry of this Order for current personnel. For all others, delivery must occur before they assume their responsibilities.

C. From each individual or entity to which a Settling Defendant delivered a copy of this Order, that Settling Defendant must obtain, within 30 days, a signed and dated acknowledgment of receipt of this Order.

## XI.

## COMPLIANCE REPORTING

**IT IS FURTHER ORDERED** that Settling Defendants make timely submissions to the Commission:

A. One year after entry of this Order, each Settling Defendant must submit a compliance report, sworn under penalty of perjury:

1. Each Settling Defendant must: (a) identify the primary physical, postal, and email address and telephone number, as designated points of contact, which representatives of the Commission may use to communicate with Settling Defendant; (b) identify all of that Settling Defendant's businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses; (c) describe the activities of each business, including the goods and services offered, the means of advertising, marketing, and sales, and the involvement of any other Settling Defendant (which Individual Defendant Mark Moskvins must describe if he knows or should know due to his own involvement); (d) describe in detail whether and how that Settling Defendant is in compliance

23

with each Section of this Order; and (e) provide a copy of each Order Acknowledgment obtained pursuant to this Order, unless previously submitted to the Commission.

2. Additionally, Individual Defendant Mark Moskvins must: (a) identify all telephone numbers and all physical, postal, email and Internet addresses, including all residences; (b) identify all business activities, including any business for which such Settling Defendant performs services whether as an employee or otherwise and any entity in which such Settling Defendant has any ownership interest; and (c) describe in detail such Settling Defendant's involvement in each such business, including title, role, responsibilities, participation, authority, control, and any ownership.

B. For 10 years after entry of this Order, each Settling Defendant must submit a compliance notice, sworn under penalty of perjury, within 14 days of any change in the following:

1. Each Settling Defendant must report any change in: (a) any designated point of contact; or (b) the structure of any Corporate Defendant or any entity that Settling Defendant has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this Order, including: creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order.

2. Additionally, Individual Defendant Mark Moskvins must report any change in: (a) name, including aliases or fictitious name, or residence address, or (b) title or role in any business activity, including any business for which such Settling Defendant performs services whether as an employee or otherwise and any entity in which such Settling Defendant has any ownership interest, and identify the name, physical address, and any Internet address of the business or entity.

C.     Each Settling Defendant must submit to the Commission notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against such Settling Defendant within 14 days of its filing.

D.     Any submission to the Commission required by this Order to be sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding:  "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on:  _____" and supplying the date, signatory's full name, title (if applicable), and signature.

E.     Unless otherwise directed by a Commission representative in writing, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue, NW, Washington, DC  20580.  The subject line must begin:  *FTC v. Apex Capital Group, LLC, et al.*

## XII.

## RECORDKEEPING

**IT IS FURTHER ORDERED** that Settling Defendants must create certain records for 10 years after entry of the Order, and retain each such record for 5 years.  Specifically, Corporate Defendants and Individual Defendant Mark Moskvins for any business that such Settling Defendant, individually or collectively with any other Settling Defendant, is a majority owner or controls directly or indirectly, must create and retain the following records:

A.     accounting records showing the revenues from all goods or services sold;

B.     personnel records showing, for each person providing services, whether as an employee or otherwise, that person's:  name; addresses; telephone

numbers; job title or position; dates of service; and (if applicable) the reason for termination;

   C.   records of all refund and Chargeback requests made with respect to High Risk Clients, whether received directly or indirectly, such as through a third party, and any response;

   D.   documents sufficient to show monthly and yearly Chargeback and refund amounts both by dollar amounts and number of transactions; and

   E.   all records necessary to demonstrate full compliance with each provision of this Order, including all submissions to the Commission.

## XIII.

## COMPLIANCE MONITORING

   **IT IS FURTHER ORDERED** that, for the purpose of monitoring Settling Defendants' compliance with this Order, including any failure to transfer any assets as required by this Order:

   A.   Within 14 days of receipt of a written request from a representative of the Commission, each Settling Defendant must:  submit additional compliance reports or other requested information, which must be sworn under penalty of perjury; appear for depositions; and produce documents for inspection and copying.  The Commission is also authorized to obtain discovery, without further leave of court, using any of the procedures prescribed by Federal Rules of Civil Procedure 29, 30 (including telephonic depositions), 31, 33, 34, 36, 45, and 69.

