Edward Chang (SBN 268204)
echang@mcnamarallp.com
McNamara Smith LLP
655 West Broadway, Suite 1600
San Diego, California 92101
Telephone: 619-269-0400
Facsimile: 619-269-0401

*Attorneys for Receiver,*
*Thomas W. McNamara*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>            Plaintiff,<br><br>      v.<br><br>APEX CAPITAL GROUP, LLC, et al.,<br><br>            Defendants. | Case No. 2:18-cv-09573-JFW (JPRx)<br><br>**DECLARATION OF THOMAS W. MCNAMARA IN SUPPORT OF RECEIVER'S MOTION FOR AUTHORIZATION TO ENGAGE CONTINGENT FEE COUNSEL**<br><br>JUDGE:  Hon. John F. Walter<br>CTRM:   7A<br>DATE:   March 9, 2020<br>TIME:   1:30 p.m.<br><br>**FILED UNDER SEAL PURSUANT TO ORDER OF THE COURT DATED MARCH 2, 2020 [147]** |

I, Thomas W. McNamara, hereby declare as follows:

1.  I have personal knowledge of the facts set forth in this declaration and if called as a witness I could and would competently testify to the facts stated herein. I make this declaration in support of the Receiver's Motion for Authorization to Engage Contingent Fee Counsel ("Motion to Engage Counsel").

2.  On November 16, 2018, this Court entered a Temporary Restraining Order with Asset Freeze and appointed me as Temporary Receiver of the Receivership Entities (ECF No. 16) ("TRO").[1] On November 28, 2018, we filed our Preliminary Report with the Court (ECF No. 31) which recounted in detail the initial implementation of the receivership, summarized Defendants' "risk-free" trial operation and finances, and documented my conclusions that the business could not be operated lawfully and profitably going forward.

3.  Individual Defendants, Phillip Peikos and David Barnett, thereafter stipulated to the entry of preliminary injunctions, which the Court entered on December 18, 2018 (ECF Nos. 40 and 41). The Stipulated Preliminary Injunctions with Asset Freeze ("Preliminary Injunctions") extended to the same Receivership Entities identified in the TRO, as well as 12 other entities not previously identified in the TRO.[2] Both Preliminary Injunctions ordered that I "continue to serve as the

---

[1] Receivership Entities are defined to include: Corporate Defendants (Apex Capital Group, LLC, Capstone Capital Solutions Limited, Clik Trix Limited, Empire Partners Limited, Interzoom Capital Limited, Lead Blast Limited, Mountain Venture Solutions Limited, Nutra Global Limited, Omni Group Limited, Rendezvous IT Limited, Sky Blue Media Limited, and Tactic Solutions Limited, and each of their subsidiaries, affiliates, successors, and assigns); the Wyoming Related Companies (the companies identified in Exhibit 1 to the TRO and each of their subsidiaries, affiliates, successors, and assigns); and the UK Related Companies (the companies identified in Exhibit 2 to the TRO and each of their subsidiaries, affiliates, successors, and assigns), as well as "any other entity that has conducted any business related to Defendants' marketing or sale of products with a Negative Option Feature, including receipt of Assets derived from any activity that is the subject of the Complaint in this matter, and that the Receiver determines is controlled or owned by any Defendant." *See* TRO at 6-8.

[2] The newly included Receivership Entities were Albright Solutions LLC, Apex Capital International Sarl, Asus Capital Solutions LLC, Brandooza LLC, DMB Marketing LLC, Element Media Group LLC, Jaci, LLC, Jaci Holding LLC, Jaci

Receiver of the Receivership Entities with full powers of an equity receiver." Preliminary Injunctions (ECF No. 40 at 18-19; ECF No. 41 at 18).