   B.   For matters concerning this Order, the Commission is authorized to communicate directly with each Settling Defendant.  Settling Defendants must permit representatives of the Commission to interview any employee or other person affiliated with any Settling Defendant who has agreed to such an interview. The person interviewed may have counsel present.

   C.   The Commission may use all other lawful means, including posing, through its representatives as consumers, suppliers, or other individuals or entities,

to Settling Defendants or any individual or entity affiliated with Settling Defendants, without the necessity of identification or prior notice. Nothing in this Order limits the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1.

## XIV.

## RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED** that this Court retains jurisdiction of this matter for purposes of construction, modification, and enforcement of this Order.

**SO ORDERED this 15th day of January, 2020.**

_____
JOHN F. WALTER
UNITED STATES DISTRICT JUDGE

**For Plaintiff Federal Trade**
**Commission:**
Dated:  1/13/20

_____/s/_____
LAURA A. ZUCKERWISE
BRIAN N. LASKY
Federal Trade Commission
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2804 (Zuckerwise)
(212) 607-2822 (Fax)
lzuckerwise@ftc.gov

FAYE CHEN BARNOUW
Federal Trade Commission
10990 Wilshire Blvd., Suite 400
Los Angeles, CA 90024
(310) 824-4300
(310) 824-4380 (Fax)

**For Defendants Mark Moskvins and**
**SIA Transact Pro**
Dated:  12/2/19

_____/s/_____
HERNÁN D. VERA
PETER A. GOLDSCHMIDT
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067
(310) 201-2100
(310) 201-2110 (Fax)
hvera@birdmarella.com

**Defendant Mark Moskvins**
Dated:  12/2/19

_____/s/_____
MARK MOSKVINS
*Individually and on behalf of*
*Defendant SIA Transact Pro*

**EXHIBIT 1**
**Wyoming Related Apex Companies**

| Company |
| --- |
| Alpha Group LLC |
| Apres Vous Media, LLC |
| Based Capital LLC |
| Bold Media LLC |
| Capstone Capital, LLC |
| Cascade Canyon LLC |
| Confidential Holdings, LLC |
| Cornice Group LLC |
| Crest Capital, LLC |
| Fortune Ventures LLC |
| Future Holdings LLC |
| Grand Assets, LLC |
| Horizon Media, LLC |
| Interzoom, LLC |
| Lead Blast LLC |
| Lion Capital LLC |
| Macro Group LLC |
| Mountain Range Ventures LLC |
| Mountain Solutions, LLC |
| Nutra First LLC |
| Nutra Global LLC |
| Old West Equity LLC |
| Omega Assets LLC |
| Rendezvous IT, LLC |
| Shadow Peak,  LLC |
| Singletrack Solutions LLC |
| Sky Media Group, LLC |
| Teton Pass LLC |
| Virtual Media LLC |
| Wonder Leads LLC |
| Wyoming Freedom Group LLC |
| Zoom Media LLC |

**EXHIBIT 2**
**UK Related Apex Companies**

| *Company* |
| --- |
| Ace Media Group Ltd |
| Alpha Corporate Ventures Ltd |
| Apres Vous Media Ltd |
| Based Capital Ltd |
| Capstone Capital Solutions Ltd |
| Clik Trix Ltd |
| Crest Capital Ventures Ltd |
| Digital X Solutions Ltd |
| Exclusive Media Group Ltd |
| Empire Partners Ltd |
| Energy Tomorrow Ltd |
| Fortune Ventures Ltd |
| Future Hold Ventures Ltd |
| Future Precision Ltd |
| G Force Max Ltd |
| Grand Assets Ventures Ltd |
| Horizon Media Partners Ltd |
| Interzoom Capital Ltd |
| Lead Blast Ltd |
| Lion Capital Solutions Ltd |
| Maverick Pro Ltd |
| Mountain Venture Solutions Ltd |
| New Idea Group Ltd |
| Nutra First Ltd |
| Nutra Global Ltd |
| Omega Assets Ltd |
| Online Product Group Ltd |
| Precision Tactic Group Ltd |
| Rendezvous IT Ltd |
| Sky Blue Media Ltd |
| Snowdrift Solutions Ltd |
| Tactic Solutions Ltd |
| Top Quality Group Ltd |
| Virtual Media Solutions Ltd |
| Visitron Capital Ltd |
| Web Media Depot Ltd |
| Zoom Media Ltd |