4. Section XV of the Preliminary Injunctions defines my duties and authority as Receiver. Of particular relevance, the section addresses, among other things, the ability to file suit and hire counsel:

> **IT IS FURTHER ORDERED** that the Receiver is directed and authorized to accomplish the following:
> . . .
> F. Choose, engage, and employ attorneys, accountants, appraisers, and other independent contractors and technical specialists, as the Receiver deems advisable or necessary in the performance of duties and responsibilities under the authority granted by this Order; [and]
> . . .
> M. Institute, compromise, adjust, appear in, intervene in, defend, dispose of, or otherwise become party to any legal action in state, federal or foreign courts or arbitration proceedings as the Receiver deems necessary and advisable to preserve or recover the Assets of the Receivership Entities, or to carry out the Receiver's mandate under this Order, including but not limited to, actions challenging fraudulent or voidable transfers . . . .

Preliminary Injunctions (ECF No. 40 at 19-22; ECF No. 41 at 18-21) (emphasis in original).

5. Since my initial appointment, counsel and I have worked diligently to perform a variety of tasks with the primary goal being to preserve and maximize assets, including by securing additional Receivership Estate assets that may be in the hands of third parties. For example, we retained counsel in Cyprus and Greece to bring suits in an effort to return roughly €2.1 million the Receivership Entities transferred (at Defendant Peikos' direction) to third parties in connection with purchase of an interest in and loan to a beach club in Greece.[3]

---

PR LL, NextG Payments, LLC, NextLevel Solutions LLC, and Vortex Media Group LLC. *See* Preliminary Injunctions (ECF No. 40 at 7; ECF No. 41 at 7).

[3] Beyond considering potential litigation to recoup estate assets, we have also managed extensive repairs to a house in Westlake Village, pursued avenues to monetize stock issued by non-public companies to Defendants Peikos and Barnett, collected on promissory notes from one of these companies, and arranged for an auction of a number of pieces of art surrendered by Barnett as part of his settlement. We have filed periodic Status Reports with the Court on April 1, 2019

6. As part of my investigation, I have determined that meritorious legal claims should be brought on behalf of the Receivership Estate against financial institution Wells Fargo and Company ("Wells Fargo") (including its corporate siblings). I would like the Court's authorization to hire contingency counsel to pursue these claims on behalf of the Receivership Estate.

7. I am filing this Declaration to give the Court further details on how I reached the conclusion that contingency counsel should be employed to pursue a case against Wells Fargo and any related parties. I am filing my declaration under seal because I am concerned about revealing my litigation evaluation and strategy in a public manner during the pre-litigation phase, when the potential defendant(s)[4] are likely to be unaware of the litigation.

8. I am concerned that Wells Fargo would use the information contained in this declaration to its advantage prior to the onset of litigation. As a result, in an abundance of caution, I am respectfully submitting, and asking the Court to accept, my declaration under seal.

**A.     Reasons Why Hiring Counsel on a Contingent-Fee Basis is Requested**

9. As indicated in the concurrently-filed Motion to Engage Counsel, I recommend that the Receivership Entities' claims against Wells Fargo be pursued on a contingent-fee basis and am respectfully seeking the Court's authorization to engage contingency counsel to do so.

10. The reasons that the Receivership Estate must use a contingent-fee arrangement become especially clear once it is understood that Wells Fargo would be the primary defendant in the anticipated litigation. Quite obviously, we must

---

(ECF No. 60), July 30, 2019 (ECF No. 100), and November 27, 2019 (ECF No. 137).

[4] For purposes of the Motion to Engage Counsel and declaration, the term "defendant" encompasses Wells Fargo and any related people or entities which may be named. At this point, we are not aware of any unrelated people or entities which will be named defendants.

prepare for the reality that Wells Fargo has deep pockets and the ability to access insurance to pay for a defense.

11. Despite the fact counsel and I believe the litigation is meritorious, I cannot and would not as the Receiver recommend that this litigation be pursued on an hourly fee basis. The estate in this case is relatively small. Even when all receivership activities are completed and assets monetized, the amount we will be able collect for consumer redress will be dwarfed by the millions of dollars in consumer loss. But even if significant funds resided in the Receivership Estate, I would not recommend risking those funds in pursuit of an action against a defendant as aggressive as and with pockets as deep as Wells Fargo. As such, I am respectfully requesting the Court's authorization before I proceed to hire contingent fee counsel.

12. Based on my investigation, I have a good-faith basis to believe that Wells Fargo has substantial legal liability for the harm it directly caused to the Receivership Estate based upon a variety of valid legal theories, as described below.

13. My conclusion that the Receivership Estate should pursue a case against Wells Fargo is based on the information I have uncovered in connection with my investigation not only of the Apex Defendants' "risk-free" trial scheme pending before this Court, but also of a second "risk-free" trial scheme, known as Triangle Media Corp. ("Triangle"), that was operating in San Diego during an overlapping time frame. I have intimate knowledge of the Triangle scheme because I was appointed receiver over the Triangle Receivership Entities in the Southern District of California in June of 2018, five months before I was appointed receiver in this action. For a full discussion of Triangle's scheme, please see my Preliminary Report in that case (*FTC v. Triangle Media Corp.*, Case No. 3:18-cv-01388-LAB-LL, ECF No. 30 (S.D. Cal. July 16, 2018)).

///

14. Both the Apex and Triangle cases involved similarly complex "risk-free" trial schemes operating out of Southern California that required continued access to merchant accounts in order to charge consumers. During my investigation of these receiverships, I learned that Wells Fargo played a central role in assisting both schemes, as the defendants in these schemes collectively opened more than 100 Wells Fargo bank accounts through which consumer funds collected from the fraud were passed.

15. When I saw that both schemes had used Wells Fargo, I started investigating to see if there were similarities or a pattern of tortious conduct by Wells Fargo that had harmed both the Apex and Triangle Receivership Estates. I reached the conclusion that Wells Fargo did indeed harm the Triangle and Apex Receivership Estates in a similar manner.[5]

16. I recently filed a motion before Judge Burns in the Southern District of California in the Triangle action, in which I respectfully requested that he authorize me to hire counsel on a contingent-fee basis. That motion was granted on November 19, 2019. *See FTC v. Triangle Media Corp.*, Case No. 3:18-cv-01388-LAB-LL, ECF No. 142 (S.D. Cal. Nov. 19, 2019).

17. Some of the investigative findings related to Apex and Triangle are set forth in Sections B and C below.

///

///

///

---

[5] I have since learned Wells Fargo was also the bank used in connection with a third risk-free trial scheme in Southern California (also now shuttered) involving Tarr, Inc. Tarr was also sued by the FTC and entered into a consent judgment before the Southern District of California. *See FTC v. Tarr Inc., et al.*, Case No. 3:17-cv-02024-LAB-KSC (S.D. Cal.). Because the case was resolved through a consent judgment, there is little underlying factual information about how the Wells Fargo accounts were employed. It is notable, however, that the consumer harm in that case was $179 million according to the stipulated judgment. *See id.*, ECF No. 7 at 27.

B. **The Role of Wells Fargo In Connection with the Apex Receivership Defendants**

18. The Apex Defendants operated what was, at its heart, an internet marketing scam that baited consumers with internet ads offering "risk-free" product trials for only the cost of shipping, but then using consumers' billing information to charge for the products and impose a monthly continuity charge. For a complete discussion of the scheme, please see my Preliminary Report (ECF No. 31) at 5-14.

19. Apex operated as a common enterprise under the ownership of Individual Defendants David Barnett and Phillip Peikos, with Apex CFO Raul Camacho exercising much of the day-to-day operational control.

20. Apex's fraudulent operation could not have continued but for Wells Fargo, which permitted the Apex Defendants to open, access, and then close dozens and dozens of bank accounts. The Wells Fargo accounts were necessary to establish hundreds of merchant accounts and then receive millions of dollars in consumer funds.

21. Indeed, the *sine qua non* of Apex's scheme was its ability to access merchant accounts. However, these merchant accounts were constantly at risk of being closed due to the unacceptably high percentage of chargebacks from complaining consumers who wanted refunds after realizing they had been scammed. When a payment processor became aware of a high volume of chargebacks, the merchant account would quickly be closed. Additionally, the nominee entity formed by the Apex Defendants for the purpose of opening that merchant account would be placed on a "match list" and black-balled from credit card processing.

22. In order to obtain these merchant accounts, Apex was required to have shell companies under its control—the nominee entities—maintain active bank accounts. This was a necessary precondition that gave credibility to each nominee

entity seeking to open an account with a payment processor, and an essential deposit point for payment processor transfers of consumer charges.

23. Apex ultimately built up its network of merchant accounts by first forming shell or nominee companies and convincing ordinary people to act as their paid straw persons. Apex relied on these people to act as their "signers" or "fronts" for the nominee companies in return for a monthly fee so that those companies could then open the merchant accounts necessary to execute the risk-free trial scheme.

24. The front individuals had essentially no involvement other than providing their names and identification for the Apex Defendants to use. The Apex Defendants did all the work necessary: they formed the nominee entity; opened a bank account in the name of the entity; submitted the merchant account application to the payment processor in the name of the entity with the front individual as the purported owner; and created clean bank pages (website pages) for the processor to review.

25. However, before the Apex Defendants could use a nominee entity to open a merchant account, the nominee entity needed to have a legitimate bank account where the consumer charges would be transferred. That is where Wells Fargo played a central role.

26. Over the life of the Apex scheme, Peikos, Barnett, and Camacho orchestrated the opening of roughly 70 bank accounts at Wells Fargo in nominee entity names. Peikos, Barnett, or Camacho was always a signor on the bank accounts. In this way, the Apex Defendants controlled all of the consumer funds that passed through the bank accounts.

27. Initially, it was Barnett, working with a Wells Fargo banker in San Diego, who was primarily responsible for opening the Wells Fargo bank accounts. Between January 2014 and end of the year, Barnett opened 20 bank accounts in nominee entities' names at Wells Fargo.

28. Around the spring of 2015, Peikos and Camacho began opening the nominee entity bank accounts with Wells Fargo and migrated the bank branch to the Los Angeles area, ultimately the Westlake Village branch. Prior to the FTC lawsuit in November of 2018, Peikos and Camacho had opened 50 nominee bank accounts at Wells Fargo.

29. During the life of the Apex scheme and across multiple Wells Fargo bankers, there was a noticeable and predictable pattern of Wells Fargo accounts being opened and then closed due to the unacceptably high percentage of chargebacks from complaining consumers, causing Apex to burn through a variety of merchant accounts in the process. Peikos was especially aggressive in charging consumers, which, in turn, led to a high volume of chargebacks. This resulted in the termination of the merchant accounts by the payment processors, after which the specific Wells Fargo account associated with the now-closed merchant account would be closed. For example, all of the 20 Wells Fargo accounts opened by Defendant Barnett in 2014 were closed by July of 2015. Indeed, 19 Wells Fargo accounts were closed *en masse* in July of 2015—after processing millions of dollars for the Apex Defendants.

30. The Wells Fargo banker in Westlake Village with whom Camacho and Peikos regularly interacted was a person by the name of Dominic Testa. Email correspondence between Testa and the Apex Defendants shows that Wells Fargo was well aware of Apex's business model. For example, while the Apex bank accounts Barnett established in 2014 were all being closed in July of 2015, bank accounts in the names of new nominee entities were simultaneously being opened. And less than six weeks after closing 19 of the 20 nominee entity accounts opened by Barnett, Camacho via Testa opened six new nominee accounts on September 3, 2015. On February 15, 2017, Camacho asked Testa to close three nominee accounts and, when Testa confirmed the accounts were closed, Camacho immediately promised to open up three "new ones" "very soon" (which Camacho

did a week later). In yet another instance, Testa opened bank accounts for Camacho after being sent controlling party information for another limited liability company that did not match the actual owners (*i.e.*, the Apex Defendants). In addition to opening bank accounts, Testa would routinely issue bank letters for the Apex Defendants to use with payment processors. He continued to work with the Apex Defendants into 2018.

31. Significantly, throughout the four and one-half years during which Apex operated, the process repeated itself: immediately after a Wells Fargo account was closed, the Apex Defendants popped up with a different Wyoming corporation to open a new Wells Fargo account to keep the scam going.

32. Overall, more than 70 Wells Fargo accounts were opened during the Apex scheme, and millions of dollars flowed through those accounts.

33. The Wells Fargo accounts, which received transfers from the merchant processors being fronted by the nominee/strawmen, were periodically swept into one Wells Fargo account. Then large sums (often more than several hundred thousands of dollars) were then wired to an Apex account at Citibank.

**C.    The Central Role of Wells Fargo In Connection with the Triangle Receivership Defendants**

34. At the same time that Wells Fargo was assisting Apex in connection with its high-risk business centered around "risk-free" trials, Wells Fargo was also performing a similar function for Triangle Media Corp., which was also operating a "risk-free" trial scam out of Southern California.[6]

35. Like Apex, Triangle was an internet marketing scam that baited consumers with internet ads offering "risk-free" product trials for only the cost of shipping, but then using consumers' billing information to charge for the products and impose a monthly continuity charge. For a complete discussion of Triangle's

---

[6] The Tarr, Inc. "risk-free" trial scheme was operating at the same time and also apparently using Wells Fargo bank accounts.

1 scheme, please see my Preliminary Report in that case (*FTC v. Triangle Media Corp.*, Case No. 3:18-cv-01388-LAB-LL, ECF No. 30 at 9-30, (S.D. Cal. July 16, 2018)).

36. Wells Fargo had a central role in this scam, too. The fraudulent operation could not have continued but for Wells Fargo, which permitted Triangle to access and maintain dozens of bank accounts, which were then used to open hundreds of merchant accounts through which millions of consumers were charged.

37. The primary individual defendants (Brian Phillips and his partner Devin Keer) had been executing variations of "risk free" internet marketing scheme since 2008, with Triangle being the latest and most evolved iteration.

38. Triangle operated as a common enterprise under the ownership of Individual Defendants Brian Phillips and Devin Keer, who also exercised day-to-day operational control over the many interconnected entities needed to keep the scheme going. To avoid detection and keep their fraudulent enterprise going, Phillips and Keer had to maintain constant access to merchant accounts through which consumer charges could be processed, and in the process, they faced many of the same challenges as the Apex Defendants.

39. Like Apex, Triangle utilized merchant accounts via nominee entities. Also like Apex, Triangle recruited and paid front people to lend their names to shell companies, paying them $500 to $1,000 per month for the use of their names.

40. Unlike the Apex Individual Defendants, who listed themselves as owners of the bank accounts held in the names of the shell companies, Triangle asked each front person tied to a shell company to co-sign for a Wells Fargo bank account alongside Defendant Brian Phillips.

41. Often Phillips would meet the front person for the first time outside a Wells Fargo branch just before entering to execute the account documents. For all intents and purposes, that ended the front person's involvement with the bank

account. Defendant Phillips and Triangle employees controlled all aspects of the shell companies' Wells Fargo accounts from that moment forward, including all interactions with Wells Fargo.

42. Over the life of the Triangle scheme, Phillips and Triangle Defendant employees he managed orchestrated the opening of more than 30 Wells Fargo accounts with the individual front people identified for these accounts. The one important feature, as noted above, was that *Brian Phillips was always an authorized signer on the accounts*—without exception. In that way, he and Triangle employees controlled all of the consumer funds that passed through the Wells Fargo accounts.

43. Roughly $80 million in consumer payments taken in by nominee entity merchant accounts ultimately flowed through the Wells Fargo bank accounts.

44. Triangle's relationship with Wells Fargo extended well beyond the opening of bank accounts for the shell companies tied to the merchant accounts. In fact, Triangle did most of its banking during the relevant time period with Wells Fargo, and Triangle, and Brian Phillips, in particular, had a large amount of interaction with Wells Fargo. For instance, Triangle constantly requested verification letters to obtain the merchant accounts. Wells Fargo changed numerous bank accounts' holders at Triangle's request, and also opened up new accounts in the same name.

45. Significantly, and most troubling, was that Triangle was directing Wells Fargo to take numerous steps to move its money offshore. Through September of 2017, Triangle directed Wells Fargo to frequently sweep their accounts (generally twice per month) into another account at Wells Fargo held specifically in the Triangle name. Once there, Triangle then directed Wells Fargo, usually almost immediately, to send the funds in that account out of country. The

///

first stop was Canada, and then from there, Triangle moved the funds to Hong Kong.[7]

### D. Potential Claims Against Wells Fargo and Next Steps

46. As set forth above, the evidence regarding Wells Fargo's role in connection with both Apex and Triangle reveals a striking pattern of troubling conduct and highlights the importance of Wells Fargo's assistance in sustaining these high-risk fraudulent enterprises. Wells Fargo was vital to the success and continuation of both schemes. The investigation to date reveals that Wells Fargo's knowledge of Apex and Triangle's conduct was extensive, and it performed numerous activities to support Apex and Triangle (*e.g.*, permitting these fraudulent enterprises to continue to open and close accounts for shell companies, all with the same signers, and then sweeping those accounts regularly into one account and then transferring that money again outside of Wells Fargo (and often abroad)).

47. The quantum of evidence indicates that Wells Fargo deviated from federal regulations and law and was a knowing participant in the scheme. Wells Fargo breached contractual duties (and possibly fiduciary duties) to its clients who included Receivership Entities, which under receivership law would come to the litigation with clean hands as they are no longer "coerced" into continuing the risk-free scam. Additionally, Wells Fargo failed to know its customers, conduct basic due diligence, or follow the applicable regulations, law, and industry standards.

48. This goes well beyond Wells Fargo's clear failure to investigate numerous red flags and implement adequate internal controls. Wells Fargo appears to have determined to avoid compliance and anti-money laundering regulations and violated the requirements for the Bank Secrecy Act (31 U.S.C. Section 5311), which requires filing Suspicious Activity Reports under these circumstances.

---

[7] After September of 2017, the nominee account funds were sent directly out of the country without passing through the Triangle Wells Fargo account.

49. While additional evidence is likely to be found through traditional discovery means, the evidence gathered so far supports claims for aiding and abetting Apex and Triangle's breaches of their fiduciary duties and conversion of assets (which Apex and Triangle accomplished through money laundering). There are also other potential claims, such as gross negligence or breach of contract.

50. As described more fully in the concurrently-filed Motion to Engage Counsel, I reached out some months ago to experienced contingency-fee counsel, Glancy Prongay & Murray LLP, a national law firm based in Los Angeles with offices in New York and Berkeley. My belief in the merits of a potential case against Wells Fargo has been bolstered by the months-long pre-filing investigation conducted independently by Glancy Prongay & Murray.

51. Based on that investigation, Glancy Prongay & Murray has informed me that it is willing to participate in the case with an agreement to be responsible for the costs and expenses without risk to the Receivership Estate. Additionally, as noted in the motion, I believe that my law firm, McNamara Smith LLP, should continue in the litigation in a supporting role to Glancy Prongay & Murray, given my firm's relevant experience, the comprehensive nature of our investigation to date, and our knowledge of the relevant facts in the often complicated context of federal receivership law.

52. In addition to building the underlying allegations and developing the legal theories, I am presently exploring other specific features of Apex's litigation. Based on my conversations with counsel, I have concluded that the Apex Receivership Estate would benefit from coordinating this litigation with other plaintiffs who have claims against Wells Fargo for substantially assisting "risk-free" trial schemes operating in California. Most notably, of course, I am a potential plaintiff with claims against Wells Fargo in my separate capacity as Receiver for the Triangle Receivership Entities, whose interests I represent. Other additional persons with potential related claims against Wells Fargo include

Case 2:18-cv-09573-JFW-JPR   Document 148   Filed 03/03/20   Page 15 of 17   Page ID #:4466

consumers, who could sue individually and on behalf of a class of victims for Apex, Triangle, and the third known entity, Tarr, which I discuss briefly above.

53. Under established receivership law, I have no standing to bring any claims directly for victim consumers. *See, e.g., Liberte Capital Group*, 248 F. App'x 650, 656 (6th Cir. 2007) (receiver for entity had "no authority to bring a cause of action on behalf of the individual customers" defrauded by former insiders of the entity) (citation, internal quotation marks, and emphasis omitted). Notwithstanding that limitation, I would be able to pursue Apex's claims alongside a class action brought by victim consumers, either in the same lawsuit or in coordinated but separate lawsuits. I believe that this approach would result in the best outcome to the Receivership Estate for the ultimate benefit of the victims, and that is one of the primary reasons I reached out to the law firm of Glancy Prongay & Murray, which has significant expertise in complex plaintiff's class action lawsuits.

54. Coordinating Apex's claims against Wells Fargo with others seems especially wise here, given the bank's deep pockets and its reputation for hard-fought litigation gained in the spate of lawsuits against it in recent years. There is precedent for receivers and class litigants suing in the same case. *See, e.g., Cent. Cmty. Church of God v. Ent & Imler CPA Group, PC*, Case No. 1:03-cv-0678-DFH-VSS, 2004 U.S. Dist. LEXIS 24339 (S.D. Ind. 2004) (Receiver and class action brought claims in the same suit, and court denied motion to disqualify counsel, finding that the interests of the class and the Receiver were sufficiently aligned). All such persons are interested in identifying and proving a pattern of similar conduct where Wells Fargo substantially assisted these similarly-situated "risk-free" trial schemes. Moreover, there is no risk here that Wells Fargo has limited assets for which the various plaintiffs would need to compete.

///

///

14   Case No. 2:18-cv-09573-JFW (JPRx)
RECEIVER'S DECL. ISO MOTION TO ENGAGE CONTINGENT FEE COUNSEL

55. I have submitted the foregoing in an effort to provide the Court with the facts and circumstances relevant to my request that the Court authorize me to engage counsel under a contingent-fee arrangement to pursue claims against Wells Fargo.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 4th day of February, 2020, in San Diego, California.

/s/ Thomas W. McNamara
Thomas W. McNamara

# CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of March, 2020, pursuant to Fed. R. Civ. P. 5(b), I served by email, a true and correct copy of the foregoing **DECLARATION OF THOMAS W. MCNAMARA IN SUPPORT OF RECEIVER'S MOTION FOR AUTHORIZATION TO ENGAGE CONTINGENT FEE COUNSEL [UNDER SEAL]**, addressed to the following:

| | |
|---|---|
| Laura A. Zuckerwise<br>Brian N. Lasky<br>Darren Lubetzky<br>Federal Trade Commission<br>One Bowling Green, Suite 318<br>New York, NY 10004<br>Tel.: 212-607-2804 (Zuckerwise)<br>Fax: 212-607-2822<br>lzuckerwise@ftc.gov<br>blasky@ftc.gov<br>dlubetzky@ftc.gov | *Attorneys for Plaintiff Federal Trade Commission* |
| Faye Chen Barnouw<br>Federal Trade Commission<br>10990 Wilshire Blvd., Suite 400<br>Los Angeles, CA 90024<br>Tel.: 310-824-4343<br>Fax: 310 824 4380<br>fbarnouw@ftc.gov | *Attorneys for Plaintiff Federal Trade Commission* |
| Craig W. Duford<br>Duford Law, LLP<br>2131 Third Avenue<br>San Diego, CA 92101<br>Tel.: 619-565-5077<br>kelly@dufordlaw.com | *Attorney for Defendant David Barnett* |
| William I. Rothbard<br>Law Offices of William I. Rothbard<br>2333 Canyonback Road<br>Los Angeles, CA 90049<br>Tel.: 310-453-8713<br>Fax: 310-453-8715<br>bill.rothbardlaw.com | *Attorneys for Defendants Phillip Peikos; Apex Capital Group, LLC; Capstone Capital Solutions Limited; Clik Trix Limited; Empire Partners Limited; Interzoom Capital Limited; Lead Blast Limited; Mountain Venture Solutions Limited; Nutra Global Limited; Omni Group Limited; Rendezvous IT Limited; Sky Blue Media Limited; and Tactic Solutions Limited* |

  /s/ Edward Chang
Edward Chang
*Attorneys for Receiver,*
*Thomas W. McNamara